MOLLY M. WHITE, Cal. Bar No. 171448
Email: whitem@sec.gov
J. CINDY ESON, Cal. Bar No. 219782
Email: esonjc@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Associate Regional Director
John W. Berry, Regional Trial Counsel
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036
Telephone: (323) 965-3998
Facsimile: (323) 965-3908



CLERK U.S. DISTRICT COURT

APR 11 2012

CENTRAL DISTRICT OF CALIFORNIA
BY            DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

SECURITIES AND EXCHANGE
COMMISSION,

        Plaintiff,

    vs.

SHERVIN NEMAN, and NEMAN
FINANCIAL, INC.,

        Defendants,

CASSANDRA C. NEMAN,

        Relief Defendant.

Case No. CV12- 03142 JHN (PLAx)

DECLARATION OF
JOSHUA L. BAUDER

I, Joshua L. Bauder, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I have personal knowledge of the matters set forth herein and, if called as a witness, could and would competently testify under oath hereto.

2.      I make this declaration in support of the Commission's *Ex Parte* Application for a Temporary Restraining Order And Orders: (1) Freezing Assets; (2) Prohibiting the Destruction of Documents; (3) Granting Expedited Discovery; (4) Requiring Accountings; and (5) Requiring Shervin Neman to Surrender his Passport; and an Order to Show Cause re Preliminary Injunction.

3.      I am a Securities Compliance Examiner with the Office of Compliance Inspections and Examinations of the U.S. Securities and Exchange Commission (the "Commission"). My office is located in the Commission's Los Angeles Regional Office ("LARO") in Los Angeles, California.

4.      I am also an attorney and have been a member of the State Bar of California since 2007.

5.      In the course of my duties with the Commission, I conduct examinations and inspections of investment advisers registered with the Commission. The purpose of these examinations and inspections is to ensure that investment advisers comply with the federal securities laws, with particular emphasis on compliance with the Investment Advisers Act of 1940. Other purposes include detecting fraud and other violations of the securities laws, fostering investment adviser compliance with those laws, and helping to ensure that the Commission continues to be aware of developments and areas of potential risk in the securities industry.

6.      My responsibilities include: (1) obtaining and analyzing documents, including bank records, brokerage records, financial records, and other company books and records; (2) making calculations and conclusions based on those records; (3) interviewing witnesses; and (4) applying federal statutes, rules and regulations promulgated by the Commission.

## THE COMMISSION STAFF'S EXAMINATION OF NEMAN FINANCIAL, INC.

7.     On December 15, 2011, two other members of the Commission staff and I (collectively, the "Examination Staff"), conducted an examination of Neman Financial, Inc. ("Neman Adviser") pursuant to the Commission's statutory authority over registered investment advisers (the "Examination").

8.     In preparing for the Examination, I confirmed that Neman Adviser was registered with the Commission as an investment adviser by utilizing a database, called the Investment Adviser Registration Depository ("IARD") maintained by the Financial Industry Regulatory Authority.  IARD provides the Commission, participating states, self-regulatory organizations, and other regulators and authorized users with licensing and registration information regarding investment advisers and their associated persons.

9.     According to the IARD database, Shervin Neman ("Mr. Neman") filed Form ADV (Uniform Application for Investment Adviser Registration) and Form ADV Part 2A (Firm Brochure) on behalf of Neman Adviser on September 2, 2011.  Attached hereto as Government Exhibit 49 and Exhibit 50, respectively, are true and correct copies of Neman Adviser's Form ADV and Form ADV Part 2A, each dated September 2, 2011.

10.     Among other things, Form ADV Part 2A states: "Mr. Neman graduated from UC Berkeley Phi Beta Kappa with a double major in business administration and molecular and cell biology with an emphasis in neurobiology." During an interview with the Examination Staff on December 15, 2011, Mr. Neman made the same statement with regard to his education and membership in Phi Beta Kappa.

11.     Form ADV and Form ADV Part 2A list Neman Adviser's website (www.nemanfinancial.com).  On November 22, 2011, I visited Neman Adviser's website and observed that, in addition to other biographical information regarding

1    Mr. Neman's background and experience, the website included the same language

2    as Form ADV Part 2A regarding Mr. Neman's education at the University of

3    California, Berkeley and membership in Phi Beta Kappa.  Additionally, on

4    November 22, 2011, I created a record of Neman Adviser's website in Adobe

5    portable document format ("PDF").  A true and accurate copy of the PDF record I

6    created on November 22, 2011 is attached as Government Exhibit 51.  On

7    February 28, 2012, I revisited Neman Adviser's website

8    (www.nemanfinancial.com), and observed that, although the website still included

9    other biographical information regarding Mr. Neman's background and

10   experience, the website no longer included any reference to Mr. Neman's

11   education at UC Berkeley or membership in Phi Beta Kappa.

12        12.    During the Examination, the Examination Staff interviewed Mr.

13   Neman, Neman Adviser's sole owner and chief executive officer.  We also sought

14   and obtained documents and other materials regarding the activities of Mr. Neman,

15   Neman Adviser and an affiliated purported hedge fund, Neman Financial, LP

16   ("Neman Fund").  The Examination Staff kept records of the Examination in the

17   ordinary course of business, and it was the ordinary course of business to make and

18   maintain such records.

19        13.    During an interview with the Examination Staff on December 15,

20   2011, Mr. Neman informed the Staff that he had changed his last name from

21   "Davatgarzadeh" to "Neman" because "Neman" was his mother's family name.

22   Mr. Neman also explained that his mother's family (Neman) is very prominent in

23   the Persian Jewish community and that this would help him raise the required

24   assets to remain registered with the Commission (i.e., minimum $100 million in

25   assets under management).

26        14.    During interviews on December 15, 2011 and December 19, 2011,

27   Mr. Neman informed the Examination Staff that:

28                a.    Neither Neman Adviser nor Neman Fund (the "Neman

1  Entities") had ever had any clients or investors.

2      b.   Neither of the Neman Entities had ever received any investor

3          funds.

4      c.   Neither of the Neman Entities had ever had a bank or brokerage

5          account, except an unfunded account at Citi Private Bank.

6      d.   Mr. Neman had never raised any funds or obtained any clients

7          or investors.

8      e.   Mr. Neman had paid all business expenses of the Neman

9          Entities using funds from his personal checking account (the

10          "JPMC Personal Checking Account") at JPMorgan Chase

11          Bank, NA ("JPMC") and such funds came from Mr. Neman's

12          savings and inheritance.

13     15.   In response to the Examination Staff's written request for statutorily

14  required books and records, Neman Adviser provided the staff with written

15  responses that generally denied the existence of such records, purportedly because

16  Neman Adviser had not formally begun operations, and neither of the Neman

17  Entities ever had any clients or investors.  True and correct copies of Neman

18  Adviser's written responses to the Examination Staff's document requests are

19  attached hereto as Government Exhibits 52 through 55.

20     16.   During the Examination, the Examination Staff reviewed a complaint

21  filed with the Commission on December 17, 2010, by an alleged investor in the

22  Neman Fund.  The Staff contacted this individual, Dr. Hamid Mirshojae,

23  interviewed him on the telephone and subsequently received documents relating to

24  his complaint.  Dr. Mirshojae informed the Staff that he had filed a police report

25  and entered into a settlement agreement with Neman Adviser after about two

26  months of negotiation with an attorney representing Neman Adviser.  Following

27  this settlement, Dr. Mirshojae received back his principal investment of $350,000

28  plus a subsequent payment of $10,000.

17.   During interviews with the Examination Staff, Mr. Neman did not disclose that he had received a complaint or entered into a settlement agreement with Dr. Mirshojae or any other clients or investors.  Rather, Mr. Neman affirmatively denied ever having any investors, ever receiving investor funds, or ever receiving any investor complaints.  Neman Adviser also provided the staff with written responses indicating the same. (See Government Exhibits 52 through 55).

18.   During an interview with the Examination Staff on December 19, 2011, Mr. Neman specifically and repeatedly denied that either of the Neman Entities had ever had an account at JPMC or UBS Financial Services, Inc. ("UBS").

## THE COMMISSION'S EXAMINATION STAFF REQUESTS BROKERAGE RECORDS OF NEMAN AND THE NEMAN ENTITIES.

19.   Pursuant to the Commission's statutory authority over registered broker-dealers, the Examination Staff issued document requests to two broker-dealers:  Morgan Stanley Smith Barney ("MSSB") and UBS for records of the accounts held by the Neman Entities and Mr. Neman.  These requests sought the production of, among other things, new account documents, account statements, transfers of cash or securities, deposits, checks, and wire transfers.

20.   Pursuant to the MSSB request, the Commission obtained records for the following accounts (collectively, the "MSSB Accounts"):

      a.   Shervin Neman:  account ending 3828, for the period November 17, 2010 to December 31, 2010 (the "MSSB Personal Account").

      b.   Neman Adviser:  account ending 3834, for the period November 17, 2010 to December 31, 2010 (the "MSSB Adviser Account").

1        c.    <u>Neman Fund</u>: account ending 3833, for the period November

2                 17, 2010 to January 31, 2011 (the "MSSB Fund Account").

3      21.     Based on my review of the records for the MSSB Accounts, I

4 determined the following:

5        a.     Mr. Neman signed all account opening documents and forms

6                 for the MSSB Accounts, and Mr. Neman was the sole

7                 authorized individual on the MSSB Accounts.

8        b.     The account documentation for each of the MSSB Accounts,

9                 which were opened on November 17, 2010, states that Mr.

10                Neman and the Neman Entities had a net worth of $25 million,

11                had $8 million in liquid assets, and had an income of $400,000.

12      22.     Pursuant to the UBS request, the Commission obtained records for the

13 following accounts (collectively, the "UBS Accounts"):

14        a.     <u>Shervin Neman</u>: account ending 557, for the period January

15                 27, 2011 through February 29, 2012 (the "UBS Personal

16                Account").

17        b.     <u>Neman Adviser</u>: account ending 559, for the period January

18                 27, 2011 through February 29, 2012 (the "UBS Adviser

19                Account").

20        c.     <u>Neman Fund</u>: account ending 560, for the period January 27,

21                 2011 through February 29, 2012 (the "UBS Fund Account").

22      23.     Based on my review of the records for UBS Accounts, I determined

23 the following:

24        a.     Mr. Neman signed all account opening documents and forms

25                 for the UBS Accounts, and Mr. Neman was the sole authorized

26                individual on the UBS Accounts.

27        b.     On May 2, 2011, Mr. Neman executed a Client Qualification

28                Form and Agreement for Options; this form indicated that Mr.

Neman had a net worth of $1 million, had $500,000 in liquid assets, and had annual income of $250,000.

## FORMAL ORDER OF EXAMINATION IN THE MATTER OF NEMAN FINANCIAL, INC.

24. On January 12, 2012, the Commission issued a formal order of investigation authorizing a nonpublic investigation (the "Investigation") into potential violations of the federal securities laws by the Neman Entities and their officers and directors, including Mr. Neman.

25. During the Investigation, Commission staff issued subpoenas to JPMC and Wells Fargo Bank, NA ("Wells Fargo"), among other financial institutions, for records concerning the account(s) of the Neman Entities and Mr. Neman. These subpoenas sought the production of documents, including account identifying information, account opening documents, account statements, signature cards, cancelled checks, bank wires, deposit slips, and copies of items deposited.

26. Pursuant to the Wells Fargo subpoena, the Commission obtained account records for the following account:

    a.   <u>Shervin Neman</u>:  account ending 8254 (the "Wells Fargo Account"), for the period from June 1, 2010 to September 15, 2010.

27. Based on my review of the records for the Wells Fargo Account, I determined that Mr. Neman was the sole account owner listed on the Wells Fargo Account.

28. Pursuant to the JPMC subpoena, the Commission obtained account records for the following accounts (collectively, the "JPMC Accounts"):

    a.   <u>Shervin Neman</u>: personal checking account ending 3957 (the "JPMC Personal Checking Account"), for the period from the account's inception in April 2010 through March 15, 2012.

    b.   <u>Neman Financial, Inc.</u>:  asset management account ending 7001

(the "JPMC Adviser Asset Account"), for the period from the account's inception in June 2010 through December 31, 2010.

   c.   Neman Financial, Inc.:  business checking account ending 6464 (the "JPMC Adviser Checking Account"), for the period from the account's inception in June 2010 through February 28, 2011.

   d.   Neman Financial, LP:  asset management account ending 4000 (the "JPMC Fund Asset Account"), for the period from the account's inception in June 2010 through December 10, 2011.

   e.   Neman Financial, LP:  business checking account ending 6456 (the "JPMC Fund Checking Account"), for the period from the account's inception in June 2010 through February 28, 2011.

29.   Based on my review of the JPMC Personal Checking Account records, I determined that Mr. Neman was the sole owner and authorized signatory on the account from its inception on April 14, 2010 until January 18, 2012, at which time Mrs. Cassandra C. Neman became an additional authorized signatory on the account.

30.   Based on my review of the JPMC Adviser Asset Account, JPMC Adviser Checking Account, JPMC Fund Asset Account, and JPMC Fund Checking Account records, I determined that Mr. Neman was the sole authorized signatory on each account from inception to closure of each account.

31.   Based on my review of the records for the JPMC Accounts, MSSB Accounts, and UBS Accounts, I determined that both of the Neman Entities previously had accounts at JPMC and MSSB.  Further, I determined that both of the Neman Entities had open accounts at UBS at the time of the Examination. During the interview with the Examination staff, Mr. Neman flatly denied the existence of these bank and brokerage accounts.

**REVIEW OF ACTIVITY IN THE MSSB AND UBS ACCOUNTS**

32.   Pursuant to my duties with the Commission, I reviewed the account records provided by MSSB and UBS.

33.   Based on my review of the records for the MSSB Accounts, I determined the following:

a.   The MSSB Adviser Account was never funded and had no activity.

b.   The MSSB Fund Account received only one deposit, totaling $420,000, which was reversed and returned "Per Branch Request" one day after it was received.

c.   The MSSB Personal Account:

(i)   Purchased shares of one security, an initial public offering ("IPO") of General Motors stock for $66,000 and sold those shares on the same day for a gain of $4,614.80.

(ii)   This purchase was covered by a single deposit of $66,000, which was transferred into the account from the JPMC Fund Asset Account.

(iii)   The proceeds from the purchase and sale described above totaled $70,614.80, and were used as follows:

1.   $60,000 was wired to an Investor (as defined in paragraph 40.a below).

2.   $7,000 was transferred to the JPMC Personal Checking Account.

3.   $3,500 was paid to a jewelry store.

34.   Based on my review of the records for UBS Accounts, I determined the following:

a.   As of February 29, 2012, the UBS Personal Account:

(i)   Had received total deposits of $275,695.75. All deposits were obtained from the JPMC Personal Checking Account, UBS Fund Account or from Granite Escrow Services.

(ii)   Had traded publicly listed securities resulting in realized and unrealized gains totaling $4,652.38.

(iii)   Had processed withdrawals totaling $266,719.61. Withdrawals were paid to the JPMC Personal Checking Account, the UBS Fund Account, and Granite Escrow Services.

(iv)   Had a closing account value of $13,628.52.

b.   As of February 29, 2012, the UBS Fund Account:

(i)   Had received two deposits totaling $18,800. Both deposits were received from the UBS Personal Account.

(ii)   Had traded publicly listed securities resulting in realized gains totaling $30.75.

(iii)   Had processed a single withdrawal of $18,630.75 on December 22, 2011. These funds were transferred to the UBS Personal Account.

(iv)   Had a closing account balance of $0.24 as of December 31, 2011.

c.   As of February 29, 2012, the UBS Adviser Account had never been funded and had no activity or statements.

35.   Based on my review of the records for the Wells Fargo Account, I determined the following:

a.   As of August 24, 2010, the Wells Fargo Account had a negative balance of $117,755.78. This negative balance was primarily the result of several bounced deposits and two withdrawals

totaling $115,000. The first of these withdrawals was a $55,000 check used to return funds (principal and purported profits) to an Investor (as defined in paragraph 40.a below). The second of these withdrawals was a $60,000 check written to a jewelry store; this check had "ring" written on the memo line. A true and correct copy of the check for $60,000, dated July 24, 2010, is attached hereto as Government Exhibit 56.

b.   On August 25, 2010, the Wells Fargo Account received a deposit of $117,755.78 resulting from transferred funds from the JPMC Personal Checking Account. This deposit returned the Wells Fargo Account balance to $0, and the account had no further activity and was closed on or before September 15, 2010.

## REVIEW AND ANALYSIS PROCEDURES FOR
## THE JPMC ACCOUNTS

36.   I used the following procedures to review and analyze the five JPMC Accounts.

37.   Other Commission staff and I entered the data contained in the JPMC Accounts records into an Excel spreadsheet for each individual account. I tested the accuracy of the data in the spreadsheets against underlying documents and corrected the spreadsheets where necessary.

38.   The spreadsheets contain the date and amount of each credit and debit (whether check, cash, wire, or transfer) to the individual accounts. The spreadsheets also identify the source or recipient of each credit and debit to the accounts, except for: (i) transactions for which the banks were unable to locate underlying documentation; (ii) transactions for amounts of less than $500; and (iii) transfers among related accounts (i.e., deposits, credits, or transfers that came from accounts in the name of the Neman Entities or Mr. Neman).

39.   I relied on these spreadsheets in performing my analysis of the JPMC Accounts' records.

40.   I identified and grouped deposits ("Sources of Funds") recorded in the spreadsheets into one of the following three categories:  (i) Investor (i.e., the amount of investor funds deposited); (ii) Cash; and (iii) Other.

      a.   In the "Investor" category, I aggregated all of the deposits:  (i) that came from individuals or entities identified as investors based on a review of bank records, investor interviews, and sworn testimony before Commission staff, unless the supporting documentation included a memo line that indicated the funds were not deposited for investment purposes (e.g., "Happy Birthday"); or (ii) for which I reviewed documentation that included memo lines indicating that the funds were intended for investment purposes (e.g., "Groupon IPO investment" or "Purch  1,250 shrs of Facebook at 28.50/shr"); or (iii) of greater than $50,000 that came from individuals and for which some other explanation was not readily available.

      b.   In the "Cash" category, I aggregated all cash deposits; and

      c.   In the "Other" category, I aggregated all the remaining deposits, credits, or transfers.

41.   I then identified and grouped the withdrawals ("Uses of Funds") recorded in the spreadsheets into one of the following eight categories:  (i) Investment Return; (ii) Personal; (iii) Political & Charitable; (iv) Travel, Hotel, Restaurant & Entertainment; (v) Business or Possibly Business; (vi) Legal & Professional; (vii) Cash & ATM; and (viii) Other.

      a.   In the "Investment Return" category, I aggregated all payments to individuals identified as Investors as described in paragraph 40.a.

b. In the "Personal" category, I aggregated all disbursements that were to payees of a personal nature, including disbursements relating to rent and house hunting costs, wedding expenses, automobile expenses (excluding insurance) and loan payments, retail purchases of clothing and jewelry, medical expenses (excluding insurance), repayment of personal and student loans, legal judgments and court fees, and payments to Mr. Neman's or his spouse's immediate family.

c. In the "Political and Charitable" category, I aggregated all disbursements to political campaigns or causes, and charitable donations.

d. In the "Travel, Hotel, Restaurant & Entertainment" category, I aggregated all payments to hotels, airlines, car rental companies, restaurants, entertainment venues (e.g., Staples Center) and concierge or ticket purchasing services (e.g. Stubhub, Inc. and Broadway.com).

e. In the "Business or Possibly Business" category, I aggregated all payments for business services (excluding those included in the "Legal and Professional" category and the "Travel, Hotel, Restaurant & Entertainment" category), office rental and parking, office supplies, furniture or equipment, payroll, commissions paid, expense reimbursements paid, business taxes, insurance premiums, and other expenses which Neman Adviser had previously indicated to the Examination Staff were business expenses by providing the Examination Staff with a receipt, invoice, or similar document.

f. In the "Legal & Professional" category, I aggregated all disbursements relating to legal, professional, or related services,

13

1   including, payments to lawyers, arbitrators, accountants, and

2   bail bondsmen.

3   g.   In the "Cash & ATM" category, I aggregated all transactions

4   marked "Withdrawal," "ATM withdrawal," or similar

5   description on the bank statements of the JPMC Neman

6   Accounts (excluding withdrawals for cashier's checks, which

7   were categorized based on the identity of the payee and/or the

8   memo line, if any).

9   h.   In the "Other" category, I aggregated all remaining

10   disbursements, including those I could not assign to another

11   category due to insufficient documentation.

12   42.   Finally, I offset the amount in each of the Uses of Funds categories

13   listed above, with any deposits, credits, or transfers within the same category:  (i)

14   that were marked as "Refund," "Return," "Reimbursement," or similar description

15   in either the bank statements or other documentation produced by JPMC; or (ii)

16   that offset the exact amount of a prior withdrawal to the same retailer or other

17   business. Attached hereto as Government Exhibit 57 is a true and correct copy of

18   the spreadsheet summarizing the Source of Funds, and attached hereto as

19   Government Exhibit 58 is a true and correct copy of the spreadsheet summarizing

20   the Uses of Funds.[1]

21   43.   My review and analysis of the combined Sources of Funds and Uses

22   of Funds in the JPMC Accounts has led me to make the following observations and

23   conclusions:

24   ///

25

26

27   [1] The Commission presents Government Exhibits 57 and 58 as summaries pursuant to Rule 1006
of the Federal Rules of Evidence.  Copies of the bank records are available for examination or

28   copying by Defendants, and the Commission will provide the Court with copies of the bank
records at the Court's request.

**Sources of Funds**

a.   Of the $7,515,609 deposited into the JPMC Neman Accounts from April 14, 2010 through March 15, 2012, $7,431,768 consisted of Investor deposits.

b.   The remaining $83,841 in deposits consisted of:

    (i)   $61,400 of Cash deposits.

    (ii)   $22,442 of Other deposits, of which:

        1.   $17,271 consisted of money from family members, wedding gifts, a federal tax refund, personal loans, birthday money; and

        2.   $5,171 could not be categorized.

**Uses of Funds**

c.   Of the $7,049,862 withdrawn from the JPMC Accounts from April 14, 2010 through March 15, 2012, $5,454,649 was distributed to Investors (including purported profits and return of principal).

d.   The remaining $1,595,213 in withdrawals from the JPMC Accounts were categorized as follows:

    (iii)   $445,429 of Personal expenses, including:

        1.   $160,845 in expenses relating to house hunting, including transfers into two different escrow accounts relating to two different homes in Beverly Hills;

        2.   $90,852 in wedding related expenses, including $84,952 paid to the Beverly Wilshire Hotel;

        3.   $57,008 in rental payments and related costs;

        4.   $38,608 of payments to family members;

        5.   $28,973 in automobile payments, which consisted primarily of leasing and financing payments relating

to a Mercedes and a BMW;

6. $19,908 in retail purchases from Saks Fifth Avenue, Chanel, Winnie Couture, Bloomindales, Dolce, and Nordstrom, among others;

7. $14,325 of legal settlements and court fees relating to Mrs. Neman, including:

   a. A cashier's check for $7,645, dated February 21, 2012, which was requested by Cassandra C. Neman and includes a memo line that states: "PAYOFF CASE #VS10501007"; a review of court records disclosed that Cassandra Neman (formerly Cassandra Grill) was a defendant in a case with that number filed in Alameda County on February 26, 2010;

   b. A cashier's check for $2,500, dated February 21, 2012, which was requested by Cassandra C. Neman and includes a memo line that states: "Settled, Payment in Full for Cassandra Grill"; and

   c. A cashier's check for $4,180, dated February 21, 2012, which was requested by Cassandra C. Neman and includes a memo line that states: "Payment in Full, Court Case #09M14104 $4100 Judgement [sic] $80 Court Fees"; a review of court records disclosed that Cassandra Neman was a defendant in a case with that number filed in Los Angeles County on December 23, 2009.

8. $12,000 in loans or repayment of personal loans;

9. $10,884 of jewelry purchases; and

10. $12,025 of medical expenses, student loan payments, and various household or personal expenses.

(iv) $510,952 of Political & Charitable contributions and donations, including:

1. $300,000 contributed to The Unity Fund on November 3, 2011;

2. $100,000 donated to the Elton John AIDS Foundation on February 27, 2012;

3. $71,600 contributed to the Obama Victory Fund 2012 on June 7, 2011; and

4. $25,000 donated to Be the Change, Inc. on December 31, 2011.

(v) $177,415 of Travel, Hotel, Restaurant & Entertainment expenses, including:

1. $127,426 of travel expenses, which consisted primarily of airfare for Mr. and Mrs. Neman;

2. $43,497 of entertainment expenses, including a check to the Staples Center for $25,000 processed on February 29, 2012; and

3. $6,493 of hotel and restaurant expenses.

(vi) $157,765 of Business or Possibly Business expenses, including:

1. $65,305 for office rental;

2. $56,627 for what appears to be payroll;

3. $12,223 for insurance; and

4. $23,610 for miscellaneous expenses.

(vii) $140,890 of Legal and Professional expenses.

(viii) $108,850 of Other expenses.

1            (ix)   $53,913 of Cash & ATM withdrawals.

2            **SUMMARY OF ACCOUNT ACTIVITY**

3     44.     Based on my review of the records for the JPMC Accounts, the MSSB

4 Accounts, the UBS Accounts, and the Wells Fargo Account (collectively, the

5 "Accounts") and my review of the Mirshojae Declaration, I have made the

6 following observations and calculations:

7        a.     The Accounts received Investor deposits of $7,481,768 from

8               July of 2010 to March 15, 2012, which consisted of:

9               (i)     $7,431,768 deposited into the JPMC Accounts.

10               (ii)     $50,000 from Dr. Mirshojae, which appears to have been

11                    deposited in the Wells Fargo Account in July of 2010.

12        b.     Investors received $5,569,649 in principal and purported profits

13               paid from the Accounts from July 2010 to March 15, 2012,

14               which consisted of:

15               (i)     $5,454,649 paid from the JPMC Accounts.

16               (ii)     $60,000 paid from the MSSB Accounts.

17               (iii)     $55,000 from the Wells Fargo Account.

18            **COMMISSION STAFF'S INVERVIEW OF INVESTOR DAVID**

19            **TABAN**

20     45.     On March 26, 2012, three other members of the Commission staff and

21 I interviewed investor David Taban at the LARO. Mr. Taban was accompanied by

22 a real estate attorney who works for Mr. Taban's company, Jade Enterprises. At

23 the interview, Mr. Taban provided the Commission staff with copies of eleven

24 different documents pertaining to his investments with Mr. Neman.

25     46.     During the interview, Mr. Taban said that:

26        a.     In November 2010, Mr. Neman approached Mr. Taban about

27               investing in "pre-IPO" shares of General Motors ("GM"). Mr.

28               Neman told Mr. Taban that he did not have to hold the shares

for six months and that Mr. Neman would sell them on the day of the IPO or the following day when the stock price was at its highest.  Mr. Neman said once he sold the shares, he would repay the principal and profit to Mr. Taban.

    b.   Based on Mr. Neman's representations, Mr. Taban and other members of his family, including his brother, Albert, pooled their funds and invested $425,000 in the GM IPO.

    c.   On or about November 16, 2010, Mr. Taban sent a letter to Mr. Neman that spelled out the terms of their agreement.

47.    Mr. Taban provided the staff with a copy of the November 16, 2010 letter agreement.  A true and correct copy of the letter agreement is attached hereto as Government Exhibit 59.

48.    During the interview, Mr. Taban said that:

    a.   On or about November 16, 2010, Mr. Taban and his brother wired their funds to a bank account in the name of Neman Financial, LP, following the wire instructions that Mr. Taban had received from Mr. Neman.  A short time later, Mr. Neman contacted Mr. Taban to say that he had sold the GM shares on the first day of the IPO and made a profit of approximately $4,000.  Mr. Neman repaid the principal to Mr. Taban and his family over a three-month period from about mid-November 2010 to late February 2011.

    b.   Although the profit on the GM IPO was small, Mr. Taban felt good about investing with Mr. Neman and he felt confident about investing with Mr. Neman again in the future.  Mr. Taban was the only one in his family to invest with Mr. Neman again after the GM IPO.

49.    During the interview, Mr. Taban said that:

1          a.     In January 2011, Mr. Neman approached Mr. Taban about

2                  investing in "pre-IPO" shares of BankUnited.

3          b.     On or about January 27, 2011, Mr. Taban sent a letter to Mr.

4                  Neman that spelled out the terms of their agreement.

5     50.    Mr. Taban provided the staff with a copy of the January 27, 2011

6 letter agreement. A true and correct copy of the letter agreement is attached hereto

7 as Government Exhibit 60. The letter agreement states that Mr. Taban's $420,000

8 will be used only to reimburse the Neman Fund for purchasing the BankUnited

9 shares on behalf of Mr. Taban and that these shares have already been purchased

10 and sold for a profit of not less than 9.25%. The letter agreement also states that

11 Mr. Taban will receive a return of his $420,000 in principal and a profit of not less

12 than $35,000 by February 11, 2011.

13     51.    During the interview, Mr. Taban said that based on Mr. Neman's

14 representations, Mr. Taban invested $420,000 in the BankUnited shares.

15     52.    Based on my review of the JPMC Personal Checking Account

16 records, I determined that:

17          a.     On January 28, 2011, $420,000 was wired from the David and

18                  Violet Taban Living Trust bank account to the JPMC Personal

19                  Checking Account.

20          b.     On or about March 4, 2011, Mr. Neman repaid Mr. Taban's

21                  $420,000 by a personal check from the JPMC Personal

22                  Checking Account.

23     53.    The Commission staff showed Mr. Taban a copy of a $420,000 check,

24 dated March 4, 2011, from the JPMC Personal Checking Account that had been

25 subpoenaed from JPMC, a true and correct copy of which is attached hereto as

26 Government Exhibit 61. Mr. Taban confirmed that Exhibit 61 is copy of the

27 $420,000 check he had received from Mr. Neman.

28     54.    During the interview, Mr. Taban said that:

    a.    On or about March 7, 2011, Mr. Neman approached Mr. Taban about investing in "pre-IPO" shares of HCA.

    b.    As with the GM IPO, Mr. Neman represented that he would sell the HCA shares on the day of the IPO, or the following day, when the stock price was at its highest, and repay the principal and any profit to Mr. Taban.

    c.    Mr. Neman sent Mr. Taban a letter on Neman Financial letterhead that spelled out the terms of their agreement.

55.    Mr. Taban provided the staff with a copy of a letter agreement dated March 7, 2011, a true and correct copy of which is attached hereto as Government Exhibit 62.    The letter agreement was drafted as if it came from Mr. Taban to Mr. Neman and it followed the same format of the letters Mr. Taban had sent Mr. Neman for the GM and BankUnited IPOs. .

56.    Based on Mr. Neman's representations, Mr. Taban invested $300,000 in the HCA IPO.

57.    Based on my review on the JPMC Personal Checking Account records, I determined that on March 7, 2011, $300,000 was wired from the David and Violet Taban Living Trust bank account to the JPMC Personal Checking Account.  My review of the account statements for the JPMC Personal Checking Account also revealed that the $300,000 wire into the JPMC Personal Checking Account from the Tabans included the notation, "Hca Ipo Stock Purchase."

58.    During the interview, Mr. Taban said that:

    a.    On or about April 6, 2011, Mr. Neman repaid Mr. Taban's $300,000 principal plus a $10,000 profit from Mr. Taban's investment in the HCA shares, by personal check.

    b.    Mr. Taban deposited the check from Mr. Neman into his account at Israel Discount Bank.  A short time later, Mr. Taban's bank notified him that the $310,000 check from Mr.

1
2

            Neman had bounced for insufficient funds and that he had been

            assessed a fee.

3
4
5
6
7

    c.    Mr. Taban contacted Mr. Neman about the bounced check and

            Mr. Neman told Mr. Taban that some money had come in late

            or that he had written another check and was a little short in the

            account.  Mr. Taban told Mr. Neman that he would have to

            repay him the $310,000 with a cashier's check.

8       59.    The Commission staff showed Mr. Taban a copy of a $310,000

9 check, dated April 6, 2011, from the JPMC Personal Checking Account that had

10 been subpoenaed from JPMC, a true and correct copy of which is attached hereto

11 as Government Exhibit 63.  Mr. Taban confirmed that Exhibit 63 was a copy of the

12 $310,000 check, which had bounced, that he had received from Mr. Neman

13 representing his principal and profit from the HCA investment.

14       60.    During the interview, Mr. Taban said that on or about April 12, 2011,

15 Mr. Neman sent Mr. Taban a $500 personal check from the JPMC Personal

16 Checking Account to compensate Mr. Taban for the bank fees he had incurred

17 when the $310,000 check had bounced.

18       61.    The Commission staff showed Mr. Taban a copy of a $500 check,

19 dated April 12, 2011, from the JPMC Personal Checking Account that had been

20 subpoenaed from JPMC, a true and correct copy of which is attached hereto as

21 Government Exhibit 64.  Mr. Taban confirmed that Exhibit 64 was copy of the

22 $500 check he had received from Mr. Neman.

23       62.    During the interview, Mr. Taban said that on or about April 19, 2011,

24 Mr. Taban received a cashier's check in the amount of $310,000 from Mr. Neman

25 to replace the $310,000 personal check that had bounced.

26       63.    During the interview, Mr. Taban said that:

27
28

    a.    On or about May 16, 2011, Mr. Neman approached Mr. Taban

            about investing in pre-IPO shares of LinkedIn.  Mr. Neman

1        represented to Mr. Taban that he would buy and sell the
2        LinkedIn IPO shares and repay his principal and any profits.
3    b.    On or about May 16, 2011, Mr. Neman sent Mr. Taban a letter
4        on Neman Financial letterhead that identified the terms of their
5        agreement.
6    64.    Mr. Taban provided the staff with a copy of the May 16, 2011 letter
7    agreement, a true and correct of which attached hereto as Government Exhibit 65.
8    The letter was drafted as if it came from Mr. Taban to Mr. Neman and followed the
9    same format of the letters Mr. Taban had sent Mr. Neman for the GM and
10   BankUnited IPOs.
11   65.    During the interview, Mr. Taban said that based on Mr. Neman's
12   representations, Mr. Taban initially invested $126,000 in the LinkedIn IPO and
13   that he invested another $100,000 shortly thereafter to increase his total investment
14   in the LinkedIn IPO to $226,000.
15   66.    Based on my review on the JPMC Personal Checking Account
16   records, I determined that:
17   a.    On May 16, 2011, $126,000 was wired from the David and
18        Violet Taban Living Trust bank account to the JPMC Personal
19        Checking Account.  My review of the account statements for
20        the JPMC Personal Checking Account also revealed that the
21        $126,000 wire into the JPMC Personal Checking Account from
22        the Tabans included the notation, "LinkedIn Ipo Stock
23        Purchase."
24   b.    On May 19, 2011, another $100,000 was wired from the David
25        and Violet Taban Living Trust bank account to the JPMC
26        Personal Checking Account.
27   67.    The Commission staff showed Mr. Taban a copy of a $470,000 check,
28   dated July 16, 2011, from the JPMC Personal Checking Account that had been

23

1  subpoenaed from JPMC, a true and correct copy of which is attached hereto as

2  Government Exhibit 66. Mr. Taban confirmed that Exhibit 66 was a copy of the

3  $470,000 check he had received from Mr. Neman.

4      68.    During the interview, Mr. Taban said that he had deposited the

5  $470,000 check from Mr. Neman into his account at Israel Discount Bank. A few

6  days later, Mr. Taban's bank notified him that the $470,000 check from Mr.

7  Neman had bounced for insufficient funds. Mr. Taban contacted Mr. Neman about

8  the bounced check and again told him that he would have to repay $470,000 with a

9  cashier's check. On or about July 21, 2011, Mr. Taban received a cashier's check

10  in the amount of $470,000 from Mr. Neman.

11      69.    During the interview, Mr. Taban said that:

12          a.    In July 2011, Mr. Neman approached Mr. Taban about

13              investing in "pre-IPO" shares of Dunkin Brands Group

14              ("Dunkin").

15          b.    Mr. Neman represented to Mr. Taban that he would buy and

16              sell the Dunkin IPO shares and repay his principal and any

17              profits.

18          c.    On or about July 25, 2011, Mr. Neman and Mr. Taban entered

19              into an IPO Purchase Agreement that set forth the terms of their

20              agreement regarding the Dunkin IPO shares.

21      70.    Mr. Taban provided the Commission staff with a copy of the Dunkin

22  Brands IPO Purchase Agreement, a true and correct copy of which is attached

23  hereto as Government Exhibit 67. The agreement states that Mr. Taban would

24  invest $150,000, which would be returned by August 25, 2011.

25      71.    During the interview, Mr. Taban said that based on Mr. Neman's

26  representations, Mr. Taban invested $150,000 in the Dunkin IPO.

27      72.    Based on my review on the JPMC Personal Checking Account

28  records, I determined that on July 25, 2011, $150,000 was wired from the David

1  and Violet Taban Living Trust bank account to the JPMC Personal Checking

2  Account. My review of the account statements for the JPMC Personal Checking

3  Account also revealed that the $150,000 wire into Mr. Neman's account from the

4  Tabans included the notation, "Ipo Dunkin Brands Grp (Dnkn)."

5      73.    During the interview, Mr. Taban said that on or about September 8,

6  2011, Mr. Taban received a personal check from Mr. Neman in the amount of

7  $190,000.

8      74.    The Commission staff showed Mr. Taban a copy of a $190,000 check,

9  dated September 8, 2011, from the JPMC Personal Checking Account that had

10 been subpoenaed from JPMC, a true and correct copy of which is attached hereto

11 as Government Exhibit 68. Mr. Taban confirmed that Exhibit 68 was copy of the

12 $190,000 check he had received from Mr. Neman.

13     75.    During the interview, Mr. Taban said that:

14          a.    Mr. Taban deposited the $190,000 check from Mr. Neman into

15              his account at Israel Discount Bank. A few days later, Mr.

16              Taban's bank notified him that the $190,000 check from Mr.

17              Neman had bounced for insufficient funds.

18          b.    Mr. Taban contacted Mr. Neman about the bounced check and

19              told Mr. Neman that he would have to repay the $190,000 to

20              Mr. Taban with a cashier's check.

21          c.    On or about September 20, 2011, Mr. Taban received from Mr.

22              Neman two cashier's check totaling $190,000 to replace the

23              personal check that had bounced. One cashier's check was for

24              $150,000, and the other was for $40,000.

25     76.    During the interview, Mr. Taban said that:

26          a.    In September 2011, Mr. Neman approached Mr. Taban about

27              investing in a company called ZocDoc, Inc. Mr. Neman told

28              Mr. Taban that this investment was different than the IPO

shares he had previously invested in because he would not
receive his principal and profit for six months to a year.

    b.   Mr. Taban told Mr. Neman that he would invest in ZocDoc
only if Mr. Neman guaranteed to pay him a certain return if Mr.
Taban decided that he did not want hold the shares for six
months or more.

    c.   On or about September 26, 2011, Mr. Taban sent a letter to Mr.
Neman that spelled out the terms of their agreement.

77.    Mr. Taban provided the staff with a copy of the September 26, 2011 letter agreement, a true and correct copy of which is attached hereto as Government Exhibit 69. This agreement includes a personal guarantee from Mr. Neman that Mr. Taban would earn a minimum $63,000 profit on his investment.

78.    During the interview, Mr. Taban said that:

    a.   Based on Mr. Neman's representations, Mr. Taban invested
$126,000 in ZocDoc stock.

    b.   Mr. Taban also asked Mr. Neman for some written information
about ZocDoc for his files, but Mr. Neman never provided any.

79.    Based on my review on the JPMC Personal Checking Account records, I determined that on September 27, 2011, $126,000 was wired from the David and Violet Taban Living Trust bank account to the JPMC Personal Checking Account. My review of the account statements for the JPMC Personal Checking Account revealed that the $126,000 wire into the JPMC Personal Checking Account from the Tabans included the notation, "Zocdoc, Inc. Stock Purchase."

80.    During the interview, Mr. Taban said that in approximately November 2011, Mr. Neman approached Mr. Taban about investing in "pre-IPO" shares of Groupon. Mr. Neman represented to Mr. Taban that he would buy and sell the Groupon shares and repay his principal and any profits.

81.   Mr. Taban provided the Commission staff with copies of the following documents:

    a.   A November 2, 2011 letter agreement, a true and correct of which is attached hereto as Government Exhibit 70.  This letter is drafted on Neman Adviser letterhead as if it came from Mr. Taban to Mr. Neman.

    b.   An IPO Purchase Agreement regarding the purchase and sale of the Groupon shares, which included a representation that Mr. Taban's principal and profit would returned by December 4, 2011.  A true and correct copy of the IPO Purchase Agreement is attached hereto as Government Exhibit 71.

    c.   A November 2, 2011 letter agreement, a true and correct of which is attached hereto as Government Exhibit 72.

82.   During the interview, Mr. Taban said that based on Mr. Neman's representations, Mr. Taban invested $500,000 in the Groupon IPO.  This was Mr. Taban's single largest investment with Mr. Neman.  But given that Mr. Neman always returned Mr. Taban's principal and profit roughly on time, and he promptly provided cashier's checks if his personal checks bounced, Mr. Taban felt comfortable investing larger amounts of money with Mr. Neman.

83.   Based on my review on the JPMC Personal Checking Account records, I determined that on November 3, 2011, $500,000 was wired from the David and Violet Taban Living Trust bank account to the JPMC Personal Checking Account.

84.   During the interview, Mr. Taban said that about two weeks after his investment in the Groupon IPO, Mr. Neman approached Mr. Taban about investing in "pre-IPO" shares of Angie's List.

85.   Mr. Taban provided the Commission staff with a copy of the following documents:

a.  An Angie's List IPO Purchase Agreement, dated November 17, 2011, a true and correct copy of which is attached hereto as Government Exhibit 73.  This IPO Purchase Agreement includes a representation that Mr. Taban's principal and profit would be returned by December 18, 2011.

b.  A letter agreement dated November 17, 2011, a true and correct copy of which is attached hereto as Government Exhibit 74.

86.  Based on my review on the JPMC Personal Checking Account records, I determined that on November 17, 2011, $500,000 was wired from the David and Violet Taban Living Trust bank account to the JPMC Personal Checking Account.

87.  The Commission staff showed Mr. Taban a copy of a $680,000 check, dated December 8, 2011, from the JPMC Personal Checking Account that had been subpoenaed from JPMC, a true and correct copy of which is attached hereto as Government Exhibit 75.  This check includes the notation, "Groupon ipo investment."  Mr. Taban confirmed that Exhibit 75 was a copy of the $680,000 check he had received from Mr. Neman.

88.  During the interview, Mr. Taban said that:

a.  Mr. Taban understood from Mr. Neman that the $680,000 represented a return of his $500,000 principal investment in Groupon plus $180,000 in profit.

b.  Mr. Taban deposited the $680,000 check from Mr. Neman into his bank account.  However, Mr. Taban's bank later notified him that the check from Mr. Neman had bounced for insufficient funds.

c.  Mr. Taban contacted Mr. Neman about the bounced check and again, insisted that Mr. Neman pay him with a cashier's check. On or about December 23, 2011, Mr. Taban received two

28

cashier's checks from Mr. Neman:  one check was for $207,000 and the other was for $259,000.

    d.    About a week later, on or about December 29, 2011, Mr. Taban received another cashier's check from Mr. Neman in the amount of $27,000.

    e.    Mr. Taban understood from Mr. Neman that these three checks, totaling $493,000, represented his profits from his investments in Groupon, Angie's List, and ZocDoc, but Mr. Taban did not remember which check corresponds to which investment.

    f.    Mr. Neman told Mr. Taban that he sold the ZocDoc shares early because he didn't want to hold them anymore.

89.    The Commission staff showed Mr. Taban a copy of a $1 million check, dated December 30, 2011, from the JPMC Personal Checking Account that had been subpoenaed from JPMC, a true and correct copy of which is attached hereto as Government Exhibit 76.  This check includes the notation, "Principal on GRPN & Angie's list."  Mr. Taban confirmed that Government Exhibit 76 was a copy of the $1 million check he received from Mr. Neman.

90.    During the interview, Mr. Taban said that:

    a.    Mr. Taban deposited the $1 million check, but his bank later notified him that the check from Mr. Neman had bounced for insufficient funds.

    b.    Mr. Taban contacted Mr. Neman about the bounced check and again insisted that Mr. Neman repay him with a cashier's check. Mr. Taban was very concerned because his investments in Groupon and Angie's List totaled $1 million, the largest investment he had ever made with Mr. Neman, and both were outstanding at the same time.

    c.    Over the next few weeks, Mr. Taban spoke with Mr. Neman

frequently about the return of his $1 million in principal.  Each time Mr. Taban spoke with him, Mr. Neman said he would send the principal the next day, or he gave Mr. Taban an excuse as to why the payment was delayed, such as he was sick or his wife was having difficulties with her pregnancy.

d.  Sometime around January 31 or February 1, 2012, Mr. Taban received three cashier's checks totaling $1 million from Mr. Neman:  two checks were in the amount of $250,000, and the third check was for $500,000.  The three cashier's checks replaced the $1 million bounced personal check that Mr. Taban had received from Mr. Neman.

91.  During the interview, Mr. Taban said that:

a.  In late February 2012, Mr. Taban received a letter from the Commission staff inquiring about his investments with Mr. Neman.  Mr. Taban contacted Mr. Neman, and Mr. Neman told him that it was standard and routine for the SEC to send letters like that when someone is a new member of the SEC.

b.  Mr. Neman also told Mr. Taban that two or three people from the SEC came to his office to conduct an audit, and that everything went well.

c.  Mr. Neman also told Mr. Taban that he had passed the test to become a fund manager.

d.  Mr. Taban also recently spoke with Mr. Neman about purchasing "pre-IPO" shares of Facebook at a price of $30 per share.  Mr. Neman told Mr. Taban that the minimum investment was 100,000 shares or $3 million.

e.  Mr. Taban told Mr. Neman that he and his friends were interested in pooling their funds to make a single $3 million

30

investment in the "pre-IPO" Facebook shares.   Mr. Neman told
Mr. Taban that it was very difficult to get shares at that price
but that he was still working on it.

f.   Mr. Neman is not a relative of Mr. Taban's.

g.   None of the funds Mr. Taban gave to Mr. Neman were intended
to be either personal or business loans.

h.   All of the funds Mr. Taban gave Mr. Neman were intended to
be used for the investment opportunities that Mr. Neman
presented to him.

i.   Mr. Taban understood that Mr. Neman would receive a portion
of the profits Mr. Taban made as compensation, though Mr.
Neman did not tell Mr. Taban how much compensation he
would receive.

j.   Mr. Neman did not tell Mr. Taban that he would use the funds
Mr. Taban gave him to pay for his personal expenses.

k.   Mr. Neman did not tell Mr. Taban that he would use the funds
Mr. Taban gave him to pay for his business expenses.

l.   Mr. Neman did not tell Mr. Taban that he would use the funds
Mr. Taban gave him to repay principal or returns to other
investors.

m.   Mr. Neman did not tell Mr. Taban that the funds Mr. Neman
sent him as repayment of principal or as profits were actually
funds that Mr. Neman received from other investors.

### STATUS OF INVESTOR FUNDS AND AVAILABLE ASSETS

92.   Based on my review of the records for the Accounts and my review of
the Mirshojae Declaration, I have made the following observations and conclusions
regarding the status of Investor profits and unreturned Investor principal as of
March 15, 2012:

31

a.  Six of the eleven Investors had received a full return of their principal and had received a total of $779,499 in purported profits. For purposes of this analysis, I grouped all Investors that were family members, spouses, or entities that were controlled or owned by family members or spouses (e.g., limited partnerships or limited liability companies). If I had not grouped Investors as described above, the total number of Investors would be greater, as would the purported profits received by some of these Investors. These six investors included:

    (i)  Two investors who received a return of only principal.

    (ii)  Three investors who received their principal plus purported profits of $41,000.

    (iii)  One group of Investors (four individual family members, two trusts, and two other entities) who received their principal plus purported profits of $738,499.

b.  The remaining five Investors had not received a full return of their principal and had total outstanding principal investments of $2,691,618. For purposes of this analysis I treated all funds returned to Investors as returns of principal, even where returned funds appeared to represent purported profits. If I had not treated all returned funds as returns of principal, the total unreturned principal for the five Investors described above would be greater. I grouped all Investors as described in paragraph a. above. If I had not grouped Investors as described, the total number of Investors would be greater as would the number of Investors that had not received a full return of their principal and the amount of principal that had not been

1   returned.

2         c.    The most recent deposit of Investor funds totaled $440,000,

3             which was deposited into the JPMC Personal Checking

4             Account on February, 16, 2012.  Immediately before this

5             deposit, the JPMC Personal Checking Account had a balance of

6             $12,192.

7         d.    The two most recent repayments of Investor principal were paid

8             from the JPMC Personal Checking Account on February 22,

9             2012 and February 23, 2012 and totaled $35,625 and $100,000,

10            respectively.

11      93.    Based on my review of the records for the Accounts, I have made the

12  following observations and conclusions regarding the available assets in the bank

13  and brokerage accounts of Mr. Neman and the Neman Entities:

14        a.    As of March 15, 2012, the JPMC Personal Checking Account

15            balance was $96,064 and all other JPMC Accounts were closed.

16        b.    As of February 29, 2012, the UBS Personal Account balance

17            was $13,628.52 and the UBS Fund Account balance was $0.23.

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

1    94.    On March 15 and 16, 2012, members of the Commission's Staff and I

2  took the investigative testimony of Shervin Neman.  Attached hereto as

3  Government Exhibit 77 are true and correct copies of excerpts from Mr. Neman's

4  testimony transcript.

5

6  I declare under penalty of perjury that the foregoing is true and correct.

7

8  Executed this 5th day of April 2012, in Los Angeles, California.

9

10

11                                    _____

12                                    JOSHUA L. BAUDER

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Exhibit 49**

# FORM ADV
## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

**Primary Business Name: NEMAN FINANCIAL, INC**

**ADV - SEC Initial, Page 1**

**9/2/2011 5:08:38 PM**

**CRD Number: 159019**

**Rev. 11/2010**

---

**ADV Part 1A, Page 1**

**WARNING:** Complete this form truthfully. False statements or omissions may result in denial of your application, revocation of your registration, or criminal prosecution. You must keep this form updated by filing periodic amendments. See Form ADV General Instruction 3.

**Item 1 Identifying Information**

Responses to this Item tell us who you are, where you are doing business, and how we can contact you.

A.  Your full legal name (if you are a sole proprietor, your last, first, and middle names):
    NEMAN FINANCIAL, INC.

B.  Name under which you primarily conduct your advisory business, if different from Item 1.A.
    NEMAN FINANCIAL, INC
    *List on Section 1.B. of Schedule D any additional names under which you conduct your advisory business.*

C.  If this filing is reporting a change in your legal name (Item 1.A.) or primary business name (Item 1.B.), enter the new name and specify whether the name change is of
    ☐ your legal name or ☐ your primary business name:

D.  If you are registered with the SEC as an investment adviser, your SEC file number: 801-72732

E.  If you have a number ("*CRD* Number") assigned by *FINRA's CRD* system or by the IARD system, your *CRD* number: 159019
    *If your firm does not have a CRD number, skip this Item 1.E. Do not provide the CRD number of one of your officers, employees, or affiliates.*

---

# FORM ADV
## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

**Primary Business Name: NEMAN FINANCIAL, INC**

**ADV - SEC Initial, Page 2**

**9/2/2011 5:08:38 PM**

**CRD Number: 159019**

**Rev. 11/2010**

---

**Item 1 Identifying Information (Continued)**

F.  *Principal Office and Place of Business*

   (1) Address (do not use a P.O. Box):

| Number and Street 1: | | Number and Street 2: | |
|---|---|---|---|
| 1999 AVENUE OF THE STARS | | SUITE 2045 | |
| City: | State: | Country: | ZIP+4/Postal Code: |
| LOS ANGELES | CA | UNITED STATES | 90067 |

GOVERNMENT
EXHIBIT

If this address is a private residence, check this box: ☐

*List on Section 1.F. of Schedule D any office, other than your principal office and place of business, at which you conduct investment advisory business. If you are applying for registration, or are registered, with one or more state securities authorities, you must list all of your offices in the state or states to which you are applying for registration or with whom you are registered. If you are applying for registration, or are registered only, with the SEC, list the largest five offices in terms of numbers of employees.*

(2) Days of week that you normally conduct business at your *principal office and place of business*:

⊙ Monday-Friday   ○ Other:

Normal business hours at this location:
8:30 AM TO 5:30 PM

(3) Telephone number at this location:
310-359-8675

(4) Facsimile number at this location:
310-388-4653

G. Mailing address, if different from your *principal office and place of business* address:

Number and Street 1:                        Number and Street 2:

City:          State:          Country:          ZIP+4/Postal Code:

If this address is a private residence, check this box: ☐

H. If you are a sole proprietor, state your full residence address, if different from your *principal office and place of business* address in Item 1.F.:

Number and Street 1:                        Number and Street 2:

City:          State:          Country:          ZIP+4/Postal Code:

# FORM ADV
## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

Primary Business Name: **NEMAN FINANCIAL, INC**                    **CRD Number: 159019**
**ADV - SEC Initial, Page 3**                                      Rev. **11/2010**
9/2/2011 5:08:38 PM

| Item 1 Identifying Information (Continued) |
|---|

|  | YES | NO |
|---|---|---|
| I.  Do you have World Wide Web site addresses? | ⊙ | ○ |

*If "yes," list these addresses on Section 1.I. of Schedule D. If a web address serves as a portal through which to access other information you have published on the World Wide Web, you may list the portal without listing addresses for all of the other information. Some advisers may need to list more than one portal address. Do not provide individual electronic mail addresses in response to this Item.*

J.  Contact *Employee*:
   Name:                              Title:

MELINDA SCOTT, ESQ                          ATTORNEY
Telephone Number:                           Facsimile Number:
646-652-8567                                866-512-2848
Number and Street 1:                        Number and Street 2:
295 MADISON AVENUE                          12TH FLOOR
City:               State:                  Country:              ZIP+4/Postal Code:
NEW YORK            NY                      UNITED STATES         10017
Electronic mail (e-mail) address, if contact *employee* has one:
MSCOTT@SCOTTGOLDRINGASSOCIATES.COM
*The contact employee should be an employee whom you have authorized to receive information*
*and respond to questions about this Form ADV.*

|  |  | YES | NO |
|---|---|---|---|

K.  Do you maintain some or all of the books and records you are required to keep under        ○   ◉
    Section 204 of the Advisers Act, or similar state law, somewhere other than your
    *principal office and place of business?*
    *If "yes," complete Section 1.K. of Schedule D.*

|  |  | YES | NO |
|---|---|---|---|

L.  Are you registered with a *foreign financial regulatory authority?*                        ○   ◉
    *Answer "no" if you are not registered with a foreign financial regulatory authority, even if*
    *you have an affiliate that is registered with a foreign financial regulatory authority. If*
    *"yes", complete Section 1.L. of Schedule D.*

# FORM ADV
## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

**Primary Business Name: NEMAN FINANCIAL, INC**              **CRD Number: 159019**
**ADV - SEC Initial, Page 4**                                **Rev. 11/2010**
**9/2/2011 5:08:38 PM**

---

**Item 2 SEC Registration**

Responses to this Item help us (and you) determine whether you are eligible to register with the SEC.
Complete this Item 2 only if you are applying for SEC registration or submitting an *annual updating*
*amendment* to your SEC registration.

A.  To register (or remain registered) with the SEC, you must check at least one of the Items 2.A(1)
    through 2.A(11), below. If you are submitting an *annual updating amendment* to your SEC
    registration and you are no longer eligible to register with the SEC, check Item 2.A(12). You:

    ☐  (1) have *assets under management* of $25 million (in U.S. dollars) or more;

            *See Part 1A Instruction 2.a. to determine whether you should check this box.*

    ☐  (2) have your *principal office and place of business* in Wyoming;

    ☐  (3) have your *principal office and place of business* outside the United States;

    ☐  (4) are an investment adviser (or sub-adviser) to an investment company registered under
           the Investment Company Act of 1940;

Exhibit 49 page 37



See Part 1A Instruction 2.b. to determine whether you should check this box.

☐ (5) have been designated as a nationally recognized statistical rating organization;

See Part 1A Instruction 2.c. to determine whether you should check this box.

☐ (6) are a pension consultant that qualifies for the exemption in rule 203A-2(b);

See Part 1A Instruction 2.d. to determine whether you should check this box.

☐ (7) are relying on rule 203A-2(c) because you are an investment adviser that *controls*, is *controlled* by, or is under common *control* with, an investment adviser that is registered with the SEC, and your *principal office and place of business* is the same as the registered adviser;

See Part 1A Instruction 2.e. to determine whether you should check this box. If you check this box, complete Section 2.A(7) of Schedule D.

☑ (8) are a newly formed adviser relying on rule 203A-2(d) because you expect to be eligible for SEC registration within 120 days;

See Part 1A Instruction 2.f. to determine whether you should check this box. If you check this box, complete Section 2.A(8) of Schedule D.

# FORM ADV
## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

**Primary Business Name: NEMAN FINANCIAL, INC**               **CRD Number: 159019**

**ADV - SEC Initial, Page 5**                                **Rev. 11/2010**

**9/2/2011 5:08:38 PM**

| Item 2 SEC Registration (Continued) |
| --- |

☐ (9)   are a multi-state adviser relying on rule 203A-2(e);

See Part 1A Instruction 2.g. to determine whether you should check this box. If you check this box, complete Section 2.A(9) of Schedule D.

☐ (10) are an Internet investment adviser relying on rule 203A-2(f);

See Part 1A Instructions 2.h. to determine whether you should check this box.

☐ (11) have received an SEC *order* exempting you from the prohibition against registration with the SEC;

If you checked this box, complete Section 2.A(11) of Schedule D.

☐ (12) are no longer eligible to remain registered with the SEC.

*See Part 1A Instructions 2.i. to determine whether you should check this box.*

B. Under state laws, SEC-registered advisers may be required to provide to *state securities authorities* a copy of the Form ADV and any amendments they file with the SEC. These are called *notice filings.* If this is an initial application, check the box(es) next to the state(s) that you would like to receive notice of this and all subsequent filings you submit to the SEC. If this is an amendment to direct your *notice filings* to additional state(s), check the box(es) next to the state (s) that you would like to receive notice of this and all subsequent filings you submit to the SEC. If this is an amendment to your registration to stop your *notice filings* from going to state(s) that currently receive them, uncheck the box(es) next to those state(s).

| | | | |
|---|---|---|---|
| ☐ AL | ☐ ID | ☐ MO | ☐ PA |
| ☐ AK | ☐ IL | ☐ MT | ☐ PR |
| ☐ AZ | ☐ IN | ☐ NE | ☐ RI |
| ☐ AR | ☐ IA | ☐ NV | ☐ SC |
| ☑ CA | ☐ KS | ☐ NH | ☐ SD |
| ☐ CO | ☐ KY | ☐ NJ | ☐ TN |
| ☐ CT | ☐ LA | ☐ NM | ☐ TX |
| ☐ DE | ☐ ME | ☐ NY | ☐ UT |
| ☐ DC | ☐ MD | ☐ NC | ☐ VT |
| ☐ FL | ☐ MA | ☐ ND | ☐ VI |
| ☐ GA | ☐ MI | ☐ OH | ☐ VA |
| ☐ GU | ☐ MN | ☐ OK | ☐ WA |
| ☐ HI | ☐ MS | ☐ OR | ☐ WV |
| | | | ☐ WI |

*If you are amending your registration to stop your notice filings from going to a state that currently receives them and you do not want to pay that state's notice filing fee for the coming year, your amendment must filed before the end of the year (December 31).*

**Item 3 Form Of Organization**

A. How are you organized?

  ⦿ Corporation   ○ Sole Proprietorship        ○ Limited Liability Partnership (LLP)

  ○ Partnership   ○ Limited Liability Company (LLC)   ○ Other (specify):

*If you are changing your response to this Item, see Part 1A Instruction 4.*

# FORM ADV
## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

**Primary Business Name: NEMAN FINANCIAL, INC**          **CRD Number: 159019**

**ADV - SEC Initial, Page 6**                                     **Rev. 11/2010**

9/2/2011 5:08:38 PM

| Item 3 Form Of Organization (Continued) |
| --- |

B. In what month does your fiscal year end each year?
December

C. Under the laws of what state or country are you organized?

State:          Country:
California    UNITED STATES

| Item 4 Successions |
| --- |

|  | YES | NO |
| --- | --- | --- |
| A. Are you, at the time of this filing, succeeding to the business of a registered investment adviser? | O | ◉ |

*If "yes," complete Item 4.B. and Section 4 of Schedule D.*

B. Date of Succession: (MM/DD/YYYY)

*If you have already reported this succession on a previous Form ADV filing, do not report the succession again. Instead, check "No." See Part 1A Instruction 4.*

| Item 5 Information About Your Advisory Business |
| --- |

Responses to this Item help us understand your business, assist us in preparing for on-site examinations, and provide us with data we use when making regulatory policy. Part 1A Instruction 5.a. provides additional guidance to newly-formed advisers for completing this Item 5.

*Employees*

A. Approximately how many *employees* do you have? Include full and part-time *employees* but do not include any clerical workers.

⊙ 1- 5          O 6-10          O 11-50          O 51-250          O 251-500

O 501-1,000     O More than      If more than 1,000, how many?
                   1,000          (round to the nearest 1,000)

B.

(1) Approximately how many of these *employees* perform investment advisory functions (including research)?

⊙ 0          O 1-5          O 6-10          O 11-50          O 51-250

O 251-500     O 501-1,000     O More than     If more than 1,000, how many?
                               1,000          (round to the nearest 1,000)

(2) Approximately how many of these *employees* are registered representatives of a broker-dealer?

⊙ 0          O 1-5          O 6-10          O 11-50          O 51-250

O 251-500     O 501-1,000     O More than     If more than 1,000, how many?
                               1,000          (round to the nearest 1,000)

*If you are organized as a sole proprietorship, include yourself as an employee in your responses to Items 5.A(1) and 5.B(2). If an employee performs more than one function, you*

*should count that employee in each of your responses to Item 5.B(1) and 5.B(2).*

# FORM ADV
## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

**Primary Business Name: NEMAN FINANCIAL, INC**                    **CRD Number: 159019**
**ADV - SEC Initial, Page 7**                                       **Rev. 11/2010**
**9/2/2011 5:08:38 PM**

| Item 5 Information About Your Advisory Business (Continued) |
|---|

(3) Approximately how many firms or other *persons* solicit advisory *clients* on your behalf?

- ☐ 0       ☒ 1-5       ☐ 6-10       ☐ 11-50       ☐ 51-250
- ☐ 251-500   ☐ 501-1,000   ☐ More than 1,000

If more than 1,000, how many? (round to the nearest 1,000)

*In your response to Item 5.B(3), do not count any of your employees and count a firm only once -- do not count each of the firm's employees that solicit on your behalf.*

*Clients*

C. To approximately how many *clients* did you provide investment advisory services during your most-recently completed fiscal year?

- ☐ 0       ☒ 1-10       ☐ 11-25       ☐ 26-100       ☐ 101-250
- ☐ 251-500   ☐ More than 500

If more than 500, how many? (round to the nearest 500)

D. What types of *clients* do you have? Indicate the approximate percentage that each type of *client* comprises of your total number of *clients*.

|  |  | None | Up to 10% | 11-25% | 26-50% | 51-75% | More Than 75% |
|---|---|---|---|---|---|---|---|
| (1) | Individuals (other than *high net worth individuals*) | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| (2) | *High net worth individuals* | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| (3) | Banking or thrift institutions | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| (4) | Investment companies (including mutual funds) | ☐ | ☐ | ☒ | ☐ | ☐ | ☐ |
| (5) | Pension and profit sharing plans (other than plan participants) | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| (6) | Other pooled investment vehicles (e.g., hedge funds) | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| (7) | Charitable organizations | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| (8) | Corporations or other businesses not listed above | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| (9) | State or municipal *government entities* | ☐ | ☐ | ☐ | ☒ | ☐ | ☐ |
| (10) | Other: | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |

*The category "individuals" includes trusts, estates, 401(k) plans and IRAs of individuals and their family members, but does not include businesses organized as sole proprietorships.*

*Unless you provide advisory services pursuant to an investment advisory contract to an investment company registered under the Investment Company Act of 1940, check "None" in response to Item 5.D(4).*

# FORM ADV
## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

**Primary Business Name: NEMAN FINANCIAL, INC**           **CRD Number: 159019**
**ADV – SEC Initial, Page 8**                             **Rev. 11/2010**
**9/2/2011 5:08:38 PM**

---

**Item 5 Information About Your Advisory Business (Continued)**

Compensation Arrangements

E.  You are compensated for your investment advisory services by (check all that apply):

☑ (1) A percentage of assets under your management

☐ (2) Hourly charges

☐ (3) Subscription fees (for a newsletter or periodical)

☐ (4) Fixed fees (other than subscription fees)

☐ (5) Commissions

☑ (6) *Performance-based fees*

☐ (7) Other (specify):

Assets Under Management

|  |  |  | YES | NO |
|---|---|---|---|---|

F.  (1)  Do you provide continuous and regular supervisory or management services to securities portfolios?   ⦿ YES   ○ NO

(2)  If yes, what is the amount of your assets under management and total number of accounts?

|  | U.S. Dollar Amount | Total Number of Accounts |
|---|---|---|
| Discretionary: | (a) $ 0 .00 | (d) 0 |
| Non-Discretionary: | (b) $ 0 .00 | (e) 0 |
| Total: | (c) $ 0 .00 | (f) 0 |

*Part 1A Instruction 5.b. explains how to calculate your assets under management. You must follow these instructions carefully when completing this Item.*

Advisory Activities

G.  What type(s) of advisory services do you provide? Check all that apply.

☑ (1) Financial planning services

☑ (2) Portfolio management for individuals and/or small businesses

☑ (3) Portfolio management for investment companies

☑ (4) Portfolio management for businesses or institutional *clients* (other than investment

companies)

☐ (5) Pension consulting services

☐ (6) Selection of other advisers

☐ (7) Publication of periodicals or newsletters

☐ (8) Security ratings or pricing services

☐ (9) Market timing services

☐ (10) Other (specify):

*Do not check Item 5.G(3) unless you provide advisory services pursuant to an investment advisory contract to an investment company registered under the Investment Company Act of 1940.*

# FORM ADV
## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

**Primary Business Name: NEMAN FINANCIAL, INC**          **CRD Number: 159019**

**ADV - SEC Initial, Page 9**                            **Rev. 11/2010**

**9/2/2011 5:08:38 PM**

| Item 5 Information About Your Advisory Business (Continued) |
|---|

H. If you provide financial planning services, to how many *clients* did you provide these services during your last fiscal year?

    ⦿ 0       ○ 1-10      ○ 11-25     ○ 26-50     ○ 51-100

    ○ 101-250   ○ 251-500   ○ More than 500   If more than 500, how many?
                                            (round to the nearest 500)

I. If you participate in a *wrap fee program*, do you (check all that apply):

    ☐ (1) *sponsor* the *wrap fee program* ?

    ☐ (2) act as a portfolio manager for the *wrap fee program*?

*If you are a portfolio manager for a wrap fee program, list the names of the programs and their sponsors in Section 5.I(2) of Schedule D.*

*If your involvement in a wrap fee program is limited to recommending wrap fee programs to your clients , or you advise a mutual fund that is offered through a wrap fee program, do not check either Item 5.I(1) or 5.I(2).*

| Item 6 Other Business Activities |
|---|

In this Item, we request information about your other business activities.

A. You are actively engaged in business as a (check all that apply):

    ☐ (1) Broker-dealer

    ☐ (2) Registered representative of a broker-dealer

    ☐ (3) Futures commission merchant, commodity pool operator, or commodity trading advisor

    ☐ (4) Real estate broker, dealer, or agent

Exhibit 49 page 43

☐ (5) Insurance broker or agent

☐ (6) Bank (including a separately identifiable department or division of a bank)

☐ (7) Other financial product salesperson (specify):

|  | YES | NO |
|---|---|---|
| B. (1) Are you actively engaged in any other business not listed in Item 6.A. (other than giving investment advice)? | ○ | ⊙ |
| (2) If yes, is this other business your primary business? | ○ | ⊙ |

*If "yes," describe this other business on Section 6.B. of Schedule D.*

|  | YES | NO |
|---|---|---|
| (3) Do you sell products or provide services other than investment advice to your advisory *clients*? | ○ | ⊙ |

# FORM ADV
## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

**Primary Business Name: NEMAN FINANCIAL, INC**                **CRD Number: 159019**

**ADV - SEC Initial, Page 10**                                  **Rev. 11/2010**

**9/2/2011 5:08:38 PM**

---

**Item 7 Financial Industry Affiliations**

In this Item, we request information about your financial industry affiliations and activities. This information identifies areas in which conflicts of interest may occur between you and your *clients*.

Item 7 requires you to provide information about you and your *related persons*. Your *related persons* are all of your *advisory affiliates* and any *related person* that is under common *control* with you.

A. You have a *related person* that is a (check all that apply):

☐ (1) broker-dealer, municipal securities dealer, or government securities broker or dealer

☐ (2) investment company (including mutual funds)

☐ (3) other investment adviser (including financial planners)

☐ (4) futures commission merchant, commodity pool operator, or commodity trading advisor

☐ (5) banking or thrift institution

☐ (6) accountant or accounting firm

☐ (7) lawyer or law firm

☐ (8) insurance company or agency

☐ (9) pension consultant

☐ (10) real estate broker or dealer

☐ (11) sponsor or syndicator of limited partnerships

*If you checked Items 7.A.(1) or (3), you must list on Section 7.A. of Schedule D all your related persons that are investment advisers, broker-dealers, municipal securities dealers, or government securities broker or dealers.*

|  | Yes | No |
|---|---|---|
| B. Are you or any *related person* a general partner in an *investment-related* limited partnership or manager of an *investment-related* limited liability company, or do you advise any other "private fund" as defined under SEC rule 203(b)(3)-1? | ⊙ | ○ |

*If "yes," for each limited partnership or limited liability company, or (if applicable) private fund, complete Section 7.B. of Schedule D . If, however, you are an SEC-registered adviser and you have related persons that are SEC-registered advisers who are the general partners of limited partnerships or the managers of limited liability companies, you do not have to complete Section 7.B. of Schedule D with respect to those related advisers' limited partnerships or limited liability companies.*

*To use this alternative procedure, you must state in the Miscellaneous Section of Schedule D :(1) that you have related SEC-registered investment advisers that manage limited partnerships or limited liability companies that are not listed in Section 7.B. of Schedule D ; (2) that complete and accurate information about those limited partnerships or limited liability companies is available in Section 7.B. of Schedule D of the Form ADVs of your related SEC-registered advisers; and (3) whether your clients are solicited to invest in any of those limited partnerships or limited liability companies.*

### Item 8 Participation or Interest in *Client* Transactions

In this Item, we request information about your participation and interest in your *clients'* transactions. Like Item 7, this information identifies areas in which conflicts of interest may occur between you and your *clients*.

Like Item 7, Item 8 requires you to provide information about you and your *related persons*.

## FORM ADV
## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

**Primary Business Name: NEMAN FINANCIAL, INC**      **CRD Number: 159019**
**ADV – SEC Initial, Page 11**      **Rev. 11/2010**
**9/2/2011 5:08:38 PM**

### Item 8 Participation or Interest in *Client* Transactions (Continued)

Proprietary Interest in *Client* Transactions

| | Yes | No |
|---|---|---|
| A. Do you or any *related person*: | | |
| (1) buy securities for yourself from advisory *clients,* or sell securities you own to advisory *clients* (principal transactions)? | O | ⦿ |
| (2) buy or sell for yourself securities (other than shares of mutual funds) that you also recommend to advisory *clients*? | O | ⦿ |
| (3) recommend securities (or other investment products) to advisory *clients* in which you or any *related person* has some other proprietary (ownership) interest (other than those mentioned in Items 8.A(1) or (2))? | O | ⦿ |

Sales Interest in *Client* Transactions

| | Yes | No |
|---|---|---|
| B. Do you or any *related person*: | | |
| (1) as a broker-dealer or registered representative of a broker-dealer, execute securities trades for brokerage customers in which advisory *client* securities are sold to or bought from the brokerage customer (agency cross transactions)? | O | ⦿ |
| (2) recommend purchase of securities to advisory *clients* for which you or any *related person* serves as underwriter, general or managing partner, or purchaser | O | ⦿ |

representative?

(3) recommend purchase or sale of securities to advisory *clients* for which you or any ○ ⊙
*related person* has any other sales interest (other than the receipt of sales
commissions as a broker or registered representative of a broker-dealer)?

**Investment or Brokerage Discretion**

C. Do you or any *related person* have *discretionary authority* to determine the:    **Yes No**

(1) securities to be bought or sold for a *client's* account?                         ⊙ ○

(2) amount of securities to be bought or sold for a *client's* account?               ⊙ ○

(3) broker or dealer to be used for a purchase or sale of securities for a *client's* account?  ⊙ ○

(4) commission rates to be paid to a broker or dealer for a *client's* securities transactions?  ⊙ ○

# FORM ADV
# UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

**Primary Business Name: NEMAN FINANCIAL, INC**              **CRD Number: 159019**

**ADV – SEC Initial, Page 12**                              **Rev. 11/2010**

**9/2/2011 5:08:38 PM**

| **Item 8 Participation or Interest in *Client* Transactions (Continued)** |
|---|

D. Do you or any *related person* recommend brokers or dealers to *clients*?   ○ ⊙

E. Do you or any *related person* receive research or other products or services other than ○ ⊙
execution from a broker-dealer or a third party in connection with *client* securities
transactions?

F. Do you or any *related person*, directly or indirectly, compensate any *person* for *client* ⊙ ○
referrals?

*In responding to this Item 8.F., consider in your response all cash and non-cash
compensation that you or a related person gave any person in exchange for client
referrals, including any bonus that is based, at least in part, on the number or amount of
client referrals.*

| **Item 9 *Custody*** |
|---|

In this Item, we ask you whether you or a *related person* has *custody* of *client* assets and about your
custodial practices.

A. (1) Do you have *custody* of any advisory *clients'*:                        **Yes No**

(a) cash or bank accounts?                                                  ○ ⊙

(b) securities?                                                             ○ ⊙

*If you are registering or registered with the SEC, answer "No" to Item 9.A.(1)(a) and (b) if you have
custody solely because (i) you deduct your advisory fees directly from your clients' accounts, or (ii) a
related person maintains client funds or securities as a qualified custodian but you have overcome
the presumption that you are not operationally independent (pursuant to Advisers Act rule 206(4)
(2)-(d)(5)) from the related person.*

(2) If you checked "yes" to Item 9.A(1)(a) or (b), what is the amount of *client* funds and securities

and total number of *clients* for which you have *custody*:

U.S. Dollar Amount          Total Number of Clients

(a)$                        (b)

*If your related person serves as qualified custodian of client assets, do not include the amount of those assets and the number of those clients in your response to Item 9.A.(2). Instead, include that information in your response to Item 9.B.(2).*

B. (1) Do any of your *related persons* have *custody* of any of your advisory *clients'*:      **Yes  No**

    (a) cash or bank accounts?      ○   ◉

    (b) securities?      ○   ◉

*You are required to answer this item regardless of how you answered Item 9.A.(1)(a) or (b).*

  (2) If you checked "yes" to Item 9.B.(1)(a) or (b), what is the amount of *client* funds and securities and total number of *clients* for which your related persons have *custody*:

U.S. Dollar Amount          Total Number of Clients

(a)$                        (b)

C. If you or your *related persons* have *custody* of *client* funds or securities, check all the following that apply:

  (1) A qualified custodian(s) sends account statements at least quarterly to the investors in the pooled investment vehicle(s) you manage.      ☐

  (2) An independent public accountant audits annually the pooled investment vehicle(s) that you manage and the audited financial statements are distributed to the investors in the pools.      ☑

  (3) An independent public accountant conducts an annual surprise examination of *client* funds and securities.      ☐

  (4) An independent public accountant prepares an internal control report with respect to custodial services when you or your *related persons* are qualified custodians for *client* funds and securities.      ☐

*If you checked Item 9.C.(2), C.(3) or C.(4), list in Section 9.C. of Schedule D the accountants that are engaged to perform the audit or examination or prepare an internal control report.*

D. Do you or your *related persons* act as qualified custodians for your *clients* in connection with advisory services you provide to *clients*?      **Yes  No**

  (1) you act as a qualified custodian      ○   ◉

  (2) your *related persons* act as qualified custodians      ○   ◉

*If you checked "yes" to Item 9.D.(2), list in Section 9.D. of Schedule D all your related persons that act as qualified custodians for your clients in connection with advisory services you provide to clients (you do not have to list broker-dealers already identified as qualified custodians in Section 7.A. of Schedule D).*

E. If you are filing your annual updating amendment and you were subject to a surprise examination by an independent public accountant during your last fiscal year, provide the date

(MM/YYYY) the examination commenced:

**Item 10 *Control Persons***

In this Item, we ask you to identify every *person* that, directly or indirectly, *controls* you.

If you are submitting an initial application, you must complete Schedule A and Schedule B. Schedule A asks for information about your direct owners and executive officers. Schedule B asks for information about your indirect owners. If this is an amendment and you are updating information you reported on either Schedule A or Schedule B (or both) that you filed with your initial application, you must complete Schedule C.

|  | YES | NO |
|---|---|---|
| Does any *person* not named in Item 1.A. or Schedules A, B, or C, directly or indirectly, *control* your management or policies? | O | ⊙ |

*If yes, complete Section 10 of Schedule D.*

# FORM ADV
# UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

**Primary Business Name: NEMAN FINANCIAL, INC**          **CRD Number: 159019**
**ADV - SEC Initial, Page 13**                            **Rev. 11/2010**
**9/2/2011 5:08:38 PM**

**Item 11 Disclosure Information**

In this Item, we ask for information about your disciplinary history and the disciplinary history of all your *advisory affiliates*. We use this information to determine whether to grant your application for registration, to decide whether to revoke your registration or to place limitations on your activities as an investment adviser, and to identify potential problem areas to focus on during our on-site examinations. One event may result in "yes" answers to more than one of the questions below.

Your *advisory affiliates* are: (1) all of your current *employees* (other than *employees* performing only clerical, administrative, support or similar functions); (2) all of your officers, partners, or directors (or any *person* performing similar functions); and (3) all *persons* directly or indirectly *controlling* you or *controlled* by you. If you are a "separately identifiable department or division" (SID) of a bank, see the Glossary of Terms to determine who your *advisory affiliates* are.

*If you are registered or registering with the SEC, you may limit your disclosure of any event listed in Item 11 to ten years following the date of the event. If you are registered or registering with a state, you must respond to the questions as posed; you may, therefore, limit your disclosure to ten years following the date of an event only in responding to Items 11.A(1), 11.A(2), 11.B(1), 11.B(2), 11.D (4), and 11.H(1)(a). For purposes of calculating this ten-year period, the date of an event is the date the final order, judgment, or decree was entered, or the date any rights of appeal from preliminary orders, judgments, or decrees lapsed.*

You must complete the appropriate Disclosure Reporting Page ("DRP") for "yes" answers to the questions in this Item 11.

For "yes" answers to the following questions, complete a Criminal Action DRP:

A. In the past ten years, have you or any *advisory affiliate*:                    **YES NO**

(1) been convicted of or plead guilty or nolo contendere ("no contest") in a domestic,    O  ⊙
foreign, or military court to any *felony*?

(2) been *charged* with any *felony*?                                    ○  ◉

*If you are registered or registering with the SEC, you may limit your response to Item 11.A(2) to charges that are currently pending.*

B. In the past ten years, have you or any *advisory affiliate*:

    (1) been convicted of or plead guilty or nolo contendere ("no contest") in a domestic,     ○  ◉
    foreign, or military court to a *misdemeanor* involving: investments or an
    *investment-related* business, or any fraud, false statements, or omissions,
    wrongful taking of property, bribery, perjury, forgery, counterfeiting, extortion, or
    a conspiracy to commit any of these offenses?

    (2) been *charged* with a *misdemeanor* listed in 11.B(1)?                 ○  ◉

*If you are registered or registering with the SEC, you may limit your response to Item 11.B(2) to charges that are currently pending.*

# FORM ADV
## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

**Primary Business Name: NEMAN FINANCIAL, INC**       **CRD Number: 159019**
**ADV - SEC Initial, Page 14**                **Rev. 11/2010**
**9/2/2011 5:08:38 PM**

| Item 11 Disclosure Information (Continued) | | |
|---|---|---|
| For "yes" answers to the following questions, complete a Regulatory Action DRP: | | |
| C. Has the SEC or the Commodity Futures Trading Commission (CFTC) ever: | **YES** | **NO** |
|   (1) *found* you or any *advisory affiliate* to have made a false statement or omission? | ○ | ◉ |
|   (2) *found* you or any *advisory affiliate* to have been *involved* in a violation of SEC or CFTC regulations or statutes? | ○ | ◉ |
|   (3) *found* you or any *advisory affiliate* to have been a cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted? | ○ | ◉ |
|   (4) entered an *order* against you or any *advisory affiliate* in connection with *investment-related* activity? | ○ | ◉ |
|   (5) imposed a civil money penalty on you or any *advisory affiliate*, or *ordered* you or any *advisory affiliate* to cease and desist from any activity? | ○ | ◉ |
| D. Has any other federal regulatory agency, any state regulatory agency, or any *foreign financial regulatory authority*: | | |
|   (1) ever *found* you or any *advisory affiliate* to have made a false statement or omission, or been dishonest, unfair, or unethical? | ○ | ◉ |
|   (2) ever *found* you or any *advisory affiliate* to have been *involved* in a violation of *investment-related* regulations or statutes? | ○ | ◉ |

Exhibit 49 page 49

|  |  |  |
|---|---|---|
| (3) ever *found* you or any *advisory affiliate* to have been a cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted? | ○ | ◉ |
| (4) in the past ten years, entered an *order* against you or any *advisory affiliate* in connection with an *investment-related* activity? | ○ | ◉ |
| (5) ever denied, suspended, or revoked your or any *advisory affiliate's* registration or license, or otherwise prevented you or any *advisory affiliate*, by *order*, from associating with an *investment-related* business or restricted your or any *advisory affiliate's* activity? | ○ | ◉ |

E. Has any *self-regulatory organization* or commodities exchange ever:

|  |  |  |
|---|---|---|
| (1) *found* you or any *advisory affiliate* to have made a false statement or omission? | ○ | ◉ |
| (2) *found* you or any *advisory affiliate* to have been *involved* in a violation of its rules (other than a violation designated as a *"minor rule violation"* under a plan approved by the SEC)? | ○ | ◉ |
| (3) *found* you or any *advisory affiliate* to have been the cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted? | ○ | ◉ |
| (4) disciplined you or any *advisory affiliate* by expelling or suspending you or the *advisory affiliate* from membership, barring or suspending you or the *advisory affiliate* from association with other members, or otherwise restricting your or the *advisory affiliate's* activities? | ○ | ◉ |

## FORM ADV
## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

**Primary Business Name: NEMAN FINANCIAL, INC**          **CRD Number: 159019**

**ADV - SEC Initial, Page 15**                                   **Rev. 11/2010**

**9/2/2011 5:08:38 PM**

### Item 11 Disclosure Information (Continued)

|  | YES | NO |
|---|---|---|
| F. Has an authorization to act as an attorney, accountant, or federal contractor granted to you or any *advisory affiliate* ever been revoked or suspended? | ○ | ◉ |
| G. Are you or any *advisory affiliate* now the subject of any regulatory *proceeding* that could result in a "yes" answer to any part of Item 11.C., 11.D., or 11.E.? | ○ | ◉ |

For "yes" answers to the following questions, complete a Civil Judicial Action DRP:

|  | YES | NO |
|---|---|---|
| H. (1) Has any domestic or foreign court: |  |  |
| (a) in the past ten years, *enjoined* you or any *advisory affiliate* in connection with any *investment-related* activity? | ○ | ◉ |
| (b) ever *found* that you or any *advisory affiliate* were *involved* in a violation of *investment-related* statutes or regulations? | ○ | ◉ |
| (c) ever dismissed, pursuant to a settlement agreement, an *investment-related* civil action brought against you or any *advisory affiliate* by a state or *foreign* | ○ | ◉ |

financial regulatory authority?

    (2) Are you or any *advisory affiliate* now the subject of any civil *proceeding* that could result in a "yes" answer to any part of Item 11.H(1)? ○ ◉

### Item 12 Small Businesses

The SEC is required by the Regulatory Flexibility Act to consider the effect of its regulations on small entities. In order to do this, we need to determine whether you meet the definition of "small business" or "small organization" under rule 0-7.

Answer this Item 12 only if you are registered or registering with the SEC *and* you indicated in response to Item 5.F(2)(c) that you have assets under management of less than $25 million. You are not required to answer this Item 12 if you are filing for initial registration as a state adviser, amending a current state registration, or switching from SEC to state registration.

# FORM ADV
## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

**Primary Business Name: NEMAN FINANCIAL, INC**       **CRD Number: 159019**

**ADV - SEC Initial, Page 16**       **Rev. 11/2010**

**9/2/2011 5:08:38 PM**

### Item 12 Small Businesses (Continued)

For purposes of this Item 12 only:

- Total Assets refers to the total assets of a firm, rather than the assets managed on behalf of *clients*. In determining your or another *person's* total assets, you may use the total assets shown on a current balance sheet (but use total assets reported on a consolidated balance sheet with subsidiaries included, if that amount is larger).
- Control means the power to direct or cause the direction of the management or policies of a *person*, whether through ownership of securities, by contract, or otherwise. Any *person* that directly or indirectly has the right to vote 25 percent or more of the voting securities, or is entitled to 25 percent or more of the profits, of another *person* is presumed to control the other *person*.

|  | YES | NO |
|---|---|---|
| A. Did you have total assets of $5 million or more on the last day of your most recent fiscal year? | ○ | ◉ |

*If "yes," you do not need to answer Items 12.B. and 12.C.*

B. Do you:

|  | YES | NO |
|---|---|---|
| (1) *control* another investment adviser that had assets under management of $25 million or more on the last day of its most recent fiscal year? | ○ | ◉ |
| (2) *control* another *person* (other than a natural person) that had total assets of $5 million or more on the last day of its most recent fiscal year? | ○ | ◉ |

C. Are you:

|  | YES | NO |
|---|---|---|
| (1) *controlled* by or under common *control* with another investment adviser that had assets under management of $25 million or more on the last day of its most recent fiscal year? | ○ | ◉ |

(2) *controlled* by or under common *control* with another *person* (other than a natural      ○    ⊙
person) that had total assets of $5 million or more on the last day of its most
recent fiscal year?

# FORM ADV
# UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

**Primary Business Name: NEMAN FINANCIAL, INC**                    **CRD Number: 159019**

**ADV – SEC Initial, Part 1B, Page 1**                            **Rev. 11/2010**

**9/2/2011 5:08:38 PM**

**You must complete this Part 1B only if you are applying for registration, or are registered, as an investment adviser with any of the *state securities authorities.***

---

**Part 1B Item 1 – State Registration**

Complete this Item 1 if you are submitting an initial application for state registration or requesting additional state registration(s). Check the boxes next to the states to which you are submitting this application. If you are already registered with at least one state and are applying for registration with an additional state or states, check the boxes next to the states in which you are applying for registration. Do not check the boxes next to the states in which you are currently registered or where you have an application for registration pending.

| | | | |
|---|---|---|---|
| ☐ AL | ☐ ID | ☐ MO | ☐ PA |
| ☐ AK | ☐ IL | ☐ MT | ☐ PR |
| ☐ AZ | ☐ IN | ☐ NE | ☐ RI |
| ☐ AR | ☐ IA | ☐ NV | ☐ SC |
| ☐ CA | ☐ KS | ☐ NH | ☐ SD |
| ☐ CO | ☐ KY | ☐ NJ | ☐ TN |
| ☐ CT | ☐ LA | ☐ NM | ☐ TX |
| ☐ DE | ☐ ME | ☐ NY | ☐ UT |
| ☐ DC | ☐ MD | ☐ NC | ☐ VT |
| ☐ FL | ☐ MA | ☐ ND | ☐ VI |
| ☐ GA | ☐ MI | ☐ OH | ☐ VA |
| ☐ GU | ☐ MN | ☐ OK | ☐ WA |
| ☐ HI | ☐ MS | ☐ OR | ☐ WV |
| | | | ☐ WI |

**Part 1B Item 2 – Additional Information**

A. Person responsible for supervision and compliance:
   Name:

   Title:

Telephone:                                        Fax:

Number and Street 1:                  Number and Street 2:

City:          State:          Country:      ZIP+4/Postal Code:

Email address, if available:

If this address is a private residence, check this box: ☐

B. Bond/Capital Information, if required by your *home state*.

  (1) Name of Issuing Insurance Company:

  (2) Amount of Bond:
    $ .00

  (3) Bond Policy Number:

|  | Yes | No |
|---|---|---|
| (4) If required by your home state, are you in compliance with your home state's minimum capital requirements? | O | O |

# FORM ADV
# UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

**Primary Business Name: NEMAN FINANCIAL, INC**          **CRD Number: 159019**

**ADV – SEC Initial, Part 1B, Page 2**          **Rev. 11/2010**

**9/2/2011 5:08:38 PM**

| Part 1B Item 2 – Additional Information (Continued) | Yes | No |
|---|---|---|
| For "yes" answers to the following question, complete a Bond DRP. | | |
|   C. Has a bonding company ever denied, paid out on, or revoked a bond for you? | O | O |
| For "yes" answers to the following question, complete a Judgment/Lien DRP: | | |
|   D. Do you have any unsatisfied judgments or liens against you? | O | O |
| For "yes" answers to the following questions, complete an Arbitration DRP: | | |
|   E. Are you, any *advisory affiliate*, or any *management person* currently the subject of, or have you, any *advisory affiliate*, or any *management person* been the subject of, an arbitration claim alleging damages in excess of $2,500, involving any of the following: | | |
|     (1) any investment or an *investment-related* business of activity? | O | O |
|     (2) fraud, false statement, or omission? | O | O |
|     (3) theft, embezzlement, or other wrongful taking of property? | O | O |
|     (4) bribery, forgery, counterfeiting, or extortion? | O | O |
|     (5) dishonest, unfair, or unethical practices? | O | O |
| For "yes" answers to the following questions, complete a Civil Judicial Action DRP: | | |

F. Are you, any *advisory affiliate*, or any *management person* currently subject to, or have you, any *advisory affiliate*, or any *management person* been *found* liable in, a civil, *self-regulatory organization*, or administrative *proceeding* involving any of the following:

(1) an investment or *investment-related* business or activity?  ○ ○

(2) fraud, false statement, or omission?  ○ ○

(3) theft, embezzlement, or other wrongful taking of property?  ○ ○

(4) bribery, forgery, counterfeiting, or extortion?  ○ ○

(5) dishonest, unfair, or unethical practices?  ○ ○

G. Other Business Activities

(1) You are actively engaged in business as a(n) (check all that apply):

☐ Attorney

☐ Certified Public Accountant

☐ Tax Preparer

# FORM ADV
# UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

Primary Business Name: **NEMAN FINANCIAL, INC**

**ADV – SEC Initial, Part 1B, Page 3**

**9/2/2011 5:08:38 PM**

CRD Number: **159019**

Rev. **11/2010**

## Part 1B Item 2 - Additional Information (Continued)

(2) If you are actively engaged in any business other than those listed in Item 6.A of Part 1A or Item 2.G(1) of Part 1B, describe the business and the approximate amount of time spent on that business:

H. If you provide financial planning services, the investments made based on those services at the end of your last fiscal year totaled:

|  | Securities Investments | Non-Securities Investments |
|---|---|---|
| Under $100,000 | ○ | ○ |
| $100,001 to $500,000 | ○ | ○ |
| $500,001 to $1,000,000 | ○ | ○ |
| $1,000,001 to $2,500,000 | ○ | ○ |
| $2,500,001 to $5,000,000 | ○ | ○ |
| More than $5,000,000 | ○ | ○ |

If securities investments are over $5,000,000, how much?  (round to the nearest $1,000,000)

If non-securities investments are over $5,000,000, how much?  (round to the nearest $1,000,000)

Yes  No

**I.** *Custody*

(1) Do you withdraw advisory fees directly from your *clients'* accounts? If you answered ⃝ ⃝
"yes", respond to the following:

    (a) Do you send a copy of your invoice to the custodian or trustee at the same time ⃝ ⃝
that you send a copy to the *client*?

    (b) Does the custodian send quarterly statements to your *clients* showing all ⃝ ⃝
disbursements for the custodian account, including the amount of the advisory
fees?

    (c) Do your *clients* provide written authorization permitting you to be paid directly for ⃝ ⃝
their accounts held by the custodian or trustee?

(2) Do you act as a general partner for any partnership or trustee for any trust in which ⃝ ⃝
your advisory *clients* are either partners of the partnership or beneficiaries of the
trust? If you answered "yes", respond to the following:

    (a) As the general partner of a partnership, have you engaged an attorney or an ⃝ ⃝
independent certified public accountant to provide authority permitting each direct
payment or any transfer of funds or securities from the partnership account?

(3) Do you require the prepayment of fees of more than $500 per *client* and for six ⃝ ⃝
months or more in advance?

# FORM ADV
## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

**Primary Business Name: NEMAN FINANCIAL, INC**      **CRD Number: 159019**

**ADV - SEC Initial, Part 1B, Page 4**      **Rev. 11/2010**

**9/2/2011 5:08:38 PM**

| Part 1B Item 2 – Additional Information (Continued) | | |
|---|---|---|
| | **Yes** | **No** |

J. If you are organized as a sole proprietorship, please answer the following:

    (1) (a) Have you passed, on or after January 1, 2000, the Series 65 examination?    ⃝ ⃝

        (b) Have you passed, on or after January 1, 2000, the Series 66 examination and also    ⃝ ⃝
passed, at any time, the Series 7 examination?

    (2) (a) Do you have any investment advisory professional designations?    ⃝ ⃝
*If "no", you do not need to answer Item 2.J(2)(b).*

        (b) I have earned and I am in good standing with the organization that issued the
following credential:

        ☐ Certified Financial Planner ("CFP")

        ☐ Chartered Financial Analyst ("CFA")

        ☐ Chartered Financial Consultant ("ChFC")

        ☐ Chartered Investment Counselor ("CIC")

        ☐ Personal Financial Specialist ("PFS")

        ☐ None of the above

    (3) Your Social Security Number:

# FORM ADV
## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

**Primary Business Name: NEMAN FINANCIAL, INC**

**CRD Number: 159019**

**ADV-SEC Initial, Part 2**

**Rev. 11/2010**

**9/2/2011 5:08:38 PM**

Amend, retire or file new brochures:

| Brochure ID | Brochure Name | Brochure Type(s) |
|---|---|---|
| 62311 | NEMAN FINANCIAL | High net worth individuals, Government/municipal, Other institutional, Private funds or pools, Financial Planning Services |

# FORM ADV
## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

**Primary Business Name: NEMAN FINANCIAL, INC**

**CRD Number: 159019**

**ADV - SEC Initial, SCHEDULE A**

**Rev. 11/2010**

**9/2/2011 5:08:38 PM**

---

**Form ADV, Schedule A**

### Direct Owners and Executive Officers

1. Complete Schedule A only if you are submitting an initial application. Schedule A asks for information about your direct owners and executive officers. Use Schedule C to amend this information.

2. Direct Owners and Executive Officers. List below the names of:

   (a) each Chief Executive Officer, Chief Financial Officer, Chief Operations Officer, Chief Legal Officer, Chief Compliance Officer(Chief Compliance Officer is required and cannot be more than one individual), director, and any other individuals with similar status or functions;

   (b) if you are organized as a corporation, each shareholder that is a direct owner of 5% or more of a class of your voting securities, unless you are a public reporting company (a company subject to Section 12 or 15(d) of the Exchange Act);

   Direct owners include any *person* that owns, beneficially owns, has the right to vote, or has the power to sell or direct the sale of, 5% or more of a class of your voting securities. For purposes of this Schedule, a *person* beneficially owns any securities: (i) owned by his/her child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, sharing the same residence; or (ii) that he/she has the right to acquire, within 60 days, through the exercise of any option, warrant, or right to purchase the security.

   (c) if you are organized as a partnership, all general partners and those limited and special partners that have the right to receive upon dissolution, or have contributed, 5% or more of your capital;

Exhibit 49 page 56

(d) in the case of a trust that directly owns 5% or more of a class of your voting securities, or that has the right to receive upon dissolution, or has contributed, 5% or more of your capital, the trust and each trustee; and

(e) if you are organized as a limited liability company ("LLC"), (i) those members that have the right to receive upon dissolution, or have contributed, 5% or more of your capital, and (ii) if managed by elected managers, all elected managers.

3. Do you have any indirect owners to be reported on Schedule B?   ○ Yes   ⊙ No

4. In the DE/FE/I column below, enter "DE" if the owner is a domestic entity, "FE" if the owner is an entity incorporated or domiciled in a foreign country, or "I" if the owner or executive officer is an individual.

5. Complete the Title or Status column by entering board/management titles; status as partner, trustee, sole proprietor, elected manager, shareholder, or member; and for shareholders or members, the class of securities owned (if more than one is issued).

6. Ownership codes are:

| NA - less than 5% | B - 10% but less than 25% | D - 50% but less than 75% |
| A - 5% but less than 10% | C - 25% but less than 50% | E - 75% or more |

7. (a) In the *Control Person* column, enter "Yes" if the *person* has *control* as defined in the Glossary of Terms to Form ADV, and enter "No" if the *person* does not have *control*. Note that under this definition, most executive officers and all 25% owners, general partners, elected managers, and trustees are *control persons*.

(b) In the PR column, enter "PR" if the owner is a public reporting company under Sections 12 or 15(d) of the Exchange Act.

(c) Complete each column.

| FULL LEGAL NAME (Individuals: Last Name, First Name, Middle Name) | DE/FE/I | Title or Status | Date Title or Status Acquired MM/YYYY | Ownership Code | Control Person | PR | CRD No. If None: S.S. No. and Date of Birth, IRS Tax No., or Employer ID No. |
|---|---|---|---|---|---|---|---|
| NEMAN, SHERVIN | I | CEO | 06/2010 | E | Y | N | 5975300 |
| NEMAN, SHERVIN | I | CHIEF COMPLIANCE OFFICER | 06/2010 | E | Y | N | 5975300 |

# FORM ADV
## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

**Primary Business Name: NEMAN FINANCIAL, INC**

**ADV - SEC Initial, SCHEDULE B**

9/2/2011 5:08:38 PM

**CRD Number: 159019**

**Rev. 11/2010**

**Form ADV, Schedule B**

**Indirect Owners**

1. Complete Schedule B only if you are submitting an initial application. Schedule B asks for information about your indirect owners; you must first complete Schedule A, which asks for information about your direct owners. Use Schedule C to amend this information.

2. **Indirect Owners.** With respect to each owner listed on Schedule A (except individual owners), list below:

   (a) in the case of an owner that is a corporation, each of its shareholders that beneficially owns, has the right to vote, or has the power to sell or direct the sale of, 25% or more of a class of a voting security of that corporation;

   For purposes of this Schedule, a *person* beneficially owns any securities: (i) owned by his/her child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, sharing the same residence; or (ii) that he/she has the right to acquire, within 60 days, through the exercise of any option, warrant, or right to purchase the security.

   (b) in the case of an owner that is a partnership, <u>all</u> general partners and those limited and special partners that have the right to receive upon dissolution, or have contributed, 25% or more of the partnership's capital;

   (c) in the case of an owner that is a trust, the trust and each trustee; and

   (d) in the case of an owner that is a limited liability company ("LLC"), (i) those members that have the right to receive upon dissolution, or have contributed, 25% or more of the LLC's capital, and (ii) if managed by elected managers, all elected managers.

3. Continue up the chain of ownership listing all 25% owners at each level. Once a public reporting company (a company subject to Sections 12 or 15(d) of the Exchange Act) is reached, no further ownership information need be given.

4. In the DE/FE/I column below, enter "DE" if the owner is a domestic entity, "FE" if the owner is an entity incorporated or domiciled in a foreign country, or "I" if the owner is an individual.

5. Complete the Status column by entering the owner's status as partner, trustee, elected manager, shareholder, or member; and for shareholders or members, the class of securities owned (if more than one is issued).

6. Ownership codes are:

| C - 25% but less than 50% | E - 75% or more |
|---|---|
| D - 50% but less than 75% | F - Other (general partner, trustee, or elected manager) |

7. (a) In the *Control Person* column, enter "Yes" if the *person* has *control* as defined in the Glossary of Terms to Form ADV, and enter "No" if the *person* does not have *control*. Note that under this definition, most executive officers and all 25% owners, general partners, elected managers, and trustees are *control persons*.

   (b) In the PR column, enter "PR" if the owner is a public reporting company under Sections 12 or 15(d) of the Exchange Act.

   (c) Complete each column.

No Indirect Owner Information Filed

# FORM ADV
## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

**Primary Business Name: NEMAN FINANCIAL, INC**  **CRD Number: 159019**
**ADV - SEC Initial, SCHEDULE C**  **Rev. 11/2010**
**9/2/2011 5:08:38 PM**

Form ADV, Schedule C

**Amendments to Schedules A and B**

1. Use Schedule C only to amend information requested on either Schedule A or Schedule B. Refer to Schedule A and Schedule B for specific instructions for completing this Schedule C. Complete each column.

2. In the Type of Amendment column, indicate "A" (addition), "D" (deletion), or "C" (change in information about the same *person*).

3. Ownership codes are:

| | | | |
|---|---|---|---|
| NA - less than 5% | C - 25% but less than 50% | G - Other (general partner, trustee, or elected member) |
| A - 5% but less than 10% | D - 50% but less than 75% | |
| B - 10% but less than 25% | E - 75% or more | |

4. List below all changes to Schedule A (Direct Owners and Executive Officers):

No Changes to Direct Owner / Executive Officer Information Filed

5. List below all changes to Schedule B (Indirect Owners):

No Changes to Indirect Owner Information Filed

# FORM ADV
## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

**Primary Business Name: NEMAN FINANCIAL, INC**              **CRD Number: 159019**
**ADV - SEC Initial, SCHEDULE D Page 1**                        **Rev. 11/2010**
**9/2/2011 5:08:38 PM**

**Form ADV, Schedule D Page 1**

Certain items in Part 1A of Form ADV require additional information on Schedule D. Use this Schedule D Page 1 to report details for items listed below. Report only new information or changes/updates to previously submitted information. Do not repeat previously submitted information.

**Section 1.B. Other Business Names**

List your other business names and the jurisdictions in which you use them. You must complete a separate Schedule D for each business name.

No Information Filed

**Section 1.F. Other Offices**

Complete the following information for each office, other than your *principal office and place of business*, at which you conduct investment advisory business. You must complete a separate Schedule D Page 1 for each location. If you are applying for registration, or are registered, only with the SEC, list only the largest five (in terms of numbers of *employees*).

No Information Filed

**Section 1.I. World Wide Web Site Addresses**

List your World Wide Web site addresses. You must complete a separate Schedule D for each World Wide Web site address.

World Wide Web Site Address:  WWW.NEMANFINANCIAL.COM

**Section 1.K. Locations of Books and Records**

Complete the following information for each location at which you keep your books and records, other than your *principal office and place of business*. You must complete a separate Schedule D Page 1 for each location.

**No Information Filed**

# FORM ADV
## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

**Primary Business Name: NEMAN FINANCIAL, INC**

**ADV - SEC Initial, SCHEDULE D, Page 2**

9/2/2011 5:08:38 PM

**CRD Number: 159019**

**Rev. 11/2010**

**Form ADV, Schedule D Page 2**

Use this Schedule D Page 2 to report details for items listed below. Report only new information or changes/updates to previously submitted information. Do not repeat previously submitted information.

**Section 1.L. Registration with *Foreign Financial Regulatory Authorities***

List the name, in English, of each *foreign financial regulatory authority* and country with which you are registered. You must complete a separate Schedule D Page 2 for each *foreign financial regulatory authority* with whom you are registered.

**No Information Filed**

**Section 2.A(7) Affiliated Adviser**

If you are relying on the exemption in rule 203A-2(c) from the prohibition on registration because you *control*, are *controlled* by, or are under common *control* with an investment adviser that is registered with the SEC and your *principal office and place of business* is the same as that of the registered adviser, provide the following information:

Name of Registered Investment Adviser

*CRD* Number of Registered Investment Adviser (if any)

SEC Number of Registered Investment Adviser
  801-

**Section 2.A(8) Newly Formed Adviser**

If you are relying on rule 203A-2(d), the newly formed adviser exemption from the prohibition on registration, you are required to make certain representations about your eligibility for SEC registration. By checking the appropriate boxes, you will be deemed to have made the required representations. You must make both of these representations:

☑ I am not registered or required to be registered with the SEC or a *state securities authority* and I have a reasonable expectation that I will be eligible to register with the SEC within 120 days after the date my registration with the SEC becomes effective.

☑ I undertake to withdraw from SEC registration if, on the 120th day after my registration with the SEC becomes effective, I would be prohibited by Section 203A(a) of the Advisers Act from

registering with the SEC.

---

**Section 2.A(9) Multi-State Adviser**

If you are relying on rule 203A-2(e), the multi-state adviser exemption from the prohibition on registration, you are required to make certain representations about your eligibility for SEC registration. By checking the appropriate boxes, you will be deemed to have made the required representations.

If you are applying for registration as an investment adviser with the SEC, you must make both of these representations:

☐ I have reviewed the applicable state and federal laws and have concluded that I am required by the laws of 30 or more states to register as an investment adviser with the securities authorities in those states.

☐ I undertake to withdraw from SEC registration if I file an amendment to this registration indicating that I would be required by the laws of fewer than 25 states to register as an investment adviser with the securities authorities of those states.

If you are submitting your *annual updating amendment*, you must make this representation:

☐ Within 90 days prior to the date of filing this amendment, I have reviewed the applicable state and federal laws and have concluded that I am required by the laws of at least 25 states to register as an investment adviser with the securities authorities in those states.

# FORM ADV
# UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

Primary Business Name: NEMAN FINANCIAL, INC                    CRD Number: 159019
ADV - SEC Initial, SCHEDULE D, Page 3                          Rev. 11/2010
9/2/2011 5:08:38 PM

---

**Form ADV, Schedule D Page 3**

Use this Schedule D Page 3 to report details for items listed below. Report only new information or changes/updates to previously submitted information. Do not repeat previously submitted information.

---

**Section 2.A(11) SEC Exemptive *Order***

No Information Filed

---

**Section 4 Successions**

Complete the following information if you are succeeding to the business of a currently-registered investment adviser. If you acquired more than one firm in the succession you are reporting on this Form ADV, you must complete a separate Schedule D Page 3 for each acquired firm. See Part 1A Instruction 4.

No Information Filed

---

**Section 5.I(2) *Wrap Fee Programs***

If you are a portfolio manager for one or more *wrap fee programs*, list the name of each program and its *sponsor*. You must complete a separate Schedule D Page 3 for each *wrap fee program* for which you are a portfolio manager.

| No Information Filed |
| --- |

| **Section 6.B. Description of Primary Business** |
| --- |
| No Information Filed |

| **SECTION 7.A. Affiliated Investment Advisers and Broker-Dealers** |
| --- |
| No Information Filed |

# FORM ADV
## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

**Primary Business Name: NEMAN FINANCIAL, INC**          **CRD Number: 159019**

**ADV - SEC Initial, SCHEDULE D, Page 4**                **Rev. 11/2010**

**9/2/2011 5:08:38 PM**

| **Form ADV, Schedule D Page 4** |
| --- |
| Use this Schedule D Page 4 to report details for items listed below. Report only new information or changes/updates to previously submitted information. Do not repeat previously submitted information. |

| **Section 7.B. Limited Partnership Participation or Other Private Fund Participation** |
| --- |
| You must complete a separate Schedule D Page 4 for each limited partnership in which you or a *related person* is a general partner, each limited liability company for which you or a *related person* is a manager, and each other private fund that you advise. |

Name of Limited Partnership, Limited Liability Company, or other Private Fund:
**NEMAN FINANCIAL, LP**

Name of General Partner or Manager:
**NEMAN FINANCIAL, INC.**

                                                                    **Yes No**

If you are registered or registering with the SEC, is this a "private fund" as defined under SEC   ⊙   ○
rule 203(b)(3)-1?

Are your *clients* solicited to invest in the limited partnership, limited liability company, or       ⊙   ○
other private fund?

Approximately what percentage of your *clients* have invested in this limited partnership, limited liability
company, or other private fund?
**0 %**

Minimum investment commitment required of a limited partner, member, or other investor:
**$ 1000000**

Current value of the total assets of the limited partnership, limited liability company, or other private
fund:
**$ 0**

| **SECTION 9.C. Independent Public Accountant** |
| --- |
| You must complete the following information for each independent public accountant engaged to perform a surprise examination, perform an audit of a pooled investment vehicle that you manage, or prepare an internal control report. You must complete a separate Schedule D Page 4 for each independent public |

accountant.

(1) Name of the independent public accountant:
ACQUAVELLA, CHIARELLI, SHUSTER, BERKOWER & CO.

(2) The location of the independent public accountant's office responsible for the services provided:

| Number and Street 1: | Number and Street 2: |
|---|---|
| 517 ROUTE ONE | |
| City: | State: |
| ISELIN | New Jersey |
| Country: | ZIP+4 / Postal Code: |
| UNITED STATES | 08830 |

If this address is a private residence, check this box: ☐

|  | Yes | No |
|---|---|---|
| (3) Is the independent public accountant registered with the Public Company Accounting Oversight Board? | ⊗ | ○ |
| (4) If yes to (3) above, is the independent public accountant subject to regular inspection by the Public Company Accounting Oversight Board in accordance with its rules? | ⊙ | ○ |

(5) The independent public accountant is engaged to:

A. ☑ audit a pooled investment vehicle

B. ☐ perform a surprise examination of *clients* assets

C. ☐ prepare an internal control report

|  | Yes | No |
|---|---|---|
| (6) Does the report prepared by the independent public accountant that audited the pooled investment vehicle or that examined internal controls contain an unqualified opinion? | ○ | ⊗ |

**SECTION 9.D. Related Person Qualified Custodian**

No Information Filed

**Section 10 *Control Persons***

You must complete a separate Schedule D Page 4 for each *control person* not named in Item 1.A. or Schedules A, B, or C that directly or indirectly *controls* your management or policies.

No Information Filed

# FORM ADV
## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

Primary Business Name: NEMAN FINANCIAL, INC

ADV - SEC Initial, SCHEDULE D, Page 5

9/2/2011 5:08:38 PM

CRD Number: 159019

Rev. 11/2010

Form ADV, Schedule D Page 5

Use this Schedule D Page 5 to report details for items listed below. Report only new information or changes/updates to previously submitted information. Do not repeat previously submitted information.

**Schedule D - Miscellaneous**

You may use the space below to explain a response to an Item or to provide any other information.

# FORM ADV
## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

Primary Business Name: NEMAN FINANCIAL, INC

**ADV - SEC Initial, DRP Pages**

9/2/2011 5:08:38 PM

CRD Number: 159019

Rev. 11/2010

| CRIMINAL DISCLOSURE REPORTING PAGE (ADV) |
|---|
| No Information Filed |
| REGULATORY ACTION DISCLOSURE REPORTING PAGE (ADV) |
| No Information Filed |
| CIVIL JUDICIAL ACTION DISCLOSURE REPORTING PAGE (ADV) |
| No Information Filed |
| Bond DRPs |
| No Information Filed |

| Judgment/Lien DRPs |
|---|
| No Information Filed |
| Arbitration DRPs |
| No Information Filed |

# FORM ADV
## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

Primary Business Name: NEMAN FINANCIAL, INC

**ADV - SEC Initial, Execution Pages**

9/2/2011 5:08:38 PM

CRD Number: 159019

Rev. 11/2010

**DOMESTIC INVESTMENT ADVISER EXECUTION PAGE**

You must complete the following Execution Page to Form ADV. This execution page must be signed and attached to your initial application for SEC registration and all amendments to registration.

## Appointment of Agent for Service of Process

By signing this Form ADV Execution Page, you, the undersigned adviser, irrevocably appoint the Secretary of State or other legally designated officer, of the state in which you maintain your *principal office and place of business* and any other state in which you are submitting a *notice filing*, as your agents to receive service, and agree that such *persons* may accept service on your behalf, of any notice, subpoena, summons, *order* instituting *proceedings*, demand for arbitration, or other process or papers, and you further agree that such service may be made by registered or certified mail, in any federal or state action, administrative *proceeding* or arbitration brought against you in any place subject to the jurisdiction of the

United States, if the action, *proceeding* or arbitration (a) arises out of any activity in connection with your investment advisory business that is subject to the jurisdiction of the United States, and (b) is *founded*, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these acts, or (ii) the laws of the state in which you maintain your *principal office and place of business* or of any state in which you are submitting a *notice filing*.

## Signature

I, the undersigned, sign this Form ADV on behalf of, and with the authority of, the investment adviser. The investment adviser and I both certify, under penalty of perjury under the laws of the United States of America, that the information and statements made in this ADV, including exhibits and any other information submitted, are true and correct, and that I am signing this Form ADV Execution Page as a free and voluntary act.

I certify that the adviser's books and records will be preserved and available for inspection as required by law. Finally, I authorize any *person* having custody or possession of these books and records to make them available to federal and state regulatory representatives.

| Signature: | Date: MM/DD/YYYY |
| --- | --- |
| SHERVIN NEMAN | 09/01/2011 |
| Printed Name: | Title: |
| SHERVIN NEMAN | CEO |
| Adviser *CRD* Number: | |
| 159019 | |

### *NON-RESIDENT* INVESTMENT ADVISER EXECUTION PAGE

You must complete the following Execution Page to Form ADV. This execution page must be signed and attached to your initial application for SEC registration and all amendments to registration.

## 1. Appointment of Agent for Service of Process

By signing this Form ADV Execution Page, you, the undersigned adviser, irrevocably appoint each of the Secretary of the SEC, and the Secretary of State or other legally designated officer, of any other state in which you are submitting a *notice filing*, as your agents to receive service, and agree that such *persons* may accept service on your behalf, of any notice, subpoena, summons, *order* instituting *proceedings*, demand for arbitration, or other process or papers, and you further agree that such service may be made by registered or certified mail, in any federal or state action, administrative *proceeding* or arbitration brought against you in any place subject to the jurisdiction of the United States, if the action, *proceeding*, or arbitration (a) arises out of any activity in connection with your investment advisory business that is subject to the jurisdiction of the United States, and (b) is *founded*, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these acts, or (ii) the laws of any state in which you are submitting a *notice filing*.

## 2. Appointment and Consent: Effect on Partnerships

If you are organized as a partnership, this irrevocable power of attorney and consent to service of process will continue in effect if any partner withdraws from or is admitted to the partnership, provided that the admission or withdrawal does not create a new partnership. If the partnership dissolves, this irrevocable

Exhibit 49 page 65

power of attorney and consent shall be in effect for any action brought against you or any of your former partners.

## 3. *Non-Resident* Investment Adviser Undertaking Regarding Books and Records

By signing this Form ADV, you also agree to provide, at your own expense, to the U.S. Securities and Exchange Commission at its principal office in Washington D.C., at any Regional or District Office of the Commission, or at any one of its offices in the United States, as specified by the Commission, correct, current, and complete copies of any or all records that you are required to maintain under Rule 204-2 under the Investment Advisers Act of 1940. This undertaking shall be binding upon you, your heirs, successors and assigns, and any *person* subject to your written irrevocable consents or powers of attorney or any of your general partners and *managing agents*.

## Signature

I, the undersigned, sign this Form ADV on behalf of, and with the authority of, the *non-resident* investment adviser. The investment adviser and I both certify, under penalty of perjury under the laws of the United States of America, that the information and statements made in this ADV, including exhibits and any other information submitted, are true and correct, and that I am signing this Form ADV Execution Page as a free and voluntary act.

I certify that the adviser's books and records will be preserved and available for inspection as required by law. Finally, I authorize any *person* having custody or possession of these books and records to make them available to federal and state regulatory representatives.

| Signature: | Date: MM/DD/YYYY |
|---|---|
| Printed Name: | Title: |

Adviser *CRD* Number:
159019

### State Registered Investment Adviser Execution Page

You must complete the following Execution Page to Form ADV. This execution page must be signed and attached to your initial application for state registration and all amendments to registration.

## 1. Appointment of Agent for Service of Process

By signing this Form ADV Execution Page, you, the undersigned adviser, irrevocably appoint the legally designated officers and their successors, of the state in which you maintain your *principal office and place of business* and any other state in which you are applying for registration or amending your registration, as your agents to receive service, and agree that such persons may accept service on your behalf, of any notice, subpoena, summons, *order* instituting *proceedings*, demand for arbitration, or other process or papers, and you further agree that such service may be made by registered or certified mail, in any federal or state action, administrative *proceeding* or arbitration brought against you in any place subject to the jurisdiction of the United States, if the action, *proceeding*, or arbitration (a) arises out of any activity in connection with your investment advisory business that is subject to the jurisdiction of the United States, and (b) is founded, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these acts, or (ii) the laws of the state in which you maintain your *principal office and place of business* or of any state in

which you are applying for registration or amending your registration.

## 2. State-Registered Investment Adviser Affidavit

If you are subject to state regulation, by signing this Form ADV, you represent that, you are in compliance with the registration requirements of the state in which you maintain your principal place of business and are in compliance with the bonding, capital, and recordkeeping requirements of that state.

## Signature

I, the undersigned, sign this Form ADV on behalf of, and with the authority of, the investment adviser. The investment adviser and I both certify, under penalty of perjury under the laws of the United States of America, that the information and statements made in this ADV, including exhibits and any other information submitted, are true and correct, and that I am signing this Form ADV Execution Page as a free and voluntary act.

I certify that the adviser's books and records will be preserved and available for inspection as required by law. Finally, I authorize any *person* having *custody* or possession of these books and records to make them available to federal and state regulatory representatives.

| Signature | Date MM/DD/YYYY |
|---|---|
| CRD Number 159019 | |
| Printed Name | Title |

Privacy ┊ Legal ┊ Use of Web CRD® or IARD™ is governed by the Terms & Conditions.
©2011 FINRA. All rights reserved. FINRA is a registered trademark of the Financial Industry Regulatory Authority, Inc.

**Exhibit 50**

Part 2A FORM ADV

FIRM BROCHURE

**Item 1. Cover Page**

NEMAN FINANCIAL

1999 AVENUE OF THE STARS

SUITE 2045

LOS ANGELES, CA 90067

310-359-8675

WWW.NEMANFINANCIAL.COM

This brochure provides information about qualifications and business practices of Neman Financial. If you have any questions about the contents of this brochure, please contact us at 310-359-8675 and/or shervin@nemanfinancial.com. The information in this brochure has not been approved or verified by the United States Securities and Exchange Commission or by any state securities authority.

Additional information about Neman Financial also is available on the SEC's website at www.adviserinfo.sec.gov. Registration with the SEC as a registered investment adviser does not imply a certain level of skill or training.



Exhibit 50 page 68

## Item 2. Material Changes

This is the initial filing for Neman Financial, there are no material changes.

Part 2A of Form ADV: Firm Brochure

Exhibit 50 page 69

**Item 3. Table of Contents**

Item 1. Cover Page.................................................................................................... 1

Item 2. Material Changes ......................................................................................... 2

Item 4. Advisory Business ........................................................................................ 4

Item 5. Fees and Compensation ............................................................................... 6

Item 6. Performance-Based Fees and Side by Side Management .................................. 8

Item 7. Types of Clients............................................................................................ 9

Item 8. Methods of Analysis, Investment Strategies and Risk of Loss ........................ 10

Item 9. Disciplinary Information .............................................................................. 13

Item 10. Other Financial Industry Activities and Affiliates ........................................ 14

Item 11. Code of Ethics, Participation or Interest in Client Transactions and Personal Trading . 15

Item 12. Brokerage Practices ................................................................................... 16

Item 13. Review of Accounts.................................................................................... 17

Item 14. Client Referrals and Other Compensation .................................................... 18

Item 15. Custody..................................................................................................... 19

Item 16. Investment Discretion................................................................................ 20

Item 17. Voting Client Securities.............................................................................. 21

Item 18. Financial Information ................................................................................. 22

Item 19. Requirements for State Registered Advisers ................................................ 23

Part 2A of Form ADV: Firm Brochure

Exhibit 50 page 70

**Item 4. Advisory Business**

A. Neman Financial ("the Firm") is an investment advisory firm that was formed June 1, 2010. The Firm provides asset management services to its Clients (individually "the Client"). Please contact Shervin Neman, Chief Executive Officer, if you have any questions about this narrative.

Shervin Neman is the founder and Chief Executive Officer of Neman Financial, LP. Previous to starting Neman Financial, Mr. Neman was Senior Vice President of First Commerce Bank. At First Commerce Bank, he received the Business Development-Banker of the Year award.

Shervin Neman is the individual associated with the Firm who shall provide its investment advisory services.

Prior to First Commerce Bank, Mr. Neman was Senior Vice President of Gateway Bank, responsible for running all of the Southern California locations.

Mr. Neman graduated from UC Berkeley Phi Beta Kappa with a double major in business administration and molecular and cell biology with an emphasis in neurobiology.

B. The Firm provides discretionary advisory services through separately managed accounts to high net worth individuals, corporations or other business entities. Neman Financial also serves as investment manager to a Limited Partnership, Neman Financial, LP.

The Firm provides discretionary advisory investment management services defined as providing continuous investment advice based on each client's individual needs. Upon execution and acceptance of the Investment Advisory Agreement, the Firm will assist client with establishing an individual account at the firm of the Client's choice. The Firm offers an Asset Management Program whereby the Firm manages Clients accounts for Management Fee and Performance Allocation. The Asset Management Program is designed to assist Clients, both individuals, trusts, estates, charitable organization, corporations and limited partnerships, to clarify their investment needs and to obtain professional asset management.

Neman Financial's primary business is to manage client and proprietary capital through global macro hedge fund strategies as well as other alternative investment disciplines. Assets are managed through a broad mandate to trade in a variety of global markets and instruments.

Part 2A of Form ADV: Firm Brochure

Exhibit 50 page 71

C. The Firm will obtain financial data from the Client and assist the Client in determining the suitability of the Asset Management Program based on information provided on a confidential client questionnaire. Neman Financial shall tailor its advisory services to the individual needs of the Client, by meeting with the clients to ascertain their financial goals and risk tolerance. The investment advice varies depending upon the Client's desires, objectives and other preferences. The Clients may place restrictions on investing in certain securities or types of securities, which shall be negotiated and memorialized in the Investment Advisory Contract.

The account is managed to diversify the Client's investments and may include but is not limited to, stocks, bonds, options, mutual funds, and money market instruments. Investments and allocations are determined based on the Client's predefined objectives, risk tolerance, time horizon, financial horizon, financial information, and other various suitability factors that are determined. Accounts are managed on an individual basis. Further restrictions and guidelines may be imposed by the Client, which may affect the composition and performance of the portfolio. On an ongoing basis, the Firm shall review the Client's financial circumstances and investment objectives and may make adjustments to the Client's portfolio in order to achieve the desired results.

D. Neman Financials does not participate in wrap fee programs at this time.

E. As of the filing date the Firm has no assets under management, but it is anticipated that the Firm will have $120 million dollars ($120,000,000 USD) in assets under management within 120 days of filing.

## Item 5. Fees and Compensation

A. Clients will be charged a Management Fee of 2% per annum.  Client may also incur charges imposed by third parties in connection with investments made through an individually managed account.  The Client must pay transaction costs separately, the Firm does not include those fees.

The Fees charged to the account are negotiable and are set forth in the agreement for services.

B. The Management Fee is deducted from the Client's assets at a rate of 2% per annum, computed and payable monthly in arrears on the first business day of each month, in monthly installments (of 0.01667%), and shall be calculated on the basis of the market value of the portfolio as of the opening of business on such day. Any Management Fee payable for any period of less than a month shall be pro-rated appropriately and be payable on the first day of such period.

No matter what structure of compensation a firm receives for managing a Client's assets, conflicts of interest are inevitable.  The Firm attempts to avoid these conflicts whenever possible and if not feasible, we try to disclose these conflicts to our customers.  The primary means we have of disclosing these conflicts to our customers is through this brochure which is updated no less than annually.

Separately managed account clients may terminate our business relations at any time, effective form the time the Firm receives written notification of such other time as may be mutually agreed upon.

C. The Client is responsible for any expenses incurred in connection with the purchase, sale or carrying of securities or other investments (including brokerage commissions, interest expenses and custody and transfer fees).

D. Payments shall be made in arrears, after they are earned, if a Client terminates the contract, the fees will be pro-rated for the month.

The foregoing represents the fees the Firm generally charges.  However, fees are negotiable depending upon the services the Client requires.

Part 2A of Form ADV: Firm Brochure

Exhibit 50 page 73

E. This section does not apply to the Firm.

Part 2A of Form ADV: Firm Brochure

Exhibit 50 page 74

## Item 6. Performance-Based Fees and Side by Side Management

The Firm in addition to acting as investment advisor to individuals in Separately Managed Accounts acts as the investment advisor to a hedge fund, Neman Financial, LP.

The Firm is entitled to receive an incentive allocation equal to 20% of the net profits originally allocated to each Separately Managed Account or for Neman Financial, LP a Limited Partner, for each fiscal year (after recovery of any losses in any prior periods).

The Firm is eligible to receive an incentive allocation for managing the partnership which could create an incentive for the Firm to focus more on the partnership. Managing two different formats of investments may be referred to as side by side management and may create some conflicts of interest. For example, the advisory fees paid by the Partnership may exceed those paid by separately managed accounts, there may be an increase in the level of competition for execution of the same or similar transactions, and there will be competition for the manager's time in monitoring various trading portfolios. The Firm believes that it has sufficient time to devote to monitoring and trading both the separately managed accounts and the partnership's assets. In addition, the Firm believes it has sufficient policies and procedures to address these conflicts.

The Firm may receive an incentive allocation equal to 20% of the net profits originally allocated the Limited Partners of Neman Financial, LP in addition to its *pro rata* share of net profits based upon its invested capital in Neman Financial, LP. Net losses, however, are allocated to the General Partner and the Limited Partners solely on the basis of their relative capital. Although this type of relative allocation of profits and losses has largely become a customary standard for private investment partnerships, it can be characterized as creating an incentive to the General Partner for speculative investment and thus a potential conflict with the interests of the Limited Partners.

The Firm's incentive allocation with respect to portfolio securities generally is based upon both realized and unrealized gains and losses. Therefore, it is possible that the Firm may be entitled to receive an incentive allocation on the basis of net unrealized gains that are in fact not ultimately realized by the Partnership. However, the Firm's incentive allocation with respect to transactions in Restricted Securities is based solely upon realized gains and losses and is determined separately. Accordingly, it is possible that the Firm may be entitled to receive an incentive allocation with respect to a Limited Partner's share of net realized gains in Restricted Securities, although the Limited Partner may have un-recouped losses as to other securities generally, and *vice versa.*

Part 2A of Form ADV: Firm Brochure

Exhibit 50 page 75

**Item 7. Types of Clients**

The Firm provides investment advisory services to high net worth individuals, banking or thrift institutions, investment companies, other pooled investment vehicles, and State or municipal government entities.  The minimum account size for the partnership is $1000,000.00, however the minimum may be waived.

Exhibit 50 page 76

## Item 8. Methods of Analysis, Investment Strategies and Risk of Loss

A. Neman Financial's primary business is to manage client and proprietary capital through global macro hedge fund strategies as well as other alternative investment disciplines. Assets are managed through a broad mandate to trade in a variety of global markets and instruments. All securities investments risk the loss of capital. The nature of the securities to be purchased and traded by the Partnership and the investment techniques and strategies to be employed by the Investment Manager may increase this risk. There can be no assurance that the Partnership will not incur losses. Many unforeseeable events, including actions by various government agencies, and domestic and international economic and political developments, may cause sharp market fluctuations which could adversely affect the Partnership's portfolio and, therefore, performance.

B. *General.* The Investment Manager's trading strategy may require the accumulation of large amounts of market and investment data on a real-time basis and the accurate analysis of such data. Although much of the analysis performed may be technical or quantitative in nature, the investment conclusions to be derived therefrom, and the application thereof to particular trading decisions, is inherently a subjective process that is critically dependent upon the skill and judgment of the Investment Manager. As with other trading strategies, the Investment Manager's analytical approach may indicate probabilities of relative price movements which are not necessary or inevitable or which may not necessarily recur in the future in a manner which will support a profitable trading strategy. There may be market or macro-economic developments, as well as events affecting a particular issuer or industry, which may not be addressed or anticipated by the trading methodology.

As with any investment approach or strategy, the Investment Manager's strategy and methodology cannot assure any given level of investment return or that the Partnership's investment objective will in fact be realized. There can be no assurance that use of the methodology will necessarily result in profitability or that the Partnership will not incur losses.

*Concentration of Investments.* There are no fixed limitations upon the Partnership's ability to invest in securities of any single issuer or in any single industry or industry group or sector. Accordingly, the Partnership's portfolio may at times be moderately or heavily concentrated. Although market economists have expressed differing views as to the effectiveness of diversification in reducing investment risk, concentration of investments in a limited number of industries or industry groups is generally regarded as increasing both relative investment risk and potential volatility.

Part 2A of Form ADV: Firm Brochure

Exhibit 50 page 77

*Transaction Execution and Costs.* The Partnership's trading strategy may involve heavy trading, high volume and in many cases relatively narrow spreads between the prices at which the Partnership will purchase and sell particular positions. The successful application of such a strategy will depend significantly upon the quality of execution of transactions, such as the ability of broker-dealers to execute orders on a timely and efficient basis. Although the Investment Manager will seek to utilize brokerage firms which afford superior execution capability to the Partnership, there is no assurance that all of the Partnership's transactions will be executed with optimal quality. On account of the degree of heavy trading, moreover, total brokerage commission charges and other transaction costs may be expected to be high, and on an annual basis may be in an amount in excess of Partnership capital. The level of brokerage commission charges, as an expense of the Partnership, may be expected to be a significant factor in determining future profitability of the Partnership.

*Possible Limited Liquidity.* The Partnership's trading strategy generally requires a high degree of market liquidity for particular positions. If events were to arise which limited the market in a particular security or otherwise adversely affected its liquidity, such securities would prove more difficult to sell in a timely or efficient manner and such developments could thus impair to some extent the Partnership's ability to fully realize portfolio gains or limit losses.

*Short Selling.* Short selling is a part of the Investment Manager's investment strategy and is utilized both in situations where the Investment Manager believes the securities in question are overvalued, and therefore likely to experience significant price declines, over time, or as a hedge or offset to related long positions. Short selling inherently involves certain additional risks. Selling securities short creates the risk of losing an amount greater than the initial investment in a relatively short period of time and the theoretically unlimited risk of an increase in the market price of the securities sold short. Short selling can also involve significant borrowing and other costs which can reduce the profit or create losses in particular positions.

*Options.* The Partnership utilizes options in furtherance of its investment strategy and for both speculative and hedging purposes. Options positions may include long positions, where the Partnership is the holder of put or call options, as well as short positions, where the Partnership is the seller (writer) of an option. Although option techniques can increase investment return, they can also involve a relatively higher level of risk. The expiration of unexercised long option positions effectively results in loss of the entire cost or premium paid for the option. Option premium costs, as well as the cost of covering options can

reduce or eliminate position profits or create losses. The Partnership's ability to close out its position as a purchaser of an exchange-listed option is dependent upon the existence of a liquid secondary market on option exchanges. On occasion, the Partnership may also utilize options, particularly in foreign markets, which may have limited liquidity.

The seller ("writer") of a call option which is covered assumes the risk of a decline in the market price of the underlying security or other instrument below the purchase price of the underlying instrument, less the amount of premium received by the seller, and forgoes the opportunity for gain on the underlying instrument above the exercise price of the option. The buyer of a call option assumes the risk of losing its entire investment (the premium paid) in the call option. If the buyer of a call option sells short the underlying security or other instrument, a loss on the call option itself may be offset, in whole or in part, by any gain on the short sale of the underlying position.

The seller ("writer") of a put option which is covered assumes the risk of an increase in the market price of the underlying security or other instrument above the sales price (in establishing the short position) of the underlying instrument, plus the premium received by the seller, and forgoes the opportunity for gain on the underlying instrument below the exercise price of the option. The buyer of a put option assumes the risk of losing its entire investment (the premium paid) in the put option. If the buyer of a put option holds a long position in the underlying security or other instrument, a loss on the put option itself may be offset, in whole or in part, by any gain on the underlying position.

*Limited Hedging.* The Investment Manager may employ certain hedging techniques, directed primarily toward general market risks, but is not required to do so. If employed, hedging against a decline in the value of a portfolio position does not eliminate fluctuations in the values of portfolio positions or prevent losses if the values of such positions decline, but establishes other positions designed to gain from those same developments. For a variety of reasons, the Investment Manager may not seek or be able to establish a sufficiently accurate correlation between hedging instruments and the portfolio holdings being hedged. Such imperfect correlation may prevent the Partnership from achieving the intended hedge or expose the Partnership to risk of loss. Hedging, if employed at all, will be employed solely as a technique to limit certain market risks. As a general matter, the Partnership's portfolio will still be exposed to basic company risk and other risks attendant to its investment strategy, which risks will not be generally hedged.

Exhibit 50 page 79

## Item 9. Disciplinary Information

Registered Investment Advisors are required to disclose all material facts regarding any legal or disciplinary events that would be material to your evaluation of the Firm or the integrity of the Firm's management. The Firm has no history of material disciplinary action.

A. The Firm has no criminal or civil actions in a domestic, foreign or military court of competent jurisdiction.

B. The Firm has no administrative proceedings before the SEC or any other federal regulatory agency, any state regulatory agency, or any foreign financial regulatory authority.

C. The Firm has no self regulatory organization proceedings.

Part 2A of Form ADV: Firm Brochure

Exhibit 50 page 80

**Item 10. Other Financial Industry Activities and Affiliates**

A. The Firm is not registered and is not planning to register as a Broker-Dealer or a registered representative of a Broker-Dealer.

B. The Firm is not registered as a futures commission merchant, commodity pool operator, a commodity trading advisor or associated person of the foregoing entities.

C. The Firm does have a relationship or arrangement that is material to the Firm's advisory business with the private investment company "Hedge Fund" Neman Financial, LP. The Firm serves as the General Partner to Neman Financial, LP. The Firm may share employees with Neman Financial, LP.  The Firm may be responsible for the start up costs of Neman Financial, LP, provided that Neman Financial, LP reimburse the Firm for said costs in equal installments over 60 months. We do not believe this arrangement will have a material impact on performance. Due to the relationship between the Firm and Neman Financial, LP and Separately Managed accounts there may be conflicts of interest.  This conflict of interest could lead an advisor to suggest switching assets to an investment in the LP or vice versa, if the advisor perceives a higher level of compensation may result from the other investment.  Interests in the LP will not be registered under the U.S. Securities Act of 1933 ("Securities Act").  Interests will be offered and sold in the United States to accredited investors and sophisticated investors under the exemptions provided by Section 4(2) of the Securities Act and Regulation D. While Portfolio Managers will use their best efforts to provide the LP and other Client portfolios with suitable investment opportunities, it is possible that Portfolio Managers might not present the LP and other clients portfolios with the same investment opportunities that may come to their attention even if such opportunities are consistent with the LP's and other clients' investment objectives.  Portfolio Managers will use their best judgment and specific knowledge of the LP and client accounts when determining which securities to recommend or invest in specific instances.

D. The firm does not recommend other investment advisors or receive compensation from other advisors.

Part 2A of Form ADV: Firm Brochure

Exhibit 50 page 81

**Item 11. Code of Ethics, Participation or Interest in Client Transactions and Personal Trading**

A. The Firm has adopted a code of ethics pursuant to SEC rule 204A-1. The Firm will provide a hard copy of the code of ethics to any client or prospective client upon request. The Firm has appointed a Chief Compliance Officer for the purposes of administering and overseeing compliance of its Code of Ethics, policies and procedures. Owners, and employees upon commencing employment shall read the Code of Ethics and attest to their understanding. The Chief Compliance Officer has the ability to establish continuing education programs.

B. The Firm will not recommend to clients or buy for client accounts securities in which it has a material financial interest, unless it has provided written notice as specified in section 206(3) of the Investment Advisors Act.

C. The Firm invests in the same securities that the firm or related person recommends to clients. The Firm has created policies to monitor client account activity and proper allocation of investment opportunities, based on each clients stated investment objectives, to address those conflicts. Because Portfolio Managers will be trading in accounts for the Partnership as well as individuals there may be incorrectly placed trades. The Firm will reverse those trades and be responsible for the loss.

D. The Firm may recommend securities to a client or buy or sell securities for client accounts about the same time that the Firm buys for its own or related account, subject to the requirements of its internal policies and procedures. The Firm has created policies to monitor client account activity and proper allocation of investment opportunities, based on each clients stated investment objectives, to address those conflicts. Because Portfolio Managers will be trading in accounts for the Partnership as well as individuals there may be incorrectly placed trades. The Firm will reverse those trades and be responsible for the loss. The Chief Compliance Officer will review evidence of the correction for consistency timeliness of resolution and to identify patterns of losses.

**Item 12. Brokerage Practices**

A.  The Firm allows the client in a Separately Managed Account to direct the Firm to execute transactions at any Brokerage Firm.   The Firm may decide on the Brokerage Firm on behalf of the Partnership.  The Fim will seek to utilize brokerage firms which afford superior execution capability to the Partnership, there is no assurance that all of the Partnership's transactions will be executed with optimal quality. In addition to seeking broker-dealers with superior execution capability, the Investment Manager may allocate transactions to brokers which agree to pay or reimburse the Partnership for certain operating expenses (including those of the Investment Manager and its affiliates), or so-called "soft dollar" arrangements under the "soft dollar" safe harbor of Section 28(e) of the Securities Exchange Act of 1934. Although the Investment Manager will, in general, seek such arrangements only where it believes the same will be consistent with principles of best execution, such soft dollar arrangements may result in increased brokerage commission costs or other inefficiencies in execution. There can be no assurance that the Investment Manager will be successful in seeking to reduce the expense costs of the Partnership through satisfactory soft dollar arrangements or that such arrangements will not result in increased transaction costs or otherwise impact the Partnership, however the Investment Manager shall determine in good faith that the amount of the commission is reasonable in relation to the value of the "brokerage and research services" obtained.

Part 2A of Form ADV: Firm Brochure

Exhibit 50 page 83

**Item 13. Review of Accounts**

    A. The Investment Advisor is involved in a continuous and on-going monitoring of he Client accounts to ensure that each security or asset is suitable for the account based on information given by the client. In addition, the Chief Executive Officer and Chief Compliance Officer shall be responsible for reviewing all client accounts. This review may be delegated to a designee.

    B. On a daily basis the manager or designee must review all trades made by the firm for its Clients. The CEO, CFO or designee will conduct an annual review of the profitability of client accounts and their investment objectives. The CEO, CFO or designee will conduct a review upon the occurrence of certain event such as unusual trading activity or performance.

    C. The Firm will provide reports to Clients on a quarterly basis. Reports shall detail profits and losses for each client account, disbursements made from the accounts, a fee payments made to the Firm.

Part 2A of Form ADV: Firm Brochure

Exhibit 50 page 84

**Item 14. Client Referrals and Other Compensation**

A. The Firm does not have any arrangements where it receives an economic benefit for providing investment advice for someone who is not a client.

B. The Firm may engage third party marketers to bring Clients to the Firm.

Part 2A of Form ADV: Firm Brochure

Exhibit 50 page 85

**Item 15. Custody**

All Client assets are held at the custodian, who will send statements, not less than quarterly, directly to the Separately Managed Account Clients or to the Partnership. The statements contain important information about the activity in your account and the fees associated with transactions, among other items. You should compare correspondence from the firm concerning your account with the statement provided by the custodian.

Exhibit 50 page 86

**Item 16. Investment Discretion**

Once an executed Investment Advisory Agreement has been approved by the Firm, there are no limitations from the client on the Firm's authorization to buy or sell securities on client's behalf, to determine the amount of securities to be bought or sold on clients behalf.  Any limitation on this discretionary authority requested by clients must be submitted in writing and may be amended by the client at any time.

Part 2A of Form ADV: Firm Brochure

Exhibit 50 page 87

**EXHIBIT 51**

HOME



HOME

ABOUT

COMPANY

LEGAL DISCLAIMER

CONTACT

WELCOME

"If all the economists were laid end to end, they would never reach a conclusion."

-George Bernard Shaw

Content copyright 2010-2011. Neman Financial Inc. All rights reserved.



**Item 17. Voting Client Securities**

A. At this time the Firm is no voting proxies for Clients. The Firm generally is not able to advise or act on behalf of clients in legal proceedings, including class actions or bankruptcies, involving securities purchased or held in client accounts.

B. The Custodian will send all legal notices, including proxies, directly to the owners of each account.

Part 2A of Form ADV: Firm Brochure

Exhibit 51 page 89

**Item 18. Financial Information**

A. Registered Investment Advisors are required in this item to provide you with certain financial information or disclosure about the Firm's financial condition if we require prepayment of advisory fees, which we do not.

B. Registered Investment Advisors are required in this item to provide you with certain financial information or disclosure about the Firm's financial condition if we require prepayment of advisory fees, which we do not.

C. The Firm has no financial commitment that impairs its ability to meet contractual and fiduciary commitments to clients, and has not been the subject of a bankruptcy proceeding.

**Item 19. Requirements for State Registered Advisers**

A. This information was supplied elsewhere in this brochure.

B. The Firm is not engaged in any other business that is outside of investment advice.

C. For Separately Managed Accounts, the Advisor shall receive an Incentive Allocation of 20% of the profits of the account on a quarterly basis, provided however that if a Client has net losses, then the Advisor shall only be able to receive an Incentive Allocation to the extent profits then exceed those prior allocated losses. For the Partnership, as of the end of each Fiscal Year for which there shall have been allocated aggregate Net Profits to a Limited Partner for all Valuation Periods during such Year, then there shall be re-allocated to the General Partner from such Limited Partner an amount of Net Profits (the "Incentive Allocation") equal to twenty percent (20%) of such aggregate Net Profits; provided, however, that if a Limited Partner has any Net Losses allocated to him for any prior Fiscal Year or Years (each, a "Loss Year") then the General Partner shall be entitled to receive an Incentive Allocation only if, and to the extent that, the cumulative Net Profits allocated to such Limited Partner subsequent to such Loss Year or Years (including the current Fiscal Year) exceeds such prior allocated Net Losses.

D. The Firm and any management person associated with the firm have not been found liable in any arbitration claims, or fraud in a civil, self regulatory organization or administrative proceeding.

E. The Firm does not have any relationship with any issuer of securities that has not been disclosed.

Exhibit 51 page 91

ABOUT



NEMAN FINANCIAL, LP.

- HOME
- ABOUT
- COMPANY
- LEGAL DISCLAIMER
- CONTACT

## ABOUT

Shervin Neman is the founder and Chief Executive Officer of Neman Financial, LP. Previous to starting Neman Financial, Mr. Neman was Senior Vice President of First Commerce Bank. At First Commerce Bank, he received the Business Development Banker of the Year award.

Prior to First Commerce Bank, Mr. Neman was Senior Vice President of Gateway Bank, responsible for running all of the Southern California locations.

Mr. Neman graduated from UC Berkeley Phi Beta Kappa with a double major in business administration and molecular and cell biology with an emphasis in neurobiology.

Content copyright 2010-2011. Neman Financial, Inc. All rights reserved

COMPANY



NEMAN FINANCIAL, LP.

- HOME
- ABOUT
- COMPANY
- LEGAL DISCLAIMER
- CONTACT

## COMPANY

Neman Financial, LP. is a Los Angles based trading and investment firm formed as the successor to Neman Financial Inc. founded by Mr. Shervin Neman.

Neman Financial's primary business is to manage client and proprietary capital through global macro hedge fund strategies as well as other alternative investment disciplines. Assets are managed through a broad mandate to trade in a variety of global markets and instruments.

Content copyright 2010-2011. Neman Financial Inc. All rights reserved.



NEMAN FINANCIAL. LP.

- HOME
- ABOUT
- COMPANY
- LEGAL DISCLAIMER
- CONTACT

## LEGAL DISCLAIMER

The material contained in this web site is for your private information and the fund is not soliciting any action based upon it. Opinions expressed are our present opinions only. the material is based upon information which is considered reliable, but no representation is made that it is accurate or complete, and should not be relied upon as such. Past performance is not an indication of future performance.

Content copyright 2010-2011. Neman Financial Inc. All rights reserved.

CONTACT



**Neman Financial, LP.**

- HOME
- ABOUT
- COMPANY
- LEGAL DISCLAIMER
- CONTACT

## CONTACT

Neman Financial, LP
1999 Avenue of the Stars
Suite 2045
Los Angeles, CA 90067

Info@NemanFinancial.com

(310) 359-8675

Content copyright 2010-2011. Neman Financial Inc. All rights reserved

**EXHIBIT 52**

# Examination Information Request List
## Part 1

**Registrant**:   Neman Financial, Inc.
**File No.**:      801-72732

## Examination Period

Information is requested for the period **June 1, 2010** through **December 15, 2011** (the "Examination Period") unless otherwise noted.

## Organizing the Information to be Provided

In order to efficiently process the material assembled for the staff's review, please label the information so that it corresponds to the item number in the request list. If information provided is responsive to more than one request item, you may provide it only once and refer to it when responding to the other request item numbers. If any request item does not apply to your business, please indicate "N/A" (not applicable).

## Information Requests

1.  Adviser's organization chart showing ownership percentages of the Adviser and control persons, and a schedule or chart of all affiliated entities.
    Shervin Neman is the sole owner of Neman Financial, there are no other shareholders, employees or control persons at this time. Neman Financial LP is an affiliated entity

    

2.  List of current employees, partners, officers and/or directors and their respective titles.
    Neman Financial is a newly formed entity that has not formally commenced business operations. There are no employees of Neman Financial at this time. Shervin Neman is the Chief Executive Officer as well as the Chief Operating Officer.

3.  Current standard client advisory contracts or agreements.
    Neman Financial is a newly formed entity that has not formally commenced business operations. Please see attached draft of form which was forwarded under a separate email. As Neman Financial currently has no clients, this form has not officially been used.



1

Exhibit 52 page 96

4. The Form ADV Part II furnished to clients during the Examination Period and any disclosure document used in conjunction with or in lieu of Part II.
Neman Financial is a newly formed entity that has not formally commenced business operations. Please see attached form as filed, which was forwarded under a separate email.

5. Any client complaints received during the examination period.
Neman Financial is a newly formed entity that has not formally commenced business operations. Neman Financial has not in the past and does currently have any clients; therefore there are no client complaints to report.

6. Any threatened, pending and settled litigation or arbitration involving the Adviser or any "supervised person" (if it relates to the individual's association with the Advisers or a securities-related matter) including a description of the allegations, the status, and a brief description of any "out of court" or informal settlement. Note that "supervised person" is any partner, officer, director (or other person occupying a similar status or performing similar functions), or employee of an investment adviser, or other person who provides investment advice on behalf of the investment adviser and is subject to the supervision and control of the investment adviser (defined in Section 202(a)(25) of the Advisers Act). If none, please provide a written statement to that effect.
Neman Financial is a newly formed entity that has not formally commenced business operations. To the best of our knowledge there is no threatened or pending litigation or arbitration involving the adviser or any supervised person. The Adviser has not commenced business and there have not been and are not currently any clients.

7. Provide the information below for all advisory clients, including privately offered funds. The preferred format for this information is in Excel.
Neman Financial is a newly formed entity that has not formally commenced business operations. Neman Financial has not in the past and does not currently have any clients.

A. Current advisory clients, indicating those that are wrap clients, including:

   a. the Account number, name and current balance, as of 12/15/2011;
   b. whether the client is a related person, affiliated person, or a proprietary account;
   c. the type of account (e.g., individual, defined benefit retirement plan, registered fund, or unregistered fund);
   d. the account custodian and location;
   e. whether or not the custodian sends periodic account statements directly to the client; whether or not the delivery is electronic, if so, a copy of the authorization; and the form of electronic delivery (e.g., email or website login);
   f. whether or not the Adviser has discretionary authority;
   g. whether the Adviser, an officer, an employee, or an affiliate acts as trustee, co-trustee, or successor trustee or has full power of attorney for the account;
   h. whether Adviser or related persons are deemed to have custody of, possession of or access to the client's assets, and if so, the location of the assets;

2

Exhibit 52 page 97

    i.  the investment strategy (*e.g.*, global equity, high-yield, aggressive growth, long-short, or statistical arbitrage) and the performance composite in which it is included, if any;

    j.  the Account portfolio manager(s);

    k.  whether client has a directed brokerage arrangement, including commission recapture (provide the name of broker(s), details of the arrangement and any reports used to monitor payments of commissions);

    l.  the value of each client's account that was used for purposes of calculating its advisory fee for the most recent billing period;

    m.  whether the client pays a performance fee and the most recent account performance figures;

    n.  whether or not advisory fees are paid directly from the client's custodial account; and

    o.  for clients obtained during the Examination Period, provide account inception date and name(s) of consultant(s) related to obtaining the client, if any.

B.  Names of advisory clients lost, including the reason, termination date and asset value at termination.

C.  Names of any financial planning, pension consulting or other advisory clients not named in response to section A above.

8.  All pitch books, one-on-one presentations, pamphlets, brochures, and any other promotional and/or marketing materials furnished to existing and/or prospective clients for each investment strategy and/or mandate.
Neman Financial is a newly formed entity that has not formally commenced business operations. Neman Financial does not have any pitch books, presentation, pamphlets or other promotional materials. The entity is newly formed and yet to create these documents.

9.  All advertisements used to inform or solicit clients. If information on services and investments is available on the Internet, such as websites and blogs, make all versions available as either printouts or electronic archives.
Neman Financial does not advertise. The website is www.nemanfinancial.com

10.  Adviser's balance sheet, trial balance, general ledger, cash receipts and disbursements journal, income statement, and cash flow statements as of the end of its most recent fiscal year and the most current year to date.
Neman Financial is a newly formed entity that has not formally commenced business operations. Please see attached Excel Spreadsheet which was forwarded under a separate email.

11.  Any loans from clients, including promissory notes, to the Adviser, or sales of the Adviser's or any affiliate's stock to clients.
Neman Financial is a newly formed entity that has not formally commenced business operations. Neman Financial has not in the past and does not currently have any clients; therefore it has no loans from clients.

3

Exhibit 52 page 98

12. For the period June 1, 2010 through present, copies of all bank statements for each bank account owned by Neman Financial, Inc., Neman Financial, LP, and any other affiliated entities.
Neman Financial is a newly formed entity that has not formally commenced business operations. Please find the copies of statement attached under a separate email.

13. For each private fund please provide the organization document, operating agreement (e.g., partnership agreement,), and offering documents (e.g., private placement memoranda).
Neman Financial is a newly formed entity that has not formally commenced business operations. Please see attached draft of form which was forwarded under a separate email. As Neman Financial currently has no clients, this form has not officially been used.

14. Names of current investors including total value of each investor's equity interest in the fund as of 12/15/2011.
Neman Financial is a newly formed entity that has not formally commenced business operations. Neman Financial has not in the past and does not currently have any clients; therefore it cannot provide any valuation.

15. For each private fund please provide the financials, audited or unaudited, for its most recent fiscal year end.
Neman Financial is a newly formed entity that has not formally commenced business operations. Neman Financial has not in the past and does not currently have any clients; therefore there are no audited statements.

4

Exhibit 52 page 99

**EXHIBIT 53**

# Examination Information Request List
## Part 1

**Registrant:**   Neman Financial, Inc.
**File No.:**      801-72732

## <u>Examination Period</u>

Information is requested for the period **June 1, 2010** through **December 15, 2011** (the "Examination Period") unless otherwise noted.

## <u>Organizing the Information to be Provided</u>

In order to efficiently process the material assembled for the staff's review, please label the information so that it corresponds to the item number in the request list. If information provided is responsive to more than one request item, you may provide it only once and refer to it when responding to the other request item numbers. If any request item does not apply to your business, please indicate "N/A" (not applicable).

## <u>Information Requests</u>

1. Adviser's organization chart showing ownership percentages of the Adviser and control persons, and a schedule or chart of all affiliated entities.
   Shervin Neman is the sole owner of Neman Financial; there are no other shareholders, employees or control persons at this time. Neman Financial LP is an affiliated entity

   > **Neman Financial, Inc.**
   > **Shervin Neman 100% owner**
   >
   > **Neman Financial Limited Partnership**

2. List of current employees, partners, officers and/or directors and their respective titles.
   List of current employees:
   Tanya Vucetic, part time receptionist, works 20 hours per week at $12 per hour, duties include answering telephone, greeting guests, light cleaning.
   Terri Johnson, part time receptionist, works 20 hours per week at $12 per hour, duties include answering telephone, greeting guests, light cleaning.
   Shervin Neman is the Chief Executive Officer as well as the Chief Operating Officer.

3. Current standard client advisory contracts or agreements.
   Neman Financial is a newly formed entity that has not formally commenced business operations. Please see attached draft of form which was forwarded under a separate



GOVERNMENT
EXHIBIT
**53**

1

Exhibit 53 page 100

email. As Neman Financial currently has no clients, this form has not officially been used.

4. The Form ADV Part II furnished to clients during the Examination Period and any disclosure document used in conjunction with or in lieu of Part II.
Neman Financial is a newly formed entity that has not formally commenced business operations. Please see attached form as filed, which was forwarded under a separate email.

5. Any client complaints received during the examination period.
Neman Financial is a newly formed entity that has not formally commenced business operations. Neman Financial has not in the past and does currently have any clients; therefore there are no client complaints to report.

6. Any threatened, pending and settled litigation or arbitration involving the Adviser or any "supervised person" (if it relates to the individual's association with the Advisers or a securities-related matter) including a description of the allegations, the status, and a brief description of any "out of court" or informal settlement. Note that "supervised person" is any partner, officer, director (or other person occupying a similar status or performing similar functions), or employee of an investment adviser, or other person who provides investment advice on behalf of the investment adviser and is subject to the supervision and control of the investment adviser (defined in Section 202(a)(25) of the Advisers Act). If none, please provide a written statement to that effect.
Neman Financial is a newly formed entity that has not formally commenced business operations. To the best of our knowledge there is no threatened or pending litigation or arbitration involving the adviser or any supervised person. The Adviser has not commenced business and there have not been and are not currently any clients.

7. Provide the information below for all advisory clients, including privately offered funds. The preferred format for this information is in Excel.
Neman Financial is a newly formed entity that has not formally commenced business operations. Neman Financial has not in the past and does not currently have any clients.

A. Current advisory clients, indicating those that are wrap clients, including:

   a. the Account number, name and current balance, as of 12/15/2011;
   b. whether the client is a related person, affiliated person, or a proprietary account;
   c. the type of account (*e.g.*, individual, defined benefit retirement plan, registered fund, or unregistered fund);
   d. the account custodian and location;
   e. whether or not the custodian sends periodic account statements directly to the client; whether or not the delivery is electronic, if so, a copy of the authorization; and the form of electronic delivery (*e.g.*, email or website login);
   f. whether or not the Adviser has discretionary authority;

2

Exhibit 53 page 101

g.  whether the Adviser, an officer, an employee, or an affiliate acts as trustee, co-trustee, or successor trustee or has full power of attorney for the account;

h.  whether Adviser or related persons are deemed to have custody of, possession of or access to the client's assets, and if so, the location of the assets;

i.  the investment strategy (*e.g.*, global equity, high-yield, aggressive growth, long-short, or statistical arbitrage) and the performance composite in which it is included, if any;

j.  the Account portfolio manager(s);

k.  whether client has a directed brokerage arrangement, including commission recapture (provide the name of broker(s), details of the arrangement and any reports used to monitor payments of commissions);

l.  the value of each client's account that was used for purposes of calculating its advisory fee for the most recent billing period;

m.  whether the client pays a performance fee and the most recent account performance figures;

n.  whether or not advisory fees are paid directly from the client's custodial account; and

o.  for clients obtained during the Examination Period, provide account inception date and name(s) of consultant(s) related to obtaining the client, if any.

B.  Names of advisory clients lost, including the reason, termination date and asset value at termination.

C.  Names of any financial planning, pension consulting or other advisory clients not named in response to section A above.

8.  All pitch books, one-on-one presentations, pamphlets, brochures, and any other promotional and/or marketing materials furnished to existing and/or prospective clients for each investment strategy and/or mandate.
Neman Financial is a newly formed entity that has not formally commenced business operations. Neman Financial does not have any pitch books, presentation, pamphlets or other promotional materials. The entity is newly formed and yet to create these documents.

9.  All advertisements used to inform or solicit clients. If information on services and investments is available on the Internet, such as websites and blogs, make all versions available as either printouts or electronic archives.
Neman Financial does not advertise. The website is www.nemanfinancial.com

10.  Adviser's balance sheet, trial balance, general ledger, cash receipts and disbursements journal, income statement, and cash flow statements as of the end of its most recent fiscal year and the most current year to date.
Neman Financial is a newly formed entity that has not formally commenced business operations. Please see attached Excel Spreadsheet which was forwarded under a separate email.

3

Exhibit 53 page 102

11. Any loans from clients, including promissory notes, to the Adviser, or sales of the Adviser's or any affiliate's stock to clients.
Neman Financial is a newly formed entity that has not formally commenced business operations. Neman Financial has not in the past and does not currently have any clients; therefore it has no loans from clients.

12. For the period June 1, 2010 through present, copies of all bank statements for each bank account owned by Neman Financial, Inc., Neman Financial, LP, and any other affiliated entities.
Neman Financial is a newly formed entity that has not formally commenced business operations. Please find the copies of statement attached under a separate email.

13. For each private fund please provide the organization document, operating agreement (e.g., partnership agreement,), and offering documents (e.g., private placement memoranda).
Neman Financial is a newly formed entity that has not formally commenced business operations. Please see attached draft of form which was forwarded under a separate email. As Neman Financial currently has no clients, this form has not officially been used.

14. Names of current investors including total value of each investor's equity interest in the fund as of 12/15/2011.
Neman Financial is a newly formed entity that has not formally commenced business operations. Neman Financial has not in the past and does not currently have any clients; therefore it cannot provide any valuation.

15. For each private fund please provide the financials, audited or unaudited, for its most recent fiscal year end.
Neman Financial is a newly formed entity that has not formally commenced business operations. Neman Financial has not in the past and does not currently have any clients; therefore there are no audited statements.

4

Exhibit 53 page 103

**EXHIBIT 54**

# Examination Information Request List
## Part 2

**Registrant:**   Neman Financial, Inc.
**File No.:**   801-72732

## Examination Period

Information is requested for the period **June 1, 2010** through **December 15, 2011** (the "Examination Period") unless otherwise noted.

## Organizing the Information to be Provided

In order to efficiently process the material assembled for the staff's review, please label the information so that it corresponds to the item number in the request list.  If information provided is responsive to more than one request item, you may provide it only once and refer to it when responding to the other request item numbers.  If any request item does not apply to your business, please indicate "N/A" (not applicable).

## Information Requests

16. All sub-advisory agreements executed with other investment advisers.
    Neman Financial does not have any sub-advisory agreements and does not anticipate having any in the future. Neman Financial is a newly formed entity that has not formally commenced business operations.

17. Any power of attorney obtained from clients, if not otherwise stated in advisory contracts.
    Neman Financial is a newly formed entity that has not formally commenced business operations. . Neman Financial has not in the past and does not currently have any clients. Neman Financial has not obtained any additional powers of attorney and does not anticipate doing so in the future.

18. Any fee splitting or revenue sharing arrangements.
    Neman Financial does not have any fee splitting arrangements and does not anticipate any in the future.  Neman Financial is a newly formed entity that has not formally commenced business operations.

19. Names of any joint ventures or any other businesses in which the Adviser or any officer, director, portfolio manager, or trader participates or has any interest (other than their employment with the Adviser), including a description of each relationship.
    The Adviser has an interest in Neman Financial, LP which is a pooled investment vehicle categorized as a Hedge Fund.  This entity is also a newly formed and has not commenced operations. Neman Financial, Inc is the General Partner to Neman Financial, LP.

20. Names of employees who were disciplined and/or terminated during the Examination Period and information regarding the reason for the action.

GOVERNMENT
EXHIBIT
**54**

1

Exhibit 54 page 104

Neman Financial is a newly formed entity that has not formally commenced business operations. There are currently no employees. No one associated with the firm has been disciplined or terminated during the Examination period.

21. Access to all client correspondence.
Neman Financial is a newly formed entity that has not formally commenced business operations. Neman Financial has not in the past and does not currently have any clients; therefore there is no client correspondence.

22. For the period June 1, 2010 (or the inception of Registrant's advisory activities, if earlier) through present, provide all of Shervin Neman's emails and instant messages (if applicable), including their corresponding attachments, sent and received. This information should be provided in an electronically searchable format (.pst).
Neman Financial is a newly formed entity that has not formally commenced business operations. Neman Financial agrees to produce all emails that are not privileged and relate to the business of the Adviser. Neman Financial requests permission to provide the emails in print form.

23. A trade blotter (*i.e.*, purchases and sales journal) that lists transactions (including all trade errors, cancellations, re-bills, and reallocations) in securities and other financial instruments (including privately offered funds) for: current and former clients; proprietary and/or trading accounts and access persons. The preferred format for this information is to provide it in Excel as indicated in Exhibit 1.
Neman Financial is a newly formed entity that has not formally commenced business operations. Neman Financial has not in the past and does not currently have any clients; therefore there is no trade blotter.

2

Exhibit 54 page 105

**EXHIBIT 1**

## Layout for Securities Trading Blotter/Purchase and Sales Journal

In conjunction with the scheduled examination, the staff requests records for all purchases and sales of securities for portfolios of advisory clients and proprietary accounts being advised by the Fund. Please provide this record in Microsoft Excel format on compact discs. This record should include the fields of information listed below in a similar format.

**Please provide separate worksheets for: (*i*) equities (Note: ETF trades should be included with equities); (*ii*) fixed income; (*iii*) cash or cash equivalents, maturities, calls, pay-downs, expirations, or reinvestments of mutual fund dividends or capital gains distributions; (*iv*) mutual funds; and (*v*) options, futures, swaps and other derivatives.**

Examples:

I. Sample Trading Blotter for Equity Securities

| Client Name/# | Trade Date | Settle Date | Buy/Sell | CUSIP | Security Symbol | Security Description | Quantity | Unit Price | Principal/Proceeds/Notional Value | Total Commission | Fees | Net Amount | Broker |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 155 | 1/1/00 | 1/3/00 | B | 1234567 | MSFT | Microsoft Corp | 100 | $100.00 | $10,000 | $10.00 | | $10,010.00 | ABC |
| 123 | 1/2/00 | 1/5/00 | S | 89101112 | IBM | IBM Corp. | 500 | $100.00 | $50,000 | $50.00 | $1.67 | $49,948.33 | DEF |

II. Sample Trading Blotter for Fixed-Income Securities

| Client Name/# | Trade Date | Settle Date | Buy/Sell | CUSIP | Security Description 1 (Issuer) | Security Description 2 (Coupon Maturity, etc) | Quantity | Unit Price | Accrued Interest | Principal Value/Proceeds | Total Commission | Net Amount | Broker |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 155 | 4/2/98 | 4/6/98 | B | 802586AG2 | SANTA ROSA CA PKG FACS DIST | 4.60% 07-02-2004 | 50,000 | 100 | $95.83 | $50,000 | $0 | $50,095.83 | GHI |

Exhibit 54 page 106

III. Sample Trading Blotter for Derivative Securities

| Client Name/# | Trade Date | Settle Date | Buy/Sell | CUSIP | Security Description 1 (Issuer) | Security Description 2 (Coupon Maturity, etc) | Quantity | Unit Price | Payments | Principal Value / Proceeds | Total Commision | Net Proceeds | Broker | Security Type | Economic Position "Long or Short" Position |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 178 | 4/1/05 | 4/3/05 | B | DR80258RG | Deutsche Bank AG, Microsoft Corp., Credit Default Swap | 6 Months 10-01-2005 | 100,000 | 100 | $95.83 | $100,000 | $0 | $100,095.83 | DB | Credit Default Swap | Buying Protection |
| 182 | 2/1/07 | 2/3/07 | S | MOSMS149 | Morgan Stanley; PD: If credit spreads as represented by the Barclays Capital U.S. CMBS AAA 8.5+ Index widen, pays the spread change minus 50 basis points*; RD: If credit spreads as represented by the Barclays Capital U.S. CMBS AAA 8.5+ Index narrow, receives the spread change*. (TWSP) | 9 Months 11-01-2007 | 150,000 | 100 | $0 | $150,000 | $0 | $150,000 | MOR | Total Return Swap | Economic Long |

2

Exhibit 54 page 107

**EXHIBIT 55**

# Examination Information Request List
## Part 2

**Registrant**: Neman Financial, Inc.
**File No.:**      801-72732

## Examination Period

Information is requested for the period **June 1, 2010** through **December 15, 2011** (the "Examination Period") unless otherwise noted.

## Organizing the Information to be Provided

In order to efficiently process the material assembled for the staff's review, please label the information so that it corresponds to the item number in the request list. If information provided is responsive to more than one request item, you may provide it only once and refer to it when responding to the other request item numbers. If any request item does not apply to your business, please indicate "N/A" (not applicable).

## Information Requests

16. All sub-advisory agreements executed with other investment advisers.
    Neman Financial does not have any sub-advisory agreements and does not anticipate having any in the future. Neman Financial is a newly formed entity that has not formally commenced business operations.

17. Any power of attorney obtained from clients, if not otherwise stated in advisory contracts.
    Neman Financial is a newly formed entity that has not formally commenced business operations. . Neman Financial has not in the past and does not currently have any clients. Neman Financial has not obtained any additional powers of attorney and does not anticipate doing so in the future.

18. Any fee splitting or revenue sharing arrangements.
    Neman Financial does not have any fee splitting arrangements and does not anticipate any in the future. Neman Financial is a newly formed entity that has not formally commenced business operations.

19. Names of any joint ventures or any other businesses in which the Adviser or any officer, director, portfolio manager, or trader participates or has any interest (other than their employment with the Adviser), including a description of each relationship.
    The Adviser has an interest in Neman Financial, LP which is a pooled investment vehicle categorized as a Hedge Fund. This entity is also a newly formed and has not commenced operations. Neman Financial, Inc is the General Partner to Neman Financial, LP.

20. Names of employees who were disciplined and/or terminated during the Examination Period and information regarding the reason for the action.

GOVERNMENT EXHIBIT 55

1

Exhibit 55 page 108

Neman Financial is a newly formed entity that has not formally commenced business operations. No one associated with the firm has been disciplined or terminated during the Examination period.

21. Access to all client correspondence.
    Neman Financial is a newly formed entity that has not formally commenced business operations. Neman Financial has not in the past and does not currently have any clients; therefore there is no client correspondence. Neman Financial has provided copies of the following documents as attached to potential clients:
    a. One copy of the Neman Financial, LP Offering Memorandum, one side letter proposal and one copy of a blank advisory agreement to an individual client – see attached under separate email
    b. One copy of a blank advisory agreement to a local municipality, see attached under separate email.

22. For the period June 1, 2010 (or the inception of Registrant's advisory activities, if earlier) through present, provide all of Shervin Neman's emails and instant messages (if applicable), including their corresponding attachments, sent and received. This information should be provided in an electronically searchable format (.pst).
    Neman Financial is a newly formed entity that has not formally commenced business operations. Neman Financial agrees to produce all emails that are not privileged and relate to the business of the Adviser. 121 privileged emails were withheld. Emails have been provided via a removable flash USB drive.

23. A trade blotter (*i.e.*, purchases and sales journal) that lists transactions (including all trade errors, cancellations, re-bills, and reallocations) in securities and other financial instruments (including privately offered funds) for: current and former clients; proprietary and/or trading accounts and access persons. The preferred format for this information is to provide it in Excel as indicated in Exhibit 1.
    Neman Financial is a newly formed entity that has not formally commenced business operations. Neman Financial has not in the past and does not currently have any clients; therefore there is no trade blotter.

2

Exhibit 55 page 109

**EXHIBIT 1**

**Layout for Securities Trading Blotter/Purchase and Sales Journal**

In conjunction with the scheduled examination, the staff requests records for all purchases and sales of securities for portfolios of advisory clients and proprietary accounts being advised by the Fund. Please provide this record in Microsoft Excel format on compact discs. This record should include the fields of information listed below in a similar format.

**Please provide separate worksheets for: (*i*) equities (Note: ETF trades should be included with equities); (*ii*) fixed income; (*iii*) cash or cash equivalents, maturities, calls, pay-downs, expirations, or reinvestments of mutual fund dividends or capital gains distributions; (*iv*) mutual funds; and (*v*) options, futures, swaps and other derivatives.**

Examples:

I.  Sample Trading Blotter for Equity Securities

| Client Name/# | Trade Date | Settle Date | Buy/ Sell | CUSIP | Security Symbol | Security Description | Quantity | Unit Price | Principal/ Proceeds/ Notional Value | Total Commission | Fees | Net Amount | Broker |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 155 | 1/1/00 | 1/3/00 | B | 1234567 | MSFT | Microsoft Corp | 100 | $100.00 | $10,000 | $10.00 | | $10,010.00 | ABC |
| 123 | 1/2/00 | 1/5/00 | S | 89101112 | IBM | IBM Corp. | 500 | $100.00 | $50,000 | $50.00 | $1.67 | $49,948.33 | DEF |

II.  Sample Trading Blotter for Fixed-Income Securities

| Client Name/# | Trade Date | Settle Date | Buy/ Sell | CUSIP | Security Description 1 (Issuer) | Security Description 2 (Coupon Maturity, etc) | Quantity | Unit Price | Accrued Interest | Principal Value / Proceeds | Total Commission | Net Amount | Broker |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 155 | 4/2/98 | 4/6/98 | B | 802586AG2 | SANTA ROSA CA PKG FACS DIST | 4.60% 07-02-2004 | 50,000 | 100 | $95.83 | $50,000 | $0 | $50,095.83 | GHI |

Exhibit 55 page 110

## III. Sample Trading Blotter for Derivative Securities

| Client Name/ # | Trade Date | Settle Date | Buy Sell | CUSIP | Security Description 1 (Issuer) | Security Description 2 (Coupon Maturity, etc) | Quantity | Unit Price | Payments | Principal Value/ Proceeds | Total Commission | Net Proceeds | Broker | Security Type | Economic Position "Long or Short" Position |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 178 | 4/1/05 | 4/3/05 | B | DR80258RG | Deutsche Bank AG, Microsoft Corp., Credit Default Swap | 6 Months 10-01-2005 | 100,000 | 100 | $95.83 | $100,000 | $0 | $100,095.83 | DB | Credit Default Swap | Buying Protection |
| 182 | 2/1/07 | 2/3/07 | S | MOSMS149 | Morgan Stanley; PD: If credit spreads as represented by the 8.5+ Index widen, pays the spread change-minus 50 basis points*; RD: If credit spreads as represented by the Barclays Capital U.S. CMBS AAA 8.5+ Index narrow, receives the spread change*; (TWSP) | 9 Months 11-01-2007 | 150,000 | 100 | $0 | $150,000 | $0 | $150,000 | MOR | Total Return Swap | Economic Long |

2

Exhibit 55 page 111

**EXHIBIT 56**



**SHERVIN DAVATGARZADEH**

LOS ANGELES, CA 90035-3540

1026

16-24/1220 5584
6880108254

Pay to the
Order of _HOD_                                    7/24/10  Date

$ 60,000.00

_Sixty thousand & 0/100_                          Dollars

Wells Fargo Bank, N.A.
California
wellsfargo.com

⑈122000247⑈    ⑈8254⑈  01026

PAY TO THE ORDER OF
SECURITY BUSINESS BANK
OF SAN DIEGO
SAN DIEGO, CA  92101
122243457
FOR DEPOSIT ONLY
HOUSE OF DIAMONDS
110003379

REQUEST  00005025159000000 60000.00
ROLL ECIA   20100805  000008414677625
JOB ECIA  P  ACC            8254
REQUESTOR A910674
3491333  02/13/2012

Subpoena Processing East
Y1372-110
Philadelphia PA  19101



GOVERNMENT
EXHIBIT
**56**

Exhibit 56 page 112

**EXHIBIT 57**

| SOURCES OF FUNDS - JPMC ACCOUNTS | Sum of Deposits |
|---|---|
| Investor | $7,431,768 |
| Cash | $61,400 |
| Other | $22,442 |
| Family | $6,500 |
| Wedding | $3,720 |
| Tax Refund | $3,051 |
| Loan | $3,000 |
| Birthday | $1,000 |
| Unknown | $5,171 |
| Grand Total | $7,515,609 |

Blumberg No. 5102

GOVERNMENT
EXHIBIT
57

Exhibit 57 page 113

**EXHIBIT 58**

| USES OF FUNDS - JPMC ACCOUNTS | Sum of Withdrawals | Refunds | Net of Refunds |
|---|---|---|---|
| **Investment Return** | **-$5,454,649** | | **-$5,454,649** |
| **Political & Charitable** | **-$510,952** | | **-$510,952** |
| **Personal** | **-$453,888** | **$8,459** | **-$445,429** |
| House Hunting | -$160,845 | | -$160,845 |
| Wedding | -$94,900 | $4,048 | -$90,852 |
| Personal Rent | -$60,874 | $3,866 | -$57,008 |
| Family | -$38,608 | | -$38,608 |
| Automobile | -$28,973 | | -$28,973 |
| Retail | -$19,908 | | -$19,908 |
| Legal Settlement | -$14,325 | | -$14,325 |
| Loan | -$12,000 | | -$12,000 |
| Jewelry | -$10,884 | | -$10,884 |
| Medical | -$6,955 | | -$6,955 |
| Household | -$2,178 | | -$2,178 |
| Various | -$1,364 | | -$1,364 |
| Student Loan | -$1,545 | $545 | -$1,000 |
| Furniture | -$529 | | -$529 |
| **Travel, Hotel, Restaurant & Entertainment** | **-$190,983** | **$13,567** | **-$177,415** |
| Travel | -$140,993 | $13,567 | -$127,426 |
| Entertainment | -$43,497 | | -$43,497 |
| Hotel | -$5,309 | | -$5,309 |
| Restaurant | -$1,184 | | -$1,184 |
| **Business or Possibly Business** | **-$164,979** | **$7,214** | **-$157,765** |
| Office Rental | -$66,080 | $775 | -$65,305 |
| Payroll | -$62,291 | $5,664 | -$56,627 |
| Insurance | -$12,223 | | -$12,223 |
| Various | -$6,804 | | -$6,804 |
| Phone | -$4,114 | | -$4,114 |
| Retail | -$3,897 | $775 | -$3,123 |
| Furniture | -$2,876 | | -$2,876 |
| Office Supply | -$2,137 | | -$2,137 |
| Taxes | -$1,600 | | -$1,600 |
| Commission | -$1,250 | | -$1,250 |
| Business | -$1,100 | | -$1,100 |
| Parking | -$608 | | -$608 |
| **Legal & Professional** | **-$140,890** | | **-$140,890** |
| **Other** | **-$108,850** | | **-$108,850** |
| **Cash & ATM** | **-$53,913** | | **-$53,913** |
| **Grand Total** | **-$7,079,102** | **$29,240** | **-$7,049,862** |



Exhibit 58 page 114

**EXHIBIT 59**

*JADE Enterprises*
888 South Figueroa Street, Suite 1990, Los Angeles, California 90017 (213) 745-5191 Fax (213) 745-5157

November 16, 2010

VIA E-MAIL
Shervin Neman
Neman Financial, LP
1875 Century Park East, Ste 600
LA, CA 90067

RE:     General Motors IPO Stock Purchase

Dear Shervin,

Pursuant to our discussions this morning, this letter agreement shall serve to confirm that (i) affiliates of Jade Enterprises, LLC (collectively, "JADE") have, in reliance upon the terms set forth below, wired funds in the amount of $425,000.00 (the "GM IPO Funds") to a bank account in the name of Neman Financial, LP ("Neman"), at JPMorgan Chase Bank, N.A., 500 Stanton Christiana Rd, Newark, DE 19713, ABA # 021 000 021, which you represent and warrant you control at your sole discretion in your capacity as general partner of Neman, (ii) the GM IPO Funds will be utilized by Neman only to purchase initial public offering stock in General Motors Company on behalf of JADE in accordance with all applicable laws, rules and regulations (the "Purchase"), (iii) the stock purchased on behalf of JADE will be sold by Neman immediately upon JADE's direction to you or Neman to do so, whether such direction is to sell the stock in whole or in part (the "Sale/s"), (iv) as promptly as possible following any and all Sale/s, Neman will return all gross proceeds from the Sale/s to an account controlled by JADE (the "JADE Account") pursuant to wiring instructions provided to Neman by JADE, (v) if the Purchase does not occur on or before November 18, 2010, except to the extent of JADE's prior written direction to the contrary, Neman will immediately return all GM IPO Funds to the JADE Account, and (vi) Neman and yourself, jointly and severally, agree to indemnify, defend, and hold JADE harmless from and against any loss, damage, cost, claim and/or expense which may arise as a result of any breach of the terms of this letter agreement by Neman or yourself

Sincerely,

David Taban

ACCEPTED AND AGREED TO:

Neman Financial, LP                          Shervin Neman, an individual

By:
Name:  Shervin Neman                         Shervin Neman
Title:   General Partner



Exhibit 59 page 115

**EXHIBIT 60**

01/28/2011  12:06    3104875499              PBC CEN                            PAGE  01

*JADE Enterprises*
*888 South Figueroa Street, Suite 1900, Los Angeles, California 90017 (213) 745-5191 Fax (213) 747-5225*

January 27, 2011

VIA E-MAIL
Shervin Neman
Neman Financial, LP
1875 Century Park East, Ste 600
LA, CA 90067

RE:   BankUnited IPO Stock Purchase

Dear Shervin,

Pursuant to our recent discussions, this letter agreement shall serve to confirm that (i) affiliates of Jade Enterprises, LLC (collectively, "JADE") have (and if not, may) in reliance upon the terms set forth below, wired (or wire) funds in the amount of $420,000.00 (the "BankUnited IPO Funds") to that certain bank account # 891173957 in the name of Neman Financial, LP ("Neman"), at JPMorgan Chase Bank, N.A., Los Angeles, CA, ABA # 322271627, which you represent and warrant you control at your sole discretion in your capacity as general partner of Neman, (ii) the BankUnited IPO Funds will be utilized by Neman only to reimburse Neman for purchasing initial public offering stock in BankUnited on behalf of JADE in accordance with all applicable laws, rules and regulations (the "Purchase"), (iii) the stock purchased on behalf of JADE has been sold by Neman for a profit of not less than 9.25% (the "Sale/s"), (iv) on or before February 11, 2011, Neman will return net proceeds of not less than $455,000.00 from the Sale/s to an account controlled by JADE pursuant to wiring instructions provided to Neman by JADE, and (v) Neman and yourself, jointly and severally, agree to indemnify, defend, and hold JADE harmless from and against any loss, damage, cost, claim and/or expense which may arise as a result of any breach of the terms of this letter agreement by Neman or yourself.

Sincerely,

David Taban

ACCEPTED AND AGREED TO:

Neman Financial, LP                      Shervin Neman, an individual

By:                                      
Name:  Shervin Neman                     Shervin Neman
Title:  General Partner

GOVERNMENT
EXHIBIT
60

Exhibit 60 page 116

**EXHIBIT 61**

21-Jan-12                                                    20Jan12-259

### THIS ITEM IS PART OF A LEGAL STATEMENT RECONSTRUCTION
### GROUP ID G20Jan12-259
Sequence number 008980008427  Posting date 07-MAR-11

---

SHERVIN NEMAN
LOS ANGELES, CA 90007-2250

7410820009                          90/7162

DATE  3 / 4 / 11

PAY TO THE
ORDER OF    Mr. David Tabar                    | $ | 420,000.00

Four hundred twenty thousand & 00/100                    DOLLARS

CHASE ◯   JPMorgan Chase Bank, N.A.
           Sacramento, CA 95823

MEMO

⑈74108200009⑈ ⑆322271627⑈    3957⑈

---

8674392

03042011                     456<
P00031390695 3          Israel Discount Bank
                        Beverly Hills, Ca. 90212

AcctNum: _____ 3957  Amount: 000000042000000
ItemID: _____ Date: 20110307  Sequence: 0089a0008427
BankNum: 0781 TranCode: 0000  Field4: 0000  ImageSeq: 00
UDK: 0v0031030200898008427  BOFD: 000000000 CapSac: PV
TranCode: 000000 RouteTran: 32227162  DocType: 8
EntryNum: 1340 ItemType: 0



GOVERNMENT
EXHIBIT
61

Exhibit 61 page 117

**EXHIBIT 62**



1875 Century Park East 6th Floors Los Angeles California 90067
(310) 284-6859 Office ◦(310) 388-4653 Fax

March 2, 2011

<u>VIA E-MAIL</u>

Shervin Neman

Neman Financial, LP

1875 Century Park East, Ste 600

LA, CA 90067

RE:     HCA IPO Stock Purchase

Dear Shervin,

Pursuant to our discussions this morning, this letter agreement shall serve to confirm that (i) Mr. David Taban has in reliance upon the terms set forth below,

wired funds in the amount of $300,000.00 (the "HCA IPO Funds") to that certain bank account # 891173957 in the name of Shervin Neman at JP Morgan

Chase Bank N. A. Los Angeles, CA ABA 322271627, which you represent and warrant you control at your sole discretion in your capacity as general partner

of Neman Financial, (ii) the HCA IPO Funds will be utilized by Neman Financial only to purchase initial public offering stock in HCA on behalf of Mr. David

Taban in accordance with all applicable laws, rules and regulations (the "Purchase"), (iii) as promptly as possible, and on/before March 31, 2011, following

any and all Sale/s, Neman Financial will return all gross proceeds from the Sale/s to an account controlled by Mr. David Taban pursuant to wiring

instructions provided to Neman Financial by Mr. David Taban (iv) Neman Financial and yourself, jointly and severally, agree to indemnify, defend, and hold

Mr. David Taban harmless from and against any loss, damage, cost, claim and/or expense which may arise as a result of any breach of the terms of this letter

agreement by Neman Financial or yourself.

Sincerely,

Mr. David Taban

<u>ACCEPTED AND AGREED TO:</u>

Neman Financial, LP                              Shervin Neman, an individual


By:  _____      _____

Name:   Shervin Neman                         Shervin Neman

Title:   General Partner



Exhibit 62 page 118

**EXHIBIT 63**

Page 1 of 1

| | |
|---|---|
| Posting Date: | 2011-04-08 |
| Sequence #: | 5990150874 |
| Account #: | ███3957 |
| Routing Transit: | 32227162 |
| Amount #: | $310000.00 |
| Check/Serial #: | 000000000118 |
| Bank #: | 703 |
| Tran Code: | 000118 |
| IRD: | 0 |
| ItemType: | P |
| BOFD: | 000000000 |
| Cost Center: | N/A |
| Teller Number: | N/A |
| Teller Seq Number: | N/A |
| Processing Date: | N/A |



SHERVIN NEMAN

50-7162 41595   118
3222

Date 4/6/11

Pay to the Order of   Mr. David Tabas   $ 310,000.00

three hundred ten thousand & 0/100   Dollars

CHASE ◉
JPMorgan Chase Bank, N.A.
www.Chase.com

Memo

⑆322271627⑆   3957⑈0118

04082011
P00155569545 3

>███3156<
Israel Discount B
Beverly Hills,

GOVERNMENT
EXHIBIT
63

Exhibit 63 page 119

Posting Date:          2011-04-12
Sequence #:            5990433696
Account #:             3957
Routing Transit:       322271162
Amount #:              $310000.00
Check/Serial #:        000000000118
Bank #:                703
Tran Code:             4
IRD:
ItemType:              P
BOFD:                  000000000
Cost Center:           N/A
Teller Number:         N/A
Teller Seq Number:     N/A
Processing Date:       N/A



This is a LEGAL COPY of
your check. You can use it
the same way you would
use the original check.

RETURN REASON - A
NOT SUFFICIENT
FUNDS

Exhibit 63 page 120

**EXHIBIT 64**

21-Jan-12                                                                        20Jan12-259

**THIS ITEM IS PART OF A LEGAL STATEMENT RECONSTRUCTION**
**GROUP ID G20Jan12-259**
**Sequence number 003380257205  Posting date 18-APR-11**

SHERVIN NEMAN

90-7162/3222   41595        103

DATE 4/12/2011

PAY TO THE ORDER OF   Mr. David Tahan        | $ 500.00

Five hundred & 00/100

CHASE ○
JPMorgan Chase Bank, N.A.
www.Chase.com

⑆322271627⑆      3957 0103

04182011
P0055019190 3

131565
Israel Discount Bank
Beverly Hills, Ca 9212

AcctNum: 000000000    3957 Amount: 000000000050000
Xerno: 0000000103 PostDate: 20110418 Sequence: 003380257205
BankNum: 0703 AppCode: 0001 Field4: 0000 ImageStat: 05
UDK: 07031104180033802572 05 BOFD: 000000000 CapSRC: PV
TranCode: 000103 RouteTran: 32227162   DocType: 8
EntryNum: 6364 ItemType: P



**EXHIBIT 65**

*fax # 213-747-8225*



1875 Century Park East 6th Floor Los Angeles California 900
(310) 284-6859 Office (310) 388-4653 Fax

May 16, 2011

<u>VIA E-MAIL</u>

Shervin Neman

Neman Financial, LP

1875 Century Park East, Ste 600

LA, CA 90067

RE:    Linkedin IPO Stock Purchase

Dear Shervin,

Pursuant to our discussions this morning, this letter agreement shall serve to confirm that (i) David Taban has in reliance upon the terms set forth below,

wired funds in the amount of $126,000.00 (the "Linkedin IPO Funds") to that certain bank account #891173957 in the name of Shervin Neman at JP Morgan

Chase Bank N.A., 1925 Century Park East, Los Angeles, CA ABA 322271627 which you represent and warrant you control at your sole discretion in your

capacity as general partner of Neman Financial, (ii) the Linkedin IPO Funds will be utilized by Neman Financial only to purchase initial public offering stock

in Linkedin on behalf of David Taban in accordance with all applicable laws, rules and regulations (the "Purchase"), (iii) as promptly as possible, and

on/before June 10, 2011, following any and all Sale/s, Neman Financial will return all gross proceeds from the Sale/s to an account controlled by David Taban

pursuant to wiring instructions provided to Neman Financial by David Taban (iv) Neman Financial and yourself, jointly and severally, agree to indemnify,

defend, and hold David Taban harmless from and against any loss, damage, cost, claim and/or expense which may arise as a result of any breach of the terms

of this letter agreement by Neman Financial or yourself.

Sincerely,

David Taban

<u>ACCEPTED AND AGREED TO:</u>

Neman Financial, LP

Shervin Neman, as individual

By:

Name:    Shervin Neman                         Shervin Neman                    5/16/11

Title:    General Partner



Exhibit 65 page 122

**EXHIBIT 66**

Page 1 of 1

Posting Date: 2011-07-15
Sequence #: 6070547158
Account #: ███████3957
Routing Transit: 32227162
Amount #: $470000.00
Check/Serial #: 000000000140
Bank #: 703
Tran Code: 000140
IRD: 0
Item Type: P
BOFD: 000000000
Cost Center: N/A
Teller Number: N/A
Teller Seq Number: N/A
Processing Date: N/A



**EXHIBIT 67**



**NEMAN FINANCIAL**

1999 Avenue of the Stars, Ste 2045, Los Angeles, California 90067
(310) 359-8675 Office ·(310) 393-4653 Fax

## IPO PURCHASE AGREEMENT

THIS AGREEMENT is made and entered into this 25th day of July, 2011, by and between Mr. Shervin Neman, ("General Partner") and Mr. David Taban, ("Investor");

WHEREAS, the General Partner is the buyer of the IPO of Dunkin Brands Grp. (DNKN),

WHEREAS, the Investor desires to participate in the purchase of the Initial Public Offering and the General Partner desires to Purchase the shares through a financial institution, upon the terms and subject to the conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained in this Agreement, and in order to consummate the purchase and the sale of the IPO aforementioned, it is hereby agreed as follows:

1. PURCHASE AND SALE: Subject to the terms and conditions hereinafter set forth, General Partner shall buy and sell the IPO through a financial institution and after completing the transaction ("Closing"), the General Partner shall return investor's money on or before Thurs. August 25th, 2011.

2. AMOUNT AND PAYMENT OF PURCHASE PRICE. The total consideration and method of payment thereof are fully set out in Exhibit "A" attached hereto and made a part hereof.

3. REPRESENTATIONS AND WARRANTIES OF General Partner. General Partner hereby warrants and represents:

(a) Organization and Standing. LP is duly organized, validly existing and in good standing under the laws of the State of CA and has the corporate power and authority to carry on its business as it is now being conducted.

*SN*



GOVERNMENT
EXHIBIT
**67**

Exhibit 67 page 124



**NEWMAN FINANCIAL**

1999 Avenue of the Stars Ste 2045, Los Angeles, California 90067
(310) 359-0675 Office •(310) 388-4653 Fax

4. REPRESENTATIONS AND WARRANTIES OF General Partner AND Investor. Investor hereby understands that there is no fee associated with the transaction.

5. GENERAL PROVISIONS

(a) Entire Agreement. This Agreement (including the exhibits hereto and any written amendments hereof executed by the parties) constitutes the entire Agreement and supersedes all prior agreements and understandings, oral and written, between the parties hereto with respect to the subject matter hereof.

(b) Sections and Other Headings. The section and other headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

(c) Governing Law. This agreement, and all transactions contemplated hereby, shall be governed by, construed and enforced in accordance with the laws of the State of CA. The parties herein waive trial by jury and agree to submit to the personal jurisdiction and venue of a court of subject matter jurisdiction located in LA County, State of CA. In the event that litigation results from or arises out of this Agreement or the performance thereof, the parties agree to reimburse the prevailing party's reasonable attorney's fees, court costs, and all other expenses, whether or not taxable by the court as costs, in addition to any other relief to which the prevailing party may be entitled.

IN WITNESS WHEREOF, this Agreement has been executed by each of the individual parties hereto on the date first above written.

*SN*

Exhibit 67 page 125



NEMAN
FINANCIAL

1959 Avenue of the Stars, Ste 2045, Los Angeles, California 90067
(310) 359-8675 Office •(310) 388-4653 Fax

Signed, sealed and delivered in the presence of:

By: _____          7/25/11

By: _____


EXHIBIT "A" AMOUNT AND PAYMENT OF PURCHASE PRICE

(a) Consideration. As total consideration for the purchase and sale of the IPO, pursuant to this Agreement, the Investor shall send the General Partner the sum of 150,000.00 Dollars (One Hundred Fifty Thousand Dollars), such total consideration to be referred to in this Agreement as the "Purchase Price".

(b) Payment. The Purchase Price shall be paid as follows:

i. The sum of 150,000.00 Dollars (One Hundred Fifty Thousand Dollars) to be delivered to General partner upon the execution of this Agreement.

Exhibit 67 page 126

**EXHIBIT 68**

Page 1 of 1

| | |
|---|---|
| Posting Date: | 2011-09-15 |
| Sequence #: | 6880401142 |
| Account #: | ███3957 |
| Routing Transit: | 32227162 |
| Amount #: | $190000.00 |
| Check/Serial #: | 000000000170 |
| Bank #: | 703 |
| Tran Code: | 000170 |
| IRD: | 0 |
| ItemType: | P |
| BOFD: | 000000000 |
| Cost Center: | N/A |
| Teller Number: | N/A |
| Teller Seq Number: | N/A |
| Processing Date: | N/A |

SHERVIN NEMAN

90-7162
3222
41595

170

DATE 9/8/11

Pay to the Order of Mr. David Taban          $ 190,000.00

One hundred ninety thousand & 0/100     DOLLARS

CHASE O
JPMorgan Chase Bank, N.A.
www.Chase.com

⑆322271627⑆      957⑈0170

09152011
P0015318310 3

3156
Israel Discount
Beverly Hills, CA

ISRAEL DISCOUNT BANK OF NEW YORK
LOS ANGELES, CA 90017

GOVERNMENT
EXHIBIT
66

Exhibit 68 page 127

**EXHIBIT 69**

Sep 26 11 01:40p     JADE ENTERPRISES          213 747 0996          p.1

## DAVID TABAN
888 South Figueroa Street, Suite 1900 Los Angeles, California 90017 (213) 745-3191 Fax (213) 747 8223

September 26, 2011

<u>VIA E-MAIL</u>
Shervin Neman
Neman Financial, LP
1999 Avenue of the Stars, Ste 2045
LA, CA 90067

RE:     ZocDoc, Inc. Stock Purchase

Dear Shervin,

Pursuant to our prior discussion and that certain Stock Purchase Agreement dated September 15, 2011 ("Stock Purchase Agreement"), this letter agreement shall serve to confirm that (i) I will, in reliance upon the terms set forth below, wire funds in the amount of $126,000.00 (the "Stock Funds") to a bank account in your name at JPMorgan Chase Bank, N.A., 1925 Century Park East, Los Angeles, California, 90067, ABA # 322 271 627, Account # 891173957, which you represent and warrant you control at your sole discretion, (ii) the Stock Funds will be utilized by you and, in your capacity as general partner thereof, Neman Financial, LP ("Neman"), but only in connection with the purchase of Series A Preferred Stock of ZocDoc, Inc., a Delaware corporation, on behalf of me and in accordance with all applicable laws, rules and regulations (the "Purchase"), (iii) the stock purchased on behalf of me will be sold by Neman on or before February 29, 2012 (the "Sale/s"), and you will personally guaranty a return of the initial $126,000.00 investment PLUS an additional minimum payment to me of $63,000.00 as profit on my investment, (iv) as promptly as possible following any and all Sale/s, Neman will return all gross proceeds from the Sale/s to an account controlled by me (the "Taban Account") pursuant to wiring instructions provided to you and Neman by me, (v) you will provide evidence to me of the Purchase the same business day it occurs, or if it has already occurred, then concurrently with your return of a signed copy of this letter agreement (and if the Purchase does not occur on or before September 26, 2011, except to the extent of my prior written direction to the contrary, Neman will immediately return all Stock Funds to the Taban Account), and (vi) you and Neman, jointly and severally, agree to indemnify, defend, and hold me harmless from and against any loss, damage, cost, claim and/or expense which may arise as a result of any breach of the terms of this letter agreement by Neman or yourself. In the event of any inconsistency between the provisions of the Stock Purchase Agreement and this letter agreement, to the extent of such inconsistency, the provisions of this letter agreement shall apply.

Sincerely,

David Taban

ACEEPTED AND AGREED TO:

Neman Financial, LP

By:
Name: Shervin Neman
Title:  General Partner

Shervin Neman, an individual

Shervin Neman

GOVERNMENT
EXHIBIT
69
Blumberg No. 5122

Exhibit 69 page 128

**EXHIBIT 70**

To: Sheila
213 - 747 - 0896



1999 Avenue of the Stars • Ste. 2045 • Los Angeles • California 90067
(310) 359-8675 Office • (310) 388-4653 Fax

November 2, 2011

VIA E-MAIL

Shervin Neman

Neman Financial, LP

1999 Avenue of the Stars, Ste 2045

LA, CA 90067

RE:    Groupon IPO Stock Purchase

Dear Shervin,

Pursuant to our prior discussions, this letter agreement shall serve to confirm that (i) Mr. David Taban has in reliance upon the terms set forth below, wired funds in the amount of $500,000.00 (the "Groupon IPO Funds") to a bank account in the name of Shervin Neman at JP Morgan Chase Bank, 1925 Century Park East, LA, CA 90067 ABA# 322271627, account number# 891173957 which you represent and warrant you control at your sole discretion in your capacity as general partner of Neman Financial, (ii) the Groupon IPO Funds will be utilized by Neman Financial only to purchase initial public offering stock in Groupon on behalf of Mr. David Taban in accordance with all applicable laws, rules and regulations (the "Purchase") and you will personally guarantee the principal amount, and (iii) as promptly as possible, and on/before December 4, 2011, following any and all Sale/s, Neman Financial will return all gross proceeds from the Sale/s to an account controlled by Mr. David Taban pursuant to wiring instructions provided to Neman Financial by Mr. David Taban (iv) Neman Financial and yourself, jointly and severally, agree to indemnify, defend, and hold Mr. David Taban harmless from and against any loss, damage, cost, claim and/or expense which may arise as a result of any breach of the terms of this letter agreement by Neman Financial or yourself.

Sincerely,

Mr. David Taban

ACCEPTED AND AGREED TO:

Neman Financial, LP                              Shervin Neman, an individual

By: _____                          _____

Name:   Shervin Neman                             Shervin Neman

Title:   General Partner

11/2/11

GOVERNMENT
EXHIBIT
70
Blumberg No. 5122

Exhibit 70 page 129

**EXHIBIT 71**



**NEMAN FINANCIAL**

1999 Avenue of the Stars, Ste 2045, Los Angeles, California 90067
(310) 359-8675 Office ◦(310) 388-4653 Fax

### IPO PURCHASE AGREEMENT

**THIS AGREEMENT** is made and entered into this 2nd day of November, 2011, by and between Shervin Neman, ("General Partner") and Mr. David Taban, ("Investor");

**WHEREAS,** the General Partner is the buyer of the IPO of Groupon (GRPN),

**WHEREAS, the Investor** desires to participate in the purchase of the Initial Public Offering and the General Partner desires to Purchase the shares through a financial institution, upon the terms and subject to the conditions hereinafter set forth;

**NOW, THEREFORE,** in consideration of the mutual covenants and agreements contained in this Agreement, and in order to consummate the purchase and the sale of the IPO aforementioned, it is hereby agreed as follows:

1. PURCHASE AND SALE: Subject to the terms and conditions hereinafter set forth, General Partner shall buy and sell the IPO through a financial institution and after completing the transaction ("Closing"), the General Partner shall return investor's money, principal and profit, on or before December 4th, 2011.

2. AMOUNT AND PAYMENT OF PURCHASE PRICE. The total consideration and method of payment thereof are fully set out in Exhibit "A" attached hereto and made a part hereof.

3. REPRESENTATIONS AND WARRANTIES OF General Partner. General Partner hereby warrants and represents:

(a) Organization and Standing. LP is duly organized, validly existing and in good standing under the laws of the State of CA and has the corporate power and authority to carry on its business as it is now



GOVERNMENT EXHIBIT

Exhibit 71 page 130



1999 Avenue of the Stars, Ste 2045, Los Angeles, California 90067
(310) 359-8675 Office ,(310) 388-4653 Fax

being conducted.

4. REPRESENTATIONS AND WARRANTIES OF General Partner AND Investor. Investor hereby
understands that there is no fee associated with the transaction.

5. GENERAL PROVISIONS
(a) Entire Agreement. This Agreement (including the exhibits hereto and any written amendments
hereof executed by the parties) constitutes the entire Agreement and supersedes all prior agreements and
understandings, oral and written, between the parties hereto with respect to the subject matter hereof
other than that certain letter agreement dated November 2, 2011.

(b) Sections and Other Headings. The section and other headings contained in this Agreement are for
reference purposes only and shall not affect the meaning or interpretation of this Agreement.

(c) Governing Law. This agreement, and all transactions contemplated hereby, shall be governed by,
construed and enforced in accordance with the laws of the State of CA. The parties herein waive trial by
jury and agree to submit to the personal jurisdiction and venue of a court of subject matter jurisdiction
located in LA County, State of CA. In the event that litigation results from or arises out of this
Agreement or the performance thereof, the non-prevailing party(ies) agree to reimburse the prevailing
party's(ies') reasonable attorneys' fees, court costs, and all other expenses, whether or not taxable by the
court as costs, in addition to any other relief to which the prevailing party may be entitled.

IN WITNESS WHEREOF, this Agreement has been executed by each of the individual parties hereto on
the date first above written.

SN

Exhibit 71 page 131



1999 Avenue of the Stars, Ste 2045, Los Angeles, California 90067
(310) 359-8675 Office ,(310) 388-4653 Fax

Signed, sealed and delivered in the presence of:

By: _____   11/3/11

By: _____   11/3/11

**EXHIBIT "A" AMOUNT AND PAYMENT OF PURCHASE PRICE**

(a) Consideration. As total consideration for the purchase and sale of the IPO, pursuant to this Agreement, the Investor shall send the General Partner the sum of 500,000.00 Dollars (Five Hundred Thousand Dollars), such total consideration to be referred to in this Agreement as the "Purchase Price".

(b) Payment. The Purchase Price shall be paid as follows:

i. The sum of 500,000.00 Dollars (Five Hundred Thousand Dollars) to be delivered to General partner upon the execution of this Agreement.

Exhibit 71 page 132

**EXHIBIT 72**

*DAVID TABAN*

888 South Figueroa Street, Suite 1900, Los Angeles, California 90017 (213) 745-4191 Fax (213) 747 8225

November 2, 2011

VIA E-MAIL
Shervin Neman
Neman Financial, LP
1999 Avenue of the Stars, Ste 2045
LA, CA 90067

RE:   Groupon, Inc. IPO and GRPN Stock Purchase

Dear Shervin,

Pursuant to our prior discussion and in furtherance of that certain IPO Purchase Agreement dated on or about the date hereof (the "IPO Purchase Agreement"), this letter agreement shall serve to confirm that (i) I will, in reliance upon the terms set forth below, wire funds in the amount of $500,000.00 (the "IPO Funds") to a bank account in your or your company's name at JPMorgan Chase Bank, N.A., 1925 Century Park East, Los Angeles, California, 90067, ABA # 322 271 627, Account # 891173957, which you represent and warrant you control at your sole discretion, (ii) the IPO Funds will be utilized by you and, in your capacity as general partner thereof, Neman Financial, LP ("Neman"), only in connection with the purchase of the initial public offering of Groupon, Inc. (GRPN) stock, on behalf of me and in accordance with all applicable laws, rules and regulations (the "Purchase"), (iii) the stock purchased on behalf of me will be sold by Neman on or before December 4, 2011 (the "Sale/s"), (iv) as promptly as possible following any and all Sale/s, Neman will return all gross proceeds from the Sale/s to an account controlled by me (the "Taban Account") pursuant to wiring instructions provided to you and Neman by me, (v) you will provide evidence to me of the Purchase the same business day it occurs, or if it has already occurred, then concurrently with your return of a signed copy of this letter agreement (and if the Purchase does not occur on or before November 5, 2011, except to the extent of my prior written direction to the contrary, Neman will immediately return all IPO Funds to the Taban Account), and (vi) you and Neman, jointly and severally, agree to indemnify, defend, and hold me harmless from and against any loss, damage, cost, claim, harm, and/or expense which may arise as a result of any breach of the terms of this letter agreement by Neman or yourself. In the event of any inconsistency between the provisions of the IPO Purchase Agreement and this letter agreement, to the extent of such inconsistency, the provisions of this letter agreement shall apply.

Sincerely,

David Taban

ACEEPTED AND AGREED TO:

Neman Financial, LP                          Shervin Neman, an individual                    11/3/11

By:
Name: Shervin Neman                          Shervin Neman
Title:   General Partner



Exhibit 72 page 133

**EXHIBIT 73**

*To: Shida*
*2 13 - 74 1 - 8 2 2 5*



1999 Avenue of the Stars, Ste 2045, Los Angeles California 90067
(310) 359-9675 Office (310) 388-4653 Fax

## IPO PURCHASE AGREEMENT

THIS AGREEMENT is made and entered into this 17th day of November, 2011, by and between Shervin Neman, ("General Partner") and Mr. David Tabun, ("Investor");

WHEREAS, the General Partner is the buyer of the IPO of Angie's List Inc. (ANGI),

WHEREAS, the Investor desires to participate in the purchase of the Initial Public Offering and the General Partner desires to Purchase the shares through a financial institution, upon the terms and subject to the conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained in this Agreement, and in order to consummate the purchase and the sale of the IPO aforementioned, it is hereby agreed as follows:

1. PURCHASE AND SALE: Subject to the terms and conditions hereinafter set forth, General Partner shall buy and sell the IPO through a financial institution and after completing the transaction ("Closing"), the General Partner shall return investor's money, principal and profit, on or before December 18th, 2011.

2. AMOUNT AND PAYMENT OF PURCHASE PRICE. The total consideration and method of payment thereof are fully set out in Exhibit "A" attached hereto and made a part hereof.

3. REPRESENTATIONS AND WARRANTIES OF General Partner. General Partner hereby warrants and represents:

(a) Organization and Standing: LP is duly organized, validly existing and in good standing under the laws of the State of CA and has the corporate power and authority to carry on its business as it is now



*S N*

Exhibit 73 page 134



1999 Avenue of the Stars, Ste 2045, Los Angeles, California 90067
(310) 359-8675 Office o(310) 388-4653 Fax

being conducted.

4. REPRESENTATIONS AND WARRANTIES OF General Partner AND Investor. Investor hereby
understands that there is no fee associated with the transaction.

5. GENERAL PROVISIONS

(a) Entire Agreement. This Agreement (including the exhibits hereto and any written amendments
hereof executed by the parties) constitutes the entire Agreement and supersedes all prior agreements and
understandings, oral and written, between the parties hereto with respect to the subject matter hereof
other than that certain letter agreement dated November 17, 2011.

(b) Sections and Other Headings. The section and other headings contained in this Agreement are for
reference purposes only and shall not affect the meaning or interpretation of this Agreement.

(c) Governing Law. This agreement, and all transactions contemplated hereby, shall be governed by,
construed and enforced in accordance with the laws of the State of CA. The parties herein waive trial by
jury and agree to submit to the personal jurisdiction and venue of a court of subject matter jurisdiction
located in LA County, State of CA. In the event that litigation results from or arises out of this
Agreement or the performance thereof, the non-prevailing party(ies) agree to reimburse the prevailing
party's(ies') reasonable attorneys' fees, court costs, and all other expenses, whether or not taxable by the
court as costs, in addition to any other relief to which the prevailing party may be entitled.

IN WITNESS WHEREOF, this Agreement has been executed by each of the individual parties hereto on
the date first above written.

Exhibit 73 page 135



1999 Avenue of the Stars Ste 2045, Los Angeles California 90067
(310) 359-8675 Office (310) 388-4653 Fax

Signed, sealed and delivered in the presence of:

By:                                                              // / 17 / 11

By:                                                              // / 17 / 11

## EXHIBIT "A" AMOUNT AND PAYMENT OF PURCHASE PRICE

(a) **Consideration.** As total consideration for the purchase and sale of the IPO, pursuant to this Agreement, the Investor shall send the General Partner the sum of 500,000.00 Dollars (Five Hundred Thousand Dollars), such total consideration to be referred to in this Agreement as the "Purchase Price".

(b) **Payment.** The Purchase Price shall be paid as follows:

i. The sum of 500,000.00 Dollars (Five Hundred Thousand Dollars) to be delivered to General partner upon the execution of this Agreement.

$S_N$

Exhibit 73 page 136

**EXHIBIT 74**

## DAVID TABAN

588 South Figueroa Street, Suite 1900, Los Angeles, California 90017 (213) 745-5191 Fax (213) 747 8225

November 17, 2011

VIA E-MAIL
Shervin Neman
Neman Financial, LP
1999 Avenue of the Stars, Ste 2045
LA, CA 90067

RE:   Angie's List Inc. (ANGI) IPO

Dear Shervin,

Pursuant to our prior discussion and in furtherance of that certain IPO Purchase Agreement dated on or about the date hereof (the "IPO Purchase Agreement"), this letter agreement shall serve to confirm that (i) I will, in reliance upon the terms set forth below, wire funds in the amount of $500,000.00 (the "IPO Funds") to a bank account in your or your company's name at JPMorgan Chase Bank, N.A., 1925 Century Park East, Los Angeles, California, 90067, ABA # 322 271 627, Account # 891173957, which you represent and warrant you control at your sole discretion, (ii) the IPO Funds will be utilized by you and, in your capacity as general partner thereof, Neman Financial, LP ("Neman"), only in connection with the purchase of the initial public offering of Angie's List Inc. (ANGI) stock, on behalf of me and in accordance with all applicable laws, rules and regulations (the "Purchase"), (iii) the stock purchased on behalf of me will be sold by Neman on or before December 17, 2011 (the "Sale/s"), (iv) as promptly as possible following any and all Sale/s, Neman will return all gross proceeds from the Sale/s to an account controlled by me (the "Taban Account") pursuant to wiring instructions provided to you and Neman by me, (v) you will provide evidence to me of the Purchase the same business day it occurs, or if it has already occurred, then concurrently with your return of a signed copy of this letter agreement (and if the Purchase does not occur on or before November 17, 2011, except to the extent of my prior written direction to the contrary, Neman will immediately return all IPO Funds to the Taban Account); and (vi) you and Neman, jointly and severally, agree to indemnify, defend, and hold me harmless from and against any loss, damage, cost, claim, harm, and/or expense which may arise as a result of any breach of the terms of this letter agreement by Neman or yourself. In the event of any inconsistency between the provisions of the IPO Purchase Agreement and this letter agreement, to the extent of such inconsistency, the provisions of this letter agreement shall apply.

Sincerely,

David Taban

ACEEPTED AND AGREED TO:

Neman Financial, LP                         Shervin Neman, an individual

By:                                         _____
Name: Shervin Neman                         Shervin Neman
Title:   General Partner

11/17/11

GOVERNMENT
EXHIBIT
74
Blumberg No. 5133

Exhibit 74 page 137

**EXHIBIT 75**

Page 1 of 1

| | |
|---|---|
| Posting Date: | 2011-12-16 |
| Sequence #: | 7690034735 |
| Account #: | ▓▓3957 |
| Routing Transit: | 32227162 |
| Amount #: | $680000.00 |
| Check/Serial #: | 000000000188 |
| Bank #: | 703 |
| Tran Code: | 000188 |
| IRD: | 4 |
| ItemType: | P |
| BOFD: | 000000000 |
| Cost Center: | N/A |
| Teller Number: | N/A |
| Teller Seq Number: | N/A |
| Processing Date: | N/A |



Exhibit 75 page 138

EXHIBIT **76**

Page 1 of 1

Posting Date:          2012-01-03
Sequence #:            6570800397
Account #:             ███3957
Routing Transit:       32227162
Amount #:              $1000000.00
Check/Serial #:        000000000243
Bank #:                703
Tran Code:             000243
IRD:                   0
ItemType:              P
BOFD:                  000000000
Cost Center:           N/A
Teller Number:         N/A
Teller Seq Number:     N/A
Processing Date:       N/A



Exhibit 76 page 139

EXHIBIT **77**

Page 1

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

COPY

In the Matter of:            )

                             ) File No. LA-04162-A

NEMAN FINANCIAL, INC.        )


WITNESS:    Shervin Neman

PAGES:      1 through 171

PLACE:      Securities and Exchange Commission

            Los Angeles Regional Office

            5760 Wilshire Boulevard

            7th Floor, Conference Room 715

            Los Angeles, California 90036

DATE:       Thursday, March 15, 2012


    The above-entitled matter came on for hearing,

pursuant to notice, at 9:50 a.m.


                    Diversified Reporting Services, Inc.

                        (202) 467-9200

Exhibit 77 page 140

Page 31

1          BY MS. ESON:

2      Q     Could you spell the last name, please.

3      A     Yeah, Gharib, G-h-a-r-i-b.

4      Q     But you ended up not doing any work for

5    Mr. Gharib?

6      A     No.  I didn't want to just work with him, you

7    know, if anything were to go wrong, then, you know, I'm

8    out with nothing.

9      Q     Explain to me how you went about setting up

10   your business and determining what your business would

11   be.

12     A     I set up the corporations and -- the

13   corporation and the LP, you know, to be able to, you

14   know, to start -- start the business.

15     Q     And so the two entities that you're

16   describing, is that Neman Financial, Inc.?

17     A     Correct.

18     Q     And then Neman Financial LP?

19     A     Correct.

20     Q     Now, what was the business of Neman Financial,

21   Inc.?

22     A     Neman Financial, Inc., would be the general

23   partner for Neman Financial LP.

24     Q     And what was Neman Financial LP, what was the

25   business of that entity?

Exhibit 77 page 141

Page 32

1        A       Would be the investment division of Neman

2    Financial, Inc.

3        Q       **What do you mean by "the investment division"?**

4        A       If there were any investments to be done, you

5    know, once all the compliance and everything is done, it

6    will go through Neman Financial LP, the investments, and

7    the general partner for it would be Neman Financial, Inc.

8        Q       **So Neman Financial LP was some kind of fund?**

9        A       Neman Financial LP, yes.

10       Q       **And you would pool money from investors in**

11   **that fund?**

12       A       Can you explain -- you mean when the -- were

13   the investor were to do -- to get -- yes, to get all the

14   money into Neman Financial LP, the management fees, the

15   fees that were, you know, that -- so whatever the fees

16   were would go to Neman Financial, Inc., and that's where,

17   you know, I would get paid, or that's how I would get

18   paid.

19               MR. FRIEDMAN:  I'm sorry for interrupting.  I

20   just want to clarify whether we're talking about what the

21   plan was or what the actual reality was, and I think

22   that's an important distinction starting in the beginning

23   of 2010.

24               BY MS. ESON:

25       Q       **What did you do in 2010 to put in place what**

Exhibit 77 page 142

Page 33

1   you've been describing?

2       A    Hmm.

3       Q    You incorporated Neman Financial, Inc., and

4   you created Neman Financial --

5       A    Neman Financial LP.

6       Q    -- LP?

7       A    Yes.

8       Q    Did you have any clients -- and I believe you

9   started those entities in June 2010; right?

10      A    Yes, June 2010.

11      Q    Did you have any clients when you first

12  started the entities?

13      A    As far as outside clients, or any clients?

14      Q    Any clients.

15      A    If you call family, you know, clients, yes.

16      Q    You're talking about members of your family?

17      A    Yes.

18      Q    Yes, including them.

19      A    Yes.

20      Q    So who were the clients that you had when you

21  first started in 2010?

22           MR. FRIEDMAN:  Answer the question.

23           THE WITNESS:  The subpoena that, you know, you

24  sent, you know.

25           MR. FRIEDMAN:  You're talking about Exhibit 2,

Exhibit 77 page 143

Page 84

1      Q      Mr. Neman, I'm handing you what has been

2   marked as Government Exhibit 3.   It is a three-page

3   document, appears to be on Neman Financial letterhead.

4   It has a title "Promissory Note," "General Partner:

5   Neman Financial LP," and the "Investor:  Dr. Hamid

6   Mirshojae."

7      A      I put this together, so we do the deal.   Oh,

8   sorry.

9             MR. FRIEDMAN:   Let her ask the questions.

10                           (SEC Exhibit No. 3 was marked

11                            for identification.)

12            BY MS. ESON:

13     Q      The principle amount shown is $350,000.

14     A      Yeah.

15     Q      And it's dated September 20th, 2010.

16     A      Uh-huh.

17     Q      Do you recognize this document?

18     A      Yeah.

19     Q      Well, what is it?

20     A      I just put it together so that he has it.

21     Q      I don't understand that answer.

22     A      I put it together so he has it for his record.

23     Q      You gave Dr. Mirshojae a promissory note?

24     A      Yeah.   That's what, you know, because --

25   because of, you know, our relationship and the trust, you

Exhibit 77 page 144

Page 85

1   know, I just put this together, and he was fine.

2       Q       You drafted this promissory note?

3       A       Between me and him, yeah.

4       Q       Between you and --

5       A       Yeah.

6       Q       -- the doctor?

7       A       Yeah.

8       Q       You came up with the language?

9       A       Yeah.

10      Q       If you go and please review this first

11  paragraph.

12      A       Yeah, sure.

13      Q       It indicates that the interest on the $350,000

14  that you're going to pay on November 20th is $63,000?

15      A       Yeah, because that's how much, you know, we

16  were thinking of getting from the properties at the time.

17  But when, you know, the deal went through, I only had

18  $10,000 to give him.

19      Q       It lists a fixed interest rate of 18 percent.

20  Is that what you offered Dr. Mirshojae, that he would

21  make 18 percent on his $350,000 investment?

22      A       Well, based on the 63,000, you know, I said

23  that's how much he's going to make, which is why I put it

24  there.

25      Q       So that's what you were offering him?

Exhibit 77 page 145

Page 100

1    David and Violet Taban Living Trust for $420,000.

2         A    Yes.

3         Q    And then following that, there's another

4    $20,000 wire coming in on the 28th from Jubin Sharifi.

5         A    Yeah, Jubin Sharifi.

6         Q    Did you use the money from David Taban and

7    Mr. Sharifi to pay back Dr. Mirshojae?

8              MR. BLAU:  And just to note, prior to their

9    two investments, the balance on the account was

10   $1,709.16.

11             THE WITNESS:  Using their money to pay for

12   Mirshojae, no, but because of the fact that the money

13   was, you know -- the money comes in and goes out and

14   comes in and goes out, so if, you know, that constitute

15   as, you know, using that money to pay for this yes; but

16   using the -- so the money comes in -- the way -- I don't

17   keep it, you know, in a sense where, you know, this money

18   comes in this money goes out, you know, when the money

19   comes in, the money comes in.  So basically --

20             MR. BLAU:  Let's put it a different way --

21             THE WITNESS:  Okay.

22             MR. BLAU:  -- if you didn't get that money

23   from the Tabans and Sharifi, would you have been able to

24   pay Dr. Dr. Mirshojae his $350,000 back?

25             THE WITNESS:  Yes, of course.

Exhibit 77 page 146

Page 101

1         MR. BLAU: How?

2         THE WITNESS: From the escrow that was done,

3  okay, take the money from there, and give it to him.

4         MR. BLAU: But that's not what happened; is

5  it?

6         THE WITNESS: No, that's -- over here, no.

7         MR. BLAU: What happened is you used their

8  money to pay him back; is that correct?

9         THE WITNESS: Yes, yes.

10        MR. BLAU: Thank you.

11        THE WITNESS: But the reason --

12        MR. BLAU: Thank you.

13        THE WITNESS: The reason --

14        MR. BLAU: Not interested. I asked you a

15  yes-or-no question, and you answered yes.

16        THE WITNESS: You're absolutely right, but the

17  reason I did that is because of the fact that I'm not

18  even sure if he's going to take this money. So the

19  money, the 350,000 was sitting at the escrow over there

20  when I haven't even used it because he's not even -- I'm

21  not even sure if he's going to get the money because he

22  wanted more money. He wanted $413,000, not $360,000.

23        MR. BAUDER: So after you used the Taban and

24  Sharifi money to pay back Mirshojae, what happened to the

25  350,000 that was in the escrow account? Where did that

Exhibit 77 page 147

Page 104

1           MR. BLAU:  So just to clarify, based on the

2    records, Exhibit 11, what I'm looking at right here, the

3    bank account in which money came in from investors and

4    went out to investors, 540,000 came in from investors --

5           THE WITNESS:  Yes.

6           MR. BLAU:  -- and then 10 days later you used

7    that to pay Dr. Mirshojae his $10,000 interest; is that

8    correct?

9           THE WITNESS:  Yes, but --

10          MR. BLAU:  Thank you.

11          THE WITNESS:  No, but that -- that's not --

12   that's not --

13          MR. BLAU:  I'm just walking you through the

14   records I see here.

15          THE WITNESS:  I understand, but if there is

16   money in the escrow account for 360,000, which is what I

17   was supposed to give him, okay, not any more, not any

18   less.  360,000 is how much he was supposed to get.

19          Now, you know, the way that the money was

20   handled in a sense where if this money came here from,

21   you know, and this transaction, and I got -- I took it to

22   pay this person, but then, you know, the money that was

23   actually done for the transaction was taken to, you know,

24   do another transaction, you know, then even though I

25   understand what you are saying, but -- and as far as

Exhibit 77 page 148

Page 105

1   accounting, that's wrong, the way to do it, but I still,

2   you know, did the deal and make sure, you know, that

3   everyone get their money back.  That's really what I

4   cared about.

5           MR. BLAU:  We're going to request that counsel

6   produce any documents, all documents relating to this

7   real estate transaction to which he's been testifying.

8           MS. ESON:  We're going to take our lunch

9   break.  Go off the record at 12:50.  Why don't we come

10  back at two.

11          (Whereupon, at 12:51 p.m., a luncheon

12  recess was taken.)

13          A F T E R N O O N   S E S S I O N

14          MR. FRIEDMAN:  We are back on the record at

15  2:10 after our lunch break.

16          BY MS. ESON:

17      Q    **Mr. Neman, I wanted to just confirm your email**

18  **address at Neman Financial.**

19      A    Yes.

20      Q    **What is it?**

21      A    Shervin@NemanFinancial.com.

22      Q    **We're going to be looking at the bank records**

23  **again, so please turn to Exhibit 14.**

24          MR. FRIEDMAN:  Let me get these out of your

25  way.  Sorry.  So is that April through May 2011, mid

Exhibit 77 page 149

Page 109

1      Q      Well, actually -- I'm sorry.  Go ahead.

2      A      When I did the deal, if I had to -- if there

3   was another deal that I will take the money and roll it

4   over to, you know, and then use this money to pay this

5   person and use this money, but at the end of the day, the

6   money that was made in the deal, I will give them that

7   much money, you know.

8            And that's the whole thing that started again

9   with Mirshojae, you know, as I go back to him, the reason

10  he got that much money is because of the fact that this

11  is what the deal made.  I could have paid him, you know,

12  the other 53,000 I had to pay from my own pocket, you

13  know, even though I didn't make a dime on it, but I

14  couldn't -- where could I bring the money to give him?

15     Q      The only monies that we see coming into your

16  account are these funds from --

17     A      Sure, I understand.  I'm sorry.

18     Q      -- are these funds from investors.  And it

19  seems that the money that is going out, you're taking

20  money from one investor and sending it to another.  It

21  looks like you're also using this account to pay your

22  personal expenses.

23     A      Yes.

24     Q      Am I right?

25     A      Yes.

Exhibit 77 page 150

Page 119

1      Q      And who was Sophia?

2      A      That's one of the real estate brokers, agents

3   that, you know.

4              MR. FRIEDMAN:  Do you know where she worked?

5              THE WITNESS:  Hmm, she worked -- before she

6   worked at Keller Williams, and then she went to

7   Prudential, and then from there she went -- she was at

8   several different agents.

9              MR. BAUDER:  While she was involved in these

10  transactions, she was at several different brokers?

11             THE WITNESS:  No, no, no, I'm saying that's

12  what her background was in, went from Keller Williams to

13  Prudential.

14             MR. FRIEDMAN:  Where did she work while you

15  were doing these transactions?

16             THE WITNESS:  I believe she was doing it on

17  her own, if I'm not mistaken.

18             MR. BAUDER:  And she was representing the

19  buyers or the sellers?  The bank who was selling it to

20  you, or the buyer who was buying the real estate from

21  you?

22             THE WITNESS:  No, no, she was representing the

23  bank.

24             BY MS. ESON:

25      Q      In looking through the accounts, Mr. Neman, it

Exhibit 77 page 151

Page 120

1    appears that most of these, or many of these expenses

2    that the funds that are coming out, appear to be personal

3    expenses for you and your wife; is that correct?

4         A     Out of what?

5         Q     Out of this account, the 3957 --

6         A     Yes, yes.

7         Q     -- the 3957 account --

8         A     Yes.

9         Q     -- is that you're using to pay your --

10        A     Business and personal, everything.

11        Q     Everything.  Your wedding, honeymoon,

12   engagement ring.

13        A     Yes, I used everything.  I used -- I -- I used

14   it for everything, which --

15        Q     Why did you use this account for your personal

16   expenses?

17        A     Looking back, I shouldn't have, you know, and

18   I understand I'm not the greatest person as far as the

19   record and bookkeeping, and that's why, you know, there

20   is the action plan for CFO and the -- you know, the

21   accounts to be set up.

22        Q     Okay.  We don't see any income coming into

23   this account except for the money that's coming from

24   investors.

25        A     Okay.

Exhibit 77 page 152

Page 131

```
 1              THE WITNESS:  Pardon?
 2              MR. BLAU:  Who has the records of this
 3    transaction?
 4              THE WITNESS:  I believe either -- Wedbush
 5    should have them.
 6              BY MS. ESON:
 7        Q      Who at Wedbush did you deal with?
 8        A      I dealt with Michael Silverstein and Kevin
 9    Cohen, but Michael left.
10        Q      So I want to make sure I understand your
11    testimony is that you purchased Facebook shares in a
12    private transaction where Wedbush was the bank?
13        A      That introduced us, correct.
14        Q      And are they the ones that facilitated the
15    transaction?
16        A      No.  They brought the people together, you
17    know, then we did the transaction, they made sure, you
18    know, that -- as long as, you know, I was happy and the
19    seller was happy, that's all really they care about.
20        Q      How many shares of Facebook did you purchase
21    through the Wedbush connection?
22        A      I got one million shares of Facebook.
23        Q      At what price?
24        A      It would be 32.50.
25        Q      So that's a $32 million?
```

Exhibit 77 page 153

Page 132

1    A    Thirty-two and a half million dollar

2   transaction, yes.

3    Q    **Explain how that transaction worked.  Where**

4   **did the money come from for those one million shares?**

5    A    So what I did was for instance, I told Sarelyn

6   about it, Sarelyn Wager about it, besides that, told my

7   cousin about it, Joseph.

8    Q    **I'm not sure which cousin you're referring to.**

9    A    Joseph.

10   Q    **Oh.**

11   A    And they agreed -- or he agreed to do the deal

12   because he saw us going back and forth that it was a good

13   deal, so we did it, you know, and then turned around and,

14   you know, after a bit, and sold it, and took care of the

15   transaction.

16   Q    **Where did the $32 million go?  Where was the**

17   **money deposited?**

18   A    Joseph -- it's a lot of -- he sent the money

19   into the escrow a lot of times, so, you know, whenever

20   there was a deal of that size, I will let him know

21   exactly how much it is, what it is about, you know, and

22   there was no -- it's all verbal.  We didn't -- and

23   specially because he was, you know, first cousin, and he

24   knew what I was doing.

25   Q    **Can you provide us the contact information for**

Exhibit 77 page 154

Page 170

1      PROOFREADER'S CERTIFICATE

2

3 In the Matter of:  NEMAN FINANCIAL

4 Witness:    Shervin Neman

5 File Number:   LA-04162-A

6 Date:     Thursday, March 15, 2012

7 Location:    Los Angeles, CA

8

9

10   This is to certify that I, Donna S. Raya,

11 (the undersigned), do hereby swear and affirm

12 that the attached proceedings before the U.S.

13 Securities and Exchange Commission were held

14 according to the record and that this is the

15 original, complete, true and accurate transcript

16 that has been compared to the reporting or recording

17 accomplished at the hearing.

18

19

20

21  _____  _____

22 (Proofreader's Name)    (Date)

23

24

25

Exhibit 77 page 155

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION

## REPORTER'S CERTIFICATE

I, Vickie Blair, reporter, hereby certify that the foregoing transcript is a complete, true and accurate transcript of the testimony indicated, held on _3/15/12_ at _LA. SEC_ in the matter of: _Neman Financial LA-04162-A_

I further certify that this proceeding was recorded by me and that the foregoing transcript has been prepared under my direction.

Date: _3/15/12_

Official Reporter: _Vickie Blair_

*Diversified Reporting Service, Inc.*

**Diversified Reporting Services, Inc.**
**(202) 296-9200**
**Fax: (202) 296-9220**

Exhibit 77 page 156